UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ERICK COLLIER,

                                        Plaintiff,

                                                                9:18-CV-0990
v.                                                              (TJM/TWD)

ANTHONY J. ANNUCCI, et al.,

                                        Defendants.
_____

APPEARANCES:                              OF COUNSEL:

ERICK COLLIER
16-A-2667
Plaintiff, *pro se*
Gowanda Correctional Facility
P.O. Box 311
Gowanda, NY 14070

HON. LETITIA JAMES                        ERIK BOULE PINSONNAULT, ESQ.
Attorney General for the State of New York   Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

## I.    INTRODUCTION

        This *pro se* civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been

referred for report and recommendation by the Honorable Thomas J. McAvoy, Senior United

States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  Plaintiff Erick

Collier, an inmate in custody of the New York State Department of Corrections and Community

Supervision ("DOCCS"), asserts allegations of wrongdoing that occurred while he was

incarcerated at Mid-State Correctional Facility ("Mid-State").  (Dkt. No. 1.)  Only Plaintiff's

Eighth Amendment conditions of confinement claim against Defendants Acting Commissioner Annucci and Superintendent Thoms survived the District Court's *sua sponte* review and required a response.  (Dkt. No. 4.[1])

Defendants now move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for dismissal of Plaintiff's complaint on the following grounds: (1) Plaintiff has failed to allege their personal involvement in the alleged constitutional violation; (2) Plaintiff's allegations are insufficient to state an Eighth Amendment conditions of confinement claim; and (3) Plaintiff's claim for injunctive relief should be dismissed.  (Dkt. Nos. 11, 11-1.)  Plaintiff has opposed the motion and seeks appointment of counsel.  (Dkt. Nos. 13, 19.)  Defendants have filed a reply. (Dkt. No. 15.)

For reasons explained below, the Court recommends that Defendants' Rule 12(b)(6) motion to dismiss for failure to state a claim (Dkt. No. 11) be granted, with leave to amend in deference to Plaintiff's *pro se* status.  Plaintiff's second motion for appointment of counsel (Dkt. No. 19) is denied without prejudice.

## II.    BACKGROUND

The following facts are derived from the face of the operative complaint and are accepted as true for the purposes of deciding the pending motion to dismiss.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

---

[1]  On initial review, conducted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), Plaintiff's Eighth Amendment condition of confinement claim against Corrections Officer ("C.O.") John Doe and Eighth Amendment medical indifference claim against Nurse Jane Doe and Dr. John Doe were dismissed without prejudice for failure to state a claim upon which relief may be granted.  (Dkt. No. 4.)

On June 4, 2017, a fire occurred in Dorm 31-3 at Mid-State (the "dorm").  (Dkt. No. 1 at 5.[2])  The fire was caused by faulty electrical wiring.  *Id*.  The officer in charge of the dorm area, C.O. John Doe, was informed of the fire but failed to "take the information seriously" until "the dorm filled up with black toxic smoke[,]" and "even then," he failed to act in accordance with DOCCS fire safety directives.  *Id*.

The fire alarm was never pulled, the fire sprinklers did not work, and the inmates on the cell block, including Plaintiff, were not immediately evacuated.  *Id*.  After the fire was extinguished, the inmates in the dorm area, including Plaintiff, were left there overnight, "forced to breathe in the toxic smoke created by burned wire, melted plastic and other toxic materials." *Id*. at 5-6.

The following night, Plaintiff and the other inmates from the dorm area were "taken to the clinic to be checked out."  *Id*. at 6.  Nurse Jane Doe and Dr. John Doe treated the inmates "indifferently" and then "dispached [sic] them."  *Id*.  Plaintiff claims the "facility followed no procedure or protocols with regard to the fire or in checking the health of those who were affected by it."  *Id*.

Since the fire, Plaintiff has "been experiencing shortness of breath, a nagging cough, chest and lung pain when [he] breathe[s] in deeply, a burning sensation in [his] throat, bouts of vertigo and mild to severe headaches."  *Id*. at 6.  He did not experience any of these symptoms prior to the fire.  *Id*.  Although he is no longer incarcerated at Mid-State, Plaintiff is "afraid to go to sleep, as [he] ha[s] no confidence in the officers' training in fire prevention as well as whether or not the sprinkler systems or alarms work."  *Id*.

---

[2]  Page references to documents identified by docket number are to the page number assigned by the Court's EM/ECF electronic docket system.

Construed liberally, Plaintiff claims Acting Commissioner Annucci and Superintendent Thoms were deliberately indifferent because they were aware, at the time of the fire, that the sprinklers and fire alarm did not work, and that the dormitory was not up to standard fire safety code. *Id*. at 5, 7. He claims Thoms, as Superintendent, also "should have known that the [electrical] wiring was old and/or faulty." *Id*. at 5. Plaintiff seeks monetary damages and injunctive relief. *Id*. at 7.

## III.    LEGAL STANDARD

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion tests the formal legal sufficiency of the complaint by determining whether it conforms to Rule 8(a)(2) of the Federal Rules of Civil Procedure, which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello*, 55 F.R.D. 72, 74 (S.D.N.Y. 1972). Satisfaction of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Id*. at 679 (internal citation and punctuation omitted). "Factual allegations must be enough to raise a right to relief above a speculative level." *Twombly*, 550 U.S. 555.

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Id.* at 570. While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Id.* (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*). Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id.*

## IV.    DISCUSSION

### A.    Conditions of Confinement Claim

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.  The Second Circuit, in addressing the needs protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety."  *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds sub nom. Bell v. Wolfish*, 441 U.S. 520 (1979); *Lareau v. Manson*, 651 F.2d 96, 106 (2d Cir. 1981).  With respect to conditions of confinement claims based on prison fire safety conditions, "[t]he Eighth Amendment requires prisons to implement fire safety protections that 'do[] not expose [prisoners] to an unreasonable risk of serious damage to their future health.'"  *Garcia v. Fischer*, No. 13-CV-8196 (VB), 2016 WL 297729, at *5 (S.D.N.Y. Jan. 22, 2016[3]) (quoting *Benjamin v. Kerik*, No. 75-CV-3073 (HB), 1998 WL 799161, at *5 (S.D.N.Y. Nov. 13, 1998)); *accord Candelaria v. Coughlin*, No. 91 Civ. 2978, 1996 WL 88555, at *10 (S.D.N.Y. Mar. 1, 1996) ("Defendants no doubt have a duty to provide adequate fire safety for the inmates in [a prison].").

As the Second Circuit has explained, "the deliberate indifference standard embodies both an objective and a subjective prong."  *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  "To demonstrate an Eighth Amendment violation based on a claim that a prison official placed an inmate's health in danger because of prison conditions (such as exposure to toxic substances), the inmate must show that the prison official acted with 'deliberate indifference' to 'a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next

---

[3] The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in Lebron v. Sanders, 557 F.3d 76 (2d Cir. 2009) (per curiam).

week or month or year.'"  *Smolen v. Fischer*, No. 12-CV-1856 (PAC)(AJP), 2012 WL 3609089, at *4 (S.D.N.Y. Aug. 23, 2012) (quoting *Helling v. McKinney*, 509 U.S. 25, 33 (1993)), *report and recommendation adopted by* 2013 WL 765315 (S.D.N.Y. Feb. 28, 2013).

Additionally, "[i] is well-settled in this circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some "tangible connection" between the constitutional violation alleged and that particular defendant.  *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

If the defendant is a supervisory official, a mere linkage to the unlawful conduct through the chain of command, *i.e.*, under the doctrine of *respondeat superior*, is insufficient to show his or her personal involvement in that unlawful conduct.  *Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (per curiam).  In other words, supervisory officials may not be held liable merely because they held positions of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996) (citations omitted).

Rather, supervisory personnel may be considered personally involved if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citations omitted); *see also Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).

1.    <u>Objective Prong</u>

To satisfy the objective prong, the inmate must demonstrate that the conditions of confinement resulted in "unquestioned and serious deprivations of basic human needs[.]" *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985); *see also Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996).

Here, Plaintiff claims that on June 4, 2017, his dorm "filled up with black toxic smoke," and, after the fire was extinguished, the inmates, including Plaintiff, were left there "overnight," "forced to breathe in the toxic smoke created by burned wire, melted plastic and other toxic materials." (Dkt. No. 1 at 5-6.) In his opposition submission, Plaintiff claims he was exposed to "unreasonable levels of smoke that were severe and lasted for an imprudent duration of time due to the fact that no DOCCS employees [including superintendents, deputy superintendents, wardens, corrections officers, sergeants, lieutenants, watch commanders, fire and safety officers, and/or any other employees] ever evacuated [Plaintiff] or the other inmates, from the dorm where the fire occurred." (Dkt. No. 13 at 2.) Plaintiff further claims he was exposed to the "thick black smoke, and its residue, for several days as [he] was not removed from the dorm at all. [His] exposure was not brief or sporadic in nature." *Id*. at 3.

At this juncture, the Court finds Plaintiff has plausibly alleged that he was exposed to "conditions that 'pose an unreasonable risk of serious damage to his future health.'" *Phelps*, 308 F.3d at 185 (quoting *Helling v. McKinney*, 509 U.S. at 35); *see, e.g.*, *Smolen*, 2012 WL 3609089, at *5 (finding inmate satisfied objective prong by claiming he was exposed to "toxic smoke" for at least fifteen minutes when a fire broke out around his cell); *Garcia*, 2016 WL 297729, at *6 (finding inmate satisfied objective prong where he claimed he was "exposed to thick black

smoke" in his housing unit for approximately four hours).  Thus, dismissal is not warranted on this basis.

### 2.    Subjective Prong and Personal Involvement

However, the Court agrees with Defendants that Plaintiff has not adequately alleged either the subjective prong of the claim or any "personal involvement" in the challenged conditions.  (*See* Dkt. No. 11 at 5-8, 10-13.)

To satisfy the subjective prong, the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  "This element entails something more than mere negligence . . . but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  *Id.*  "Plaintiff need not show actual knowledge of the risk of harm, but rather can 'present [ ] evidence showing that a substantial risk . . . was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it.'"  *Jackson v. Goord*, 664 F. Supp. 2d 307, 317 (S.D.N.Y. 2009) (quoting *Farmer*, 511 U.S. at 842).

In his complaint, Plaintiff alleges in wholly conclusory and speculative fashion that Acting Commissioner Annucci was "well aware" that the "dorm itself was not up to standard first safety code."  (Dkt. No. 1 at 5.)  Similarly, Plaintiff claims Superintendent Thoms was "also aware that the dorm did not meet standard fire safety codes, as he has all the records."  *Id.*  This is insufficient.  *See, e.g.*, *Christian v. Suanders*, No. 17-CV-2587 (GBD)(BCM), 2018 WL 3300695, at *9 (S.D.N.Y. Mar. 22, 2018) (dismissing conditions of confinement claims where

inmate alleged the warden "knew or reasonably should have known" of the "deplorable and inhumane conditions" and allowed them to continue); *Garcia*, 2016 WL 297729, at *6 (granting motion to dismiss for failure to satisfy subjective component of deliberate indifference where the plaintiffs claimed that defendants knew of risk from previous fires, but failed to provide an "explanation of how, if at all, these previous fires would have alerted defendants to any deficiency in the fire safety conditions at Sing Sing").

Nor has Plaintiff plausibly claimed "allegations [were] longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Jackson v. Goord*, 664 F. Supp. 2d 307, 317 (S.D.N.Y. 2009) (quoting *Farmer*, 511 U.S. at 842); *see, e.g.*, *Smolen*, 2012 WL 3609089, at *8-9 (denying motion to dismiss where plaintiff claimed that defendants knew about the "excessively risky conditions from previous fires" because the superintendent was required "to file all reports of past fires—[including] potentially and dangerous existing conditions at Downstate[,]" and because the commissioner receives a full report whenever a fire breaks out).

Indeed, Plaintiff's complaint is devoid of any allegations of previous incidents or specific reports that would suggest Defendants were or should have been aware of the dangerous fire safety conditions in the dorm, "let alone that either of them acted with deliberate indifference or refused to take steps to address this situation." *Clark v. Gardner*, 256 F. Supp. 3d 154, 168-69 (N.D.N.Y. 2017.)  As noted above, the deliberate indifference standard requires more than "mere negligence" on the part of the defendants. *See Farmer*, 511 U.S. at 837 (1994); *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003).  Even construed liberally, Plaintiff's claim that Superintendent

Thoms "should have known that the wiring was old/ and or faulty" sounds, at most, in negligence. *See Farmer*, 511 U.S. at 837; *Brock*, 315 F.3d at 164 (2003).

Furthermore, even assuming, *arguendo*, the dorm "was not up to standard fire safety code" and/or various DOCCS regulations were violated, "[a] violation of state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Burroughs v. Petrone*, 138 F. Supp. 3d 182, 219 (N.D.N.Y. 2015) (quoting *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 482 (N.D.N.Y. 2009) (collecting cases)); *see also Patterson v. Coughlin*, 761 F.2d 886, 891 (2d Cir. 1985) ("[A] state employee's failure to conform to state law does not itself violate the Constitution and is not alone actionable under § 1983[.]").

"[W]here a particular state of mind is a necessary element of a claim, [a party's] pleading of that state of mind must be plausible and supported by factual allegations." *Garcia*, 2016 WL 297729, at *6 (quoting *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 278 (S.D.N.Y. 2013) (citing *Iqbal*, 556 U.S. at 686-87)). Allegations that defendants "acted with . . . knowing . . . and/or reckless indifference to the plaintiff's constitutional rights" are "conclusory" and "not entitled to the presumption of truth." *Id*. (quoting *D.S. v. City of Peekskill*, 581 F. App'x 65, 66-67 (2d Cir. 2014) (summary order)).

In his opposition submission, Plaintiff argues DOCCS officials, including Defendants, "knew of, and disregarded" a risk to his health and safety with "wanton disregard" toward their duty to protect him from breathing smoke and other carcinogens caused by the fire "over an extended period of time." (Dkt. No. 13 at 4.) Yet there are no facts alleged in the complaint that either Defendant was personally responsible for supervising the dorm at the time of the fire, was involved in the delayed evacuation, or was involved in the decision as to whether Plaintiff slept in the dorm after the fire. Rather, Plaintiff suggests "it is only logical to acknowledge the

involvement" of all DOCCS employees and claims Defendants "had collective acquiescence toward any protection action." *Id*. at 2-3. This is insufficient.

Defendants also argue that in addition to being speculative and conclusory, Plaintiff's opposition submission confirms that his claims against them are based solely on their positions of authority in DOCCS, which is insufficient to establish their personal involvement. (Dkt. No. 15 at 2.) The Court agrees.

In sum, given the conclusory nature of Plaintiff's Eighth Amendment conditions of confinement claims against Defendants Acting Commissioner Annucci and Superintendent Thoms, the Court recommends dismissal for failure to state a claim, with leave to amend in deference to Plaintiff's *pro se* status.

## B.    Injunctive Relief

Although he is no longer incarcerated at Mid-State, Plaintiff is "afraid to go to sleep, as [he] ha[s] no confidence in the officers' training in fire prevention as well as whether or not the sprinkler systems or alarms work." (Dkt. No. 1 at 6.) As such, Plaintiff requests that "the fire safety equipment in every facility be brought up to code." *Id*. at 7. Defendants argue Plaintiff's claim for injunctive relief should be dismissed. (Dkt. No. 11-1 at 12-13.) The Court agrees.

As an initial matter, "[i]t is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility." *Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996). Thus, to the extent Plaintiff seeks injunctive relief relating to his confinement at Mid-State, such request is moot as he has since been transferred from Mid-State and is now housed at Gowanda Correctional Facility. (Dkt. No. 1 at 6; *see also* Dkt. No. 18.)

Additionally, to the extent Plaintiff seeks injunctive relief in that he asks that the fire safety equipment at *every correctional facility* be "brought up to code" the Court agrees with

Defendants that such request amounts to little more than a request for Defendants (and perhaps even non-parties) to "obey the law." (Dkt. No. 11-1 at 12-13.) Such "obey the law" injunctions are "disfavored" because they are "vague, do not require a defendant to do anything more than that already imposed by law, subject the defendant to contempt rather than statutorily prescribed sanctions, and are not readily capable of enforcement." *Dublino v. McCarthy*, No. 9:19-CV-0391 (GLS/DJS), 2019 WL 2053829, at \*20 (N.D.N.Y. May 9, 2019).

Accordingly, the Court recommends dismissal of Plaintiff's claim for injunctive relief.

## V.    MOTION FOR COUNSEL

Plaintiff has moved for appointment of counsel and filed documentation of his unsuccessful efforts to obtain *pro bono* counsel on his own as part of his second motion. (Dkt. No. 19.[4]) Even if the Court were not recommending dismissal of Plaintiff's complaint, a more fully developed record would be necessary before an assessment can be made as to whether counsel should be appointed. *See Hendricks v. Coughlin*, 114 F.3d 390, 392 (2d Cir. 1997) (court must look to the likelihood of merit of the underlying dispute in determining whether to appoint counsel). Therefore, the motion is denied without prejudice so that Plaintiff will not be precluded from making a subsequent motion for appointment of counsel in the event the District Court allows the action to proceed or grants Plaintiff leave to file an amended complaint.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' Rule 12(b)(6) motion to dismiss (Dkt. No. 11) be **GRANTED WITH LEAVE TO AMEND**; and it is further

---

[4] The Court notes that in his opposition to Defendants' motion to dismiss, Plaintiff also requests appointment of counsel. *See* Dkt. No. 13 at 4-5 ("I respectfully request assignment of counsel to represent my interests in this complex matter as I must also request permission to file an amended complaint to adequately protect my interests in this matter and clarify those points that Defense counsel has misconstrued and/or distorted in support of their instant motion.").

**ORDERED** that Plaintiff's second motion for appointment of counsel (Dkt. No. 19) is **DENIED WITHOUT PREJUDICE**; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: July 23, 2019
       Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

Garcia v. Fischer, Not Reported in Fed. Supp. (2016)

2016 WL 297729

2016 WL 297729
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Felix GARCIA, Philip Caldarola, Eleggua
Osun Elufe, Wayne Norris, James Jameson,
Elmer Ortiz, Amaury Bonilla, Ercrey
Grangier, Kevin Williams, Malumba Kazigo,
Brandon Holmes, Rolando Coronado, Paul
Thompson, and Lamonte Johnson, Plaintiffs,
v.
Brian FISCHER, Philip D. Heath, Michael A. Capra,
William F. Keyser, Jr., Kevin Winship, Noel F.
Morris, Emil Mejia, Anthony M. Theriault, Valerie
Colon, Richard A. Moss, Sheldon Welsh, Candice
P. Sumpter, Peter Mendez, Kevin M. Jackson,
Daniel Hausrath, Maryann Genovese, Barbara
Furco, Dr. Williams, and Nurses DOE, Defendants.

13 CV 8196 (VB)
|
Signed 01/22/2016

**Attorneys and Law Firms**

Amy Michelle Palumbo, Eric Peter Stephens, Jones Day, New York, NY, for Plaintiffs.

Inna Ringh, Attorney General of the State of New York, Richard Warren Brewster, New York State Department of Law Litigation, New York, NY, for Defendants.

**OPINION AND ORDER**

Briccetti, J.

**\*1** This case arises from an electrical fire occurring at Sing Sing Correctional Facility ("Sing Sing") in the early morning hours of April 18, 2011. Sing Sing is operated by the New York State Department of Corrections and Community Supervision ("DOCCS"). Plaintiffs, fourteen current and former Sing Sing inmates, bring civil rights claims pursuant to 42 U.S.C. § 1983, alleging defendants, all of whom hold or held positions at DOCCS or Sing Sing, violated plaintiffs' Eighth Amendment and due process rights. Specifically, plaintiffs allege defendants were deliberately indifferent to (i) constitutionally inadequate fire safety conditions before the fire; (ii) plaintiffs' safety during the fire; and (iii) plaintiffs' serious medical needs after the fire. Plaintiffs seek damages for these alleged violations, as well as injunctive relief to remedy the constitutionally inadequate fire safety conditions they claim persist at Sing Sing to this day.

Now pending is a motion to dismiss plaintiffs' Second Consolidated Amended Complaint ("SCAC") (Doc. #51) pursuant to Rule 12(b)(6), which was made on behalf of all defendants except defendant Candice P. Sumpter. [1] (Doc. #62).

[1] Defendant Sumpter has answered the SCAC. (Doc. #67).

For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

**BACKGROUND**

I. Parties

Plaintiffs Felix Garcia, Philip Caldarola, Eleggua Osun Elufe, Wayne Norris, James Jameson, Elmer Ortiz, Amaury Bonilla, Ercrey Grangier, Kevin Williams, Malumba Kazigo, Brandon Holmes, Rolando Coronado, Paul Thompson, and Lamonte Johnson were all inmates at Sing Sing on April 18, 2011. All but Caldarola and Thompson remain incarcerated there.

According to the SCAC, defendants occupied the following positions at Sing Sing at all times referred to in the SCAC, including April 18, 2011, unless otherwise noted:

Brian Fischer was the Commissioner of DOCCS, which operates Sing Sing.

Philip Heath was Sing Sing's superintendent on April 18, 2011, while Michael Capra is the current superintendent.

William F. Keyser Jr. was the deputy superintendent of security.

Kevin Winship was the deputy superintendent of administration.

Defendants Fischer, Capra, Keyser Jr., and Winship are alleged to be responsible for the "emergency response and

evacuation plans" at Sing Sing to this day. (SCAC ¶¶ 27, 29-31).

Noel F. Morris was the fire and safety officer.

Emil Mejia, Anthony M. Theriault, [2] Valerie Colon, Richard A. Moss, Sheldon Welsh, Candice P. Sumpter, Peter Mendez, Kevin M. Jackson, and Daniel Hausrath were corrections officers of varying rank and responsibilities. Other than as to defendant Sumpter (SCAC ¶ 84), who did not move to dismiss, the SCAC makes no individual factual allegations about any of these defendants besides alleging each was "present at Sing Sing on April 18, 2011 and personally participated in the events at issue." (Id. ¶¶ 33-37, 39-41).

[2]     The Court has been advised that Theriault died on or about November 26, 2015. (Doc. #74). For unrelated reasons, as explained below, all claims against him are dismissed pursuant to Rule 12(b)(6).

**\*2** Maryann Genovese was the Medical Director. Barbara Furco was the Nurse Administrator. "Dr. Williams" was a physician at the prison. The SCAC also brings claims against an unspecified number of "Nurses Doe" present at Sing Sing on and after April 18, 2011.

II. Factual Allegations

In deciding the pending motion, the Court accepts as true all well-pleaded factual allegations in the SCAC and draws all reasonable inferences in plaintiffs' favor. [3]

[3]     Defendants' brief cites to complaints filed by individual plaintiffs prior to the filing of the SCAC. (See, e.g., Defs.' Br. at 2-3). Because the SCAC replaced the individual complaints, for the purposes of this motion, the Court considers only the facts alleged in the SCAC and the exhibit attached thereto.

A. Before the Fire

Plaintiffs claim fires have occurred at Sing Sing prior to April 18, 2011. Notably, however, the SCAC does not indicate whether these previous fires disabled Sing Sing's electrical service as did the April 18 fire. Nor does the SCAC allege facts suggesting these fires highlighted any particular need for improved fire safety procedures before that date.

The SCAC alleges that, prior to April 18, 2011, defendants failed to establish or implement a fire safety plan, failed to prepare the inmates for a fire emergency, and failed to

establish or implement an inmate health evaluation plan to assess fire-related injuries. Specifically, plaintiffs point to a lack of regular fire drills and the fact that defendant Morris (the fire and safety officer) does not speak to inmates at orientation.

The SCAC also alleges defendants knew there was asbestos and lead paint in Sing Sing before April 18, 2011, and plaintiffs were forced to inhale these substances during the fire. The SCAC does not allege any facts indicating which defendants knew about these substances or how they knew.

B. The Fire

At approximately 1:58 a.m. on April 18, 2011, an electrical fire occurred in the basement of Sing Sing's Housing Block C. Thick, black smoke filled Housing Block A, where all the plaintiffs were housed. The fire also disabled Housing Block A's electricity, which Sing Sing's emergency generator was unable to restore. Plaintiffs allege the generator did not work because of Sing Sing's failure to maintain it properly.

Without electricity, Housing Block A was in complete darkness, its emergency public address system was disabled, and the cells could only be opened manually, with a special key, one cell at a time. Plaintiffs heard no smoke detectors or fire alarms, and prison staff made no public announcements to alert the inmates to the fire or address evacuation procedures.

Defendants (the SCAC does not specify which ones) allegedly became aware of the fire at about 2:00 a.m., but did not contact the local fire department until 3:17 a.m. At 4:00 a.m., unspecified defendants began opening the cells in Housing Block A and evacuating the inmates, a process that took over two hours. The SCAC alleges defendant Sumpter and other unspecified defendants fled their posts rather than conduct an evacuation. The SCAC claims defendants would not have evacuated Housing Block A if the local fire department had not ordered them to do so.

The SCAC does not explicitly indicate which defendants made the decision to begin evacuating Housing Block A at 4:00 a.m., but does allege Superintendent Heath "was present at the facility and directed the DOCCS response to the events at issue," and fire and safety officer Morris "was present at Sing Sing and responsible for ... the DOCCS response to the electrical fire at issue." (SCAC ¶¶ 28, 32).

**\*3** Once released from their cells, plaintiffs and other inmates had to evacuate Housing Block A by running through

Case 9:18-cv-00990-TJM-TWD   Document 20   Filed 07/23/19   Page 17 of 79

Garcia v. Fischer, Not Reported in Fed. Supp. (2016)
2016 WL 297729

dark, smoky hallways and stairwells, which caused some inmates to fall. It is unclear whether any plaintiffs fell as well.

Plaintiffs Bonilla, Caldarola, Coronado, Grangier, Elufe, Johnson, Ortiz, Thompson, and Williams were sent to the gymnasium in Housing Block A, while plaintiffs Garcia, Holmes, Jameson, Kazigo, and Norris were sent to the keeplock recreation pen. Both locations were dark and filled with smoke. The SCAC alleges unspecified defendant corrections officers stayed outside both locations rather than supervise the inmates, and no inmates were searched for weapons before being admitted. Plaintiffs and the other inmates were kept in these locations until daylight, when they were returned to their cells.

While in the gymnasium, plaintiff Ortiz was assaulted by another inmate. No other plaintiffs were assaulted.

### C. After the Fire
The SCAC alleges that in the hours and days following the fire, unspecified defendant medical personnel denied plaintiffs adequate medical care for smoke inhalation, other injuries, and psychological trauma.

The SCAC lists the following injuries suffered by at least one plaintiff as a result of smoke inhalation or other fire-related causes: anxiety; black discharge from sinuses; blackouts; blurred vision; chest pain; Chronic Obstructive Pulmonary Disease ("COPD");[4] congestion; coughing; difficulty breathing or shortness of breath; difficulty sleeping; diminished appetite; dizziness; ear pain; elevated blood pressure; eye irritation; fatigue; headaches; light-headedness; mental anguish; mood changes; nausea; nightmares; panic attacks resulting from airflow obstruction; pulmonary pain; right frontal sinusitis;[5] runny nose; skin irritation; stomach pain; vomiting; watery eyes; weakness; wheezing; worsened asthma; and worsened seasonal allergies. (SCAC ¶¶ 149-162). Plaintiff Thompson also suffered a back injury from falling in the course of the evacuation, which required "anti-inflammatory medication and multiple months of physical therapy." (Id. ¶ 161). Plaintiff Ortiz suffered a bruised head and bruised ribs from being assaulted in the gymnasium. The SCAC alleges these injuries were not appropriately treated by Sing Sing's medical staff.

[4]     Suffered by plaintiff Coronado.

[5]     Suffered by plaintiff Johnson.

Plaintiffs seek monetary damages for the injuries they suffered as a result of the fire and the subsequent alleged failure to treat these injuries.

The SCAC also alleges nothing has been done to address the fire safety failures brought to light by the April 18, 2011, fire. Specifically, defendants have not addressed the problems with "Sing Sing's electrical equipment, public address system, cell doors, ventilation system, [ ] windows, and the hazardous materials present at the facility." (SCAC ¶ 147). Plaintiffs seek injunctive relief to force defendants to do so.

### III. Procedural History
This case began as fourteen individual pro se actions, each with its own individual complaint filed in 2013 and 2014.[6] The Court accepted them all as related cases. On May 28, 2014, the Court issued an order granting limited-purpose pro bono counsel to represent all plaintiffs through pre-trial proceedings except defending a motion for summary judgment. (Doc. #13).

[6]     The docket numbers are 13 CV 8196; 14 CV 972; 14 CV 1319; 14 CV 1320; 14 CV 1447; 14 CV 1726; 14 CV 1766; 14 CV 1864; 14 CV 2068; 14 CV 2079; 14 CV 2500; 14 CV 3217; 14 CV 4963; 14 CV 5738.

 *4   On November 18, 2014, plaintiffs' counsel filed one Consolidated Amended Complaint (Doc. #42) setting forth all plaintiffs' various claims. On February 19, 2015, plaintiffs filed the SCAC that is the subject of this motion to dismiss. (Doc. #51). The SCAC purports to encompass all claims by all plaintiffs against all defendants in the fourteen related cases.

Defendants, excluding defendant Sumpter, move to dismiss the SCAC on the grounds that (i) it fails to allege the personal involvement of any defendant; (ii) it fails to allege any conduct arising to a constitutional claim; and (iii) defendants are entitled to qualified immunity.

### DISCUSSION

### I. Legal Standards

#### A. Rule 12(b)(6)
In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court evaluates the sufficiency of the complaint under the "two-pronged approach" outlined by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, plaintiff's

Case 9:18-cv-00990-TJM-TWD   Document 20   Filed 07/23/19   Page 18 of 79

Garcia v. Fischer, Not Reported in Fed. Supp. (2016)

2016 WL 297729

legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. Id. at 678; accord Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id.

B. Prisoner Eighth Amendment Violations

"There are three basic theories pursuant to which inmates customarily bring Eighth Amendment claims: (1) denial of adequate medical care; (2) unconstitutional conditions of confinement unrelated to medical care; and (3) failure to protect." Randle v. Alexander, 960 F. Supp. 2d 457, 470 (S.D.N.Y. 2013). All three of these theories are relevant to this case. No matter the theory, however, an Eighth Amendment claim must satisfy both an objective and a subjective component. That is, the deprivation of rights must be "sufficiently serious" and the defendant prison official must have acted with " 'deliberate indifference' to the health and safety of inmates." Id. (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).

1. Inadequate Medical Care

The Eighth Amendment requires prisons to provide constitutionally adequate medical care. In cases alleging inadequate care, the objective component requires the medical condition itself to be sufficiently serious. A condition is sufficiently serious if it may cause "death, degeneration, or extreme pain," Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005) (quoting Hemmings v. Gorszyk, 134 F.3d 104, 108 (2d Cir. 1998)), or if "the failure to treat [the] condition could result in further significant injury or the

unnecessary and wanton infliction of pain." Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000) (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.' " Salahuddin v. Goord, 467 F.3d 263, 279-80 (2d Cir. 2006) (quoting Chance v. Armstrong, 143 F.3d at 702).

*5 To satisfy the subjective component, a plaintiff must allege the defendant had a mental state akin to recklessness, which "requires that the charged official act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result." Salahuddin v. Goord, 467 F.3d at 280 (citing Farmer v. Brennan, 511 U.S. at 836-37). A plaintiff must allege "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. at 835.

2. Conditions of Confinement

"The conditions of a prisoner's confinement can give rise to an Eighth Amendment violation" as well. Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (citing Farmer v. Brennan, 511 U.S. at 828). To satisfy the objective component, the conditions of confinement must be bad enough to deny the prisoner "the minimal civilized measure of life's necessities," id. (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)), such as "food, clothing, shelter ... and reasonable safety." Id. (quoting Helling v. McKinney, 509 U.S. 25, 32 (1993)). This may include "conditions that 'pose an unreasonable risk of serious damage to [prisoners'] future health.' " Id. (quoting Helling v. McKinney, 509 U.S. at 35).

To satisfy the subjective component, the prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." Phelps v. Kapnolas, 308 F.3d at 185-86 (quoting Farmer v. Brennan, 511 U.S. at 837).

Prison fire safety conditions are usually analyzed as "conditions of confinement" claims. See, e.g., Candelaria v. Coughlin, 1996 WL 88555, at *10 (S.D.N.Y. Mar. 1, 1996). The Eighth Amendment requires prisons to implement fire safety protections that "do[ ] not expose [prisoners] to an unreasonable risk of serious damage to their future health."

Garcia v. Fischer, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00990-TJM-TWD   Document 20   Filed 07/23/19   Page 19 of 79

2016 WL 297729

See Benjamin v. Kerik, 1998 WL 799161, at *5 (S.D.N.Y. Nov. 13, 1998) (citing Helling v. McKinney, 509 U.S. at 33); accord Candelaria v. Coughlin, 1996 WL 88555, at *10 ("Defendants no doubt have a duty to provide adequate fire safety for the inmates in [a prison].").

### 3. Failure to Protect

The Eighth Amendment also "requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996) (citing Farmer v. Brennan, 511 U.S. at 832-33). The objective component requires a plaintiff to "demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm." Id. The subjective component requires the defendant prison official to have knowledge of that risk and yet "fail[ ] to take reasonable measures to abate the harm." Id. This Eighth Amendment right is implicated when a prison official fails to prevent an inmate from being attacked by another, despite knowing the inmate was at risk. See id.

### 4. Personal Involvement

As with any Section 1983 claim, a plaintiff must allege defendants' personal involvement in the claimed violation of his Eighth Amendment rights. Provost v. City of Newburgh, 262 F.3d 146, 154 (2d Cir. 2001). To do so, plaintiff must allege defendants (i) participated directly in the alleged constitutional violation; (ii) were made aware of the wrongs and failed to remedy them; (iii) created or allowed a policy or custom under which unconstitutional practices occurred; (iv) were grossly negligent in supervising subordinates who committed the wrongful acts; or (v) exhibited deliberate indifference to his rights by failing to act on information indicating unconstitutional acts were occurring. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). [7]

---

[7]    The Second Circuit has noted, without deciding, that the five types of liability articulated in Colon v. Coughlin may not all have survived the Supreme Court's holding in Ashcroft v. Iqbal. See Reynolds v. Barrett, 685 F.3d 193, 205 n.14 (2d Cir. 2012). The Court need not decide this issue because, as explained further below, the only theory of liability applicable to any defendant in this case is direct participation, which unquestionably survived Iqbal.

## II. Inadequate Fire Safety Conditions Before the Fire

**\*6**  Plaintiffs claim defendants violated their Eighth Amendment rights by failing to establish or implement fire safety and evacuation plans before the April 18, 2011, fire, thereby exposing plaintiffs to unreasonably dangerous conditions. Additionally, plaintiffs claim there was asbestos and lead paint present in Sing Sing before the fire broke out, to which they were exposed when the fire began to burn it.

This claim fails. Assuming, without deciding, that plaintiffs have met the objective component of a conditions of confinement claim, this claim fails the subjective component.

"[W]here a particular state of mind is a necessary element of a claim, [a party's] pleading of that state of mind must be plausible and supported by factual allegations." Biro v. Conde Nast, 963 F. Supp. 2d 255, 278 (S.D.N.Y. 2013) (citing Ashcroft v. Iqbal, 556 U.S. at 686-87). Allegations that Section 1983 defendants "acted with ... knowing ... and/or reckless indifference to the plaintiff's constitutional rights" are "conclusory" and "not entitled to the presumption of truth." D.S. v. City of Peekskill, 581 F. App'x 65, 66-67 (2d Cir. 2014) (summary order).

Here, the SCAC fails to plead facts showing any defendant knew about and ignored risks created by any deficiencies in Sing Sing's fire safety and evacuation plans before April 18, 2011. There are no allegations any defendant knew how dangerous it would be to evacuate Housing Block A without electricity, knew the backup generator would not work, or had any idea the prisoners could be exposed to toxic substances if a fire occurred. Though defendants possibly could have been more perspicacious in anticipating the potential risks in the event of a fire, nothing in the SCAC suggests they knew these risks and yet were deliberately indifferent.

Plaintiffs argue defendants were on notice of these risks "as a result of other fires at Sing Sing." (Pls.' Br. at 14). This is unpersuasive. Though the SCAC alleges previous fires occurred, it contains no explanation of how, if at all, these previous fires would have alerted defendants to any deficiency in the fire safety conditions at Sing Sing.

All of plaintiffs' other allegations about defendants' state of mind are conclusory and therefore not entitled to the presumption of truth. Therefore, any claims based on defendants' conduct before the April 18, 2011, fire are dismissed.

Case 9:18-cv-00990-TJM-TWD    Document 20    Filed 07/23/19    Page 20 of 79

Garcia v. Fischer, Not Reported in Fed. Supp. (2016)

2016 WL 297729

### III. Failure Timely to Evacuate Plaintiffs

On the morning of the fire, however, the SCAC does state a "conditions of confinement" claim based on certain defendants' deliberate indifference to the risk of exposing plaintiffs to heavy smoke for several hours.

To satisfy the objective component, the SCAC alleges plaintiffs were exposed to thick black smoke in Housing Block A for two hours before evacuation even began, and an additional two hours or more while the cells were evacuated one by one. This is sufficient at the pleading stage for the Court to find plaintiffs were exposed to "conditions that 'pose an unreasonable risk of serious damage to [their] future health.' " Phelps v. Kapnolas, 308 F.3d at 185 (quoting Helling v. McKinney, 509 U.S. at 35). Indeed, the prolonged exposure to this smoke is alleged to have caused serious health conditions for at least two plaintiffs: plaintiff Coronado has developed COPD, and plaintiff Johnson has developed sinusitis. See Hobson v. Fischer, 2011 WL 891314, at *5 (S.D.N.Y. Mar. 14, 2011) (COPD found sufficiently serious to support an Eighth Amendment claim at motion to dismiss stage); Denis v. N.Y.S. Dep't of Corr. Servs., 2006 WL 217926, at *18-19 (S.D.N.Y. Jan. 30, 2006) (chronic sinusitis found sufficiently serious at summary judgment stage).

*7 This claim satisfies the subjective component as well. According to the SCAC, the smoke condition was apparent at around 2:00 a.m., yet defendants did not call the fire department until 3:17 a.m. or begin evacuating plaintiffs until 4:00 a.m. This could give rise to the inference that defendants knew plaintiffs were being exposed to unreasonably dangerous heavy smoke, yet deliberately chose not to alleviate this for two or more hours. Additionally, the SCAC alleges plaintiffs were brought to other smoke-filled rooms—the keeplock and gymnasium—and thus exposed to more smoke until sunrise. Taken together, the SCAC plausibly alleges deliberate indifference to an unreasonably dangerous condition of confinement.[8]

[8]    Defendants argue the SCAC does not plausibly allege deliberate indifference because defendants were reasonable to evacuate Housing Block C first, where the fire was located, and under those circumstances, defendants could not have evacuated Housing Block A any more quickly than they did. (Defs.' Br. at 12-13). This is not a proper argument for a motion to dismiss because it asks the Court to consider facts outside the SCAC and interpret them favorably to defendants, the moving party.

Finally, the SCAC alleges defendants Heath and Morris were directly involved in exposing plaintiffs to this condition. The SCAC does not explicitly state which defendant or defendants made the decision not to evacuate plaintiffs until 4:00 a.m., or to direct them to other smoke-filled rooms. However, it does allege Heath and Morris were present at Sing Sing during the fire and directed Sing Sing's response to it. Although it is a close case, the Court finds this allegation sufficient to meet the personal involvement requirement.

However, the SCAC does not sufficiently allege personal involvement by any other defendant. For all defendants besides Heath and Morris, the SCAC either alleges no decision-making authority with respect to evacuating Housing Block A, or alleges merely that particular defendants were "responsible" for evacuation or emergency protocol in general. Likewise, there are no allegations to suggest any defendant created a policy under which defendants Heath or Morris purposely delayed the evacuation, was grossly negligent in supervising defendants Heath or Morris, or knew Heath or Morris were violating plaintiffs' constitutional rights and did nothing to stop them. Therefore, none of the Colon factors are met for any other defendant.

For these reasons, claims based on the way Housing Block A was evacuated on April 18, 2011, are dismissed as to all defendants except Heath and Morris.

### IV. Failure to Protect

The SCAC alleges plaintiff Ortiz was assaulted in the gymnasium because of defendants' failure to protect him from other inmates.[9]

[9]    The SCAC does not specify that only plaintiff Ortiz brings this claim. But because no other plaintiffs are alleged to have been assaulted, the Court dismisses all failure to protect claims brought by other plaintiffs.

This claim fails because the SCAC fails to allege personal involvement by any defendant. The SCAC alleges only that "Defendant Correction Officers remained outside the gymnasium, leaving maximum security inmates crowded in the dark without supervision while fighting broke out, with reckless and deliberate indifference to Plaintiffs' safety." (SCAC ¶ 120). "Defendant Correction Officers" is defined as all defendants except Genovese, Furco, Williams, and Nurses Doe. (Id. ¶ 42). It is implausible that all of these defendants stood outside the gymnasium and failed to protect plaintiff Ortiz from other inmates. Indeed, according to the

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    6

Case 9:18-cv-00990-TJM-TWD   Document 20   Filed 07/23/19   Page 21 of 79

Garcia v. Fischer, Not Reported in Fed. Supp. (2016)

2016 WL 297729

SCAC, some "Defendant Correction Officers" were not even present at Sing Sing on April 18, 2011.[10] Nor does the SCAC allege any facts indicating any defendant created a policy under which a corrections officer failed to protect plaintiff Ortiz, was grossly negligent in supervising such an officer, or knew plaintiff Ortiz's rights were being violated and did nothing.

[10]   For this reason, plaintiffs' reliance on Messina v. Mazzeo is misplaced. (Pls.' Br. at 9-10). In that case, referring to defendants as "defendant Police Officers" in the complaint still alleged personal involvement by individual officers because the complaint alleged all individual police officers had used excessive force together. 854 F. Supp. 116, 125-26 (E.D.N.Y. 1994). Here, by contrast, the SCAC cannot plausibly allege all "Defendant Correction Officers" participated in every action attributed to the group.

*8  Therefore, the Court need not decide whether the failure to protect plaintiff Ortiz satisfies either the objective or subjective component of the test for Eighth Amendment violations.

V. Inadequate Medical Care

Plaintiffs' claims based on constitutionally inadequate medical care also fail.

First, almost all of the alleged medical conditions at issue are not serious enough to satisfy the objective component of the test. See supra Background Part II.C. With the possible exceptions of plaintiff Coronado's COPD, plaintiff Johnson's sinusitis, and plaintiff Thompson's back injury, none of plaintiffs' injuries as described in the SCAC is capable of causing "death, degeneration, or extreme pain," Johnson v. Wright, 412 F.3d at 403 (quoting Hemmings v. Gorsczyk, 134 F.3d at 108), or "could result in further significant injury or the unnecessary and wanton infliction of pain" if not treated. Harrison v. Barkley, 219 F.3d at 136 (quoting Chance v. Armstrong, 143 F.3d at 702). Thus, the failure to treat these alleged injuries does not rise to an Eighth Amendment violation.

Second, assuming for the sake of this motion that COPD, sinusitis, and Thompson's back injury were all serious enough to satisfy the objective component, the SCAC also does not allege a violation of the subjective component because it contains no facts to show any defendant knew how serious these conditions were. After the fire, plaintiff

Coronado complained to the medical staff only of "difficulty breathing" (SCAC ¶ 128.E) and was not even diagnosed with COPD until 2013. (Id. ¶ 160). Plaintiff Thompson complained only of "a back injury." (Id. ¶ 128.H). There are no allegations at all that plaintiff Johnson alerted anyone about the symptoms of his sinusitis, or if he even displayed any symptoms immediately after the fire. None of these allegations is sufficient to suggest any defendant knew of the serious nature of plaintiffs' conditions, yet disregarded the risks.

Therefore, all of plaintiffs' claims based on constitutionally inadequate medical care are dismissed.

VI. Injunctive Relief

The SCAC claims the problems with Sing Sing's fire safety conditions and evacuation protocols persist to this day. Plaintiffs therefore bring a claim for injunctive relief to force defendants to provide constitutionally adequate safety conditions in Sing Sing.

Federal courts can order prospective relief "in any civil action with respect to prison conditions," provided it "extend[s] no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a).

Here, the SCAC plausibly pleads an ongoing Eighth Amendment violation with respect to fire safety and evacuation procedures.

Prison inmates have a constitutional right to adequate fire safety, so they are not exposed to an unreasonable risk of serious damage to their future health. See Benjamin v. Kerik, 1998 WL 799161, at *5 (citing Helling v. McKinney, 509 U.S. at 33). In prison fire safety cases, "not every deviation from ideally safe conditions constitutes a violation of the constitution," and "[t]here is no bright line separating an unreasonable danger from a reasonable one." Coniglio v. Thomas, 657 F. Supp. 409, 414 (S.D.N.Y. 1987) (quoting Santana v. Collazo, 714 F.2d 1172, 1183 (1st Cir. 1983)).

*9  Nevertheless, in finding that prisons have constitutionally inadequate fire safety, other courts in this district have pointed to several of the dangerous conditions plaintiffs allege here. See Benjamin v. Kerik, 1998 WL 799161, at *1 (malfunctioning fire alarms and a cell locking system that could cause "delay in opening the doors in case of an emergency"); Candelaria v. Coughlin, 1996 WL 88555, at

Case 9:18-cv-00990-TJM-TWD   Document 20   Filed 07/23/19   Page 22 of 79
Garcia v. Fischer, Not Reported in Fed. Supp. (2016)
2016 WL 297729

*10 (no electronic cell locking system); Coniglio v. Thomas, 657 F. Supp. at 414 (prison lacked a "system of effective smoke management").

Moreover, plaintiffs' claim that the fire safety conditions and evacuation procedures at Sing Sing were unreasonably dangerous is supported by the alleged events of April 18, 2011. Because of the alleged deficiencies, it took over four hours to fully evacuate Housing Block A, and even after it was evacuated, plaintiffs were brought to other smoke-filled spaces. This alleged mishandling of the evacuation exposed plaintiffs to prolonged smoke inhalation, which damaged multiple plaintiffs' health. According to plaintiffs, proper procedures, facility maintenance, and training could have prevented this damage from happening, yet Sing Sing has done nothing, and another fire could very well cause the same exact problems.

Given the difficulty of evaluating the reasonableness or unreasonableness of prison fire safety conditions without the benefit of a fuller record, the Court finds at this early stage that the SCAC plausibly alleges a sufficiently serious fire safety problem at Sing Sing. Therefore, the objective component is met.

The subjective component is also met. Accepting the SCAC as true, the fire brought to light several of Sing Sing's deficiencies with respect to fire safety. Specifically, when the fire disabled the electricity in Housing Block A, it prevented the use of the public address system, caused complete darkness, and significantly delayed the process of opening the cell doors to release the prisoners. The windows and ventilation issues compounded this problem as the smoke accumulated. Moreover, the fire demonstrated the unreliability of the backup power generator, which could not restore the electricity. By virtue of this fire—not to mention this lawsuit—it is plausible defendants are aware of the allegedly unconstitutionally dangerous fire safety conditions in Sing Sing. If, as the SCAC claims, defendants have declined to address these problems, that is sufficient to establish a claim for "deliberate indifference."

However, this claim may be brought only against defendants Fischer, Capra, Keyser Jr., and Winship. "Actions involving claims for prospective declaratory or injunctive relief are permissible provided the official against whom the action is brought has a direct connection to, or responsibility for, the alleged illegal action." Davidson v. Scully, 148 F. Supp. 2d 249, 254 (S.D.N.Y. 2001) (quoting Marshall v. Switzer, 900

F. Supp. 604, 615 (N.D.N.Y. 1995)). These four defendants are the only ones the SCAC alleges are still responsible for "emergency response and evacuation plans" at Sing Sing. (SCAC ¶¶ 27, 29-31). Therefore, the claim for injunctive relief is dismissed as to all other defendants.

To the extent plaintiffs seek an injunction based on constitutionally inadequate medical care, this claim is dismissed. As explained above, defendants did not violate plaintiffs' Eighth Amendment right to adequate treatment on or following the April 18, 2011, fire because all but three injuries were not "sufficiently serious," and there are no allegations suggesting defendants continue to refuse treatment for plaintiff Coronado's COPD, plaintiff Johnson's sinusitis, or plaintiff Thompson's back injury.

## VII. Qualified Immunity

*10 Based on the foregoing, the Court finds plaintiffs have alleged claims against defendants Heath and Morris for violating their right to constitutionally adequate conditions of confinement on April 18, 2011, and claims against defendants Fischer, Capra, Keyser Jr., and Winship for injunctive relief to remedy the ongoing constitutionally inadequate fire safety at Sing Sing. Defendants nonetheless contend they are entitled to qualified immunity, and thus the claims against them must be dismissed.[11]

[11]   Because defendants' motion is granted as to all other claims, the Court need not consider the applicability of qualified immunity to those claims.

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). A qualified immunity defense is established where "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998).

Defendants' alleged actions violated clearly established law. On April 18, 2011, it was clearly established that prison officials had a duty to provide "reasonably safe" prison conditions. Phelps v. Kapnolas, 308 F.3d at 185 (quoting Helling v. McKinney, 509 U.S. at 32). It was also clear this

duty extended to fire safety. See, e.g., Candelaria v. Coughlin, 1996 WL 88555, at *10 ("Defendants no doubt have a duty to provide adequate fire safety for the inmates in [a prison]."). Finally, it was clear prolonged exposure to smoke presented an "unreasonable risk of serious damage to [an inmate's] future health," potentially violating the Eighth Amendment. Helling v. McKinney, 509 U.S. at 35. Therefore, defendants' argument that they did not violate clearly established law fails.

Moreover, without a fuller record, the Court cannot determine whether defendants were objectively reasonable in believing their actions were lawful. For example, at this stage, the Court cannot determine whether it was reasonable for defendants to believe the evacuation did not violate the Eighth Amendment. Therefore, qualified immunity is denied without prejudice to being reasserted at a later stage of the proceedings.

## CONCLUSION

Defendants' motion to dismiss is DENIED as to claims against defendants Heath and Morris based on the failure to evacuate plaintiffs from Housing Block A properly or in a timely manner on April 18, 2011.

Defendants' motion is also DENIED as to claims against defendants Fischer, Capra, Keyser Jr., and Winship for injunctive relief concerning fire safety and emergency evacuation protocol at Sing Sing.

Defendants' motion to dismiss is GRANTED as to all other claims against these six defendants, and as to all claims against defendants Mejia, Theriault, Colon, Moss, Walsh, Mendez, Jackson, Hausrath, Genovese, Furco, "Dr. Williams," and Nurses Doe.

The Clerk is directed to terminate from this action defendants Emil Mejia, Anthony M. Theriault, Valerie Colon, Richard A. Moss, Sheldon Walsh, Peter Mendez, Kevin M. Jackson, Daniel Hausrath, Maryann Genovese, Barbara Furco, "Dr. Williams," and Nurses Doe.

The Clerk is further directed to terminate the motion. (Doc. #62).

**\*11** SO ORDERED:

**All Citations**

Not Reported in Fed. Supp., 2016 WL 297729

---

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works. 9

1998 WL 799161
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

James BENJAMIN, et al., Plaintiffs,

v.

Bernard KERIK, Commissioner of the New York
City Department of Correction et al., Defendants.

No. 75 CIV. 3073(HB).
|
Nov. 13, 1998.

*Decision and Order*

BAER, District J.

**\*1** Plaintiffs, a class of pretrial detainees, move for an
order that requires the defendants to improve the fire safety
conditions at the Brooklyn and Bronx Houses of Detention as
well as the modular units on Rikers Island, to comply with
Consent Decrees between the parties. A hearing was held and
testimony taken on May 26 and May 27 as well as June 1
through June 3, 1998. For the reasons discussed below, certain
relief is GRANTED.

I. Background

The original Consent Decrees at issue in this litigation were
agreed to in 1978–79. They are designed to ensure the
safety and humanity of prison conditions. Institutionally, the
Consent Decrees, among other things, strive to maintain
the physical plant of the jails in a condition safe for
human habitation. On December 17, 1993 an order was
issued that required fire safety improvements which included
a functioning alarm system, operable smoke detectors or
heat sensors, sprinkler systems not dependant on human
intervention and electronic egress doors.

The Bronx House of Detention is a nine-story jail constructed
primarily of concrete and steel that houses 400 beds on
the second through sixth floors. The Brooklyn House of
Detention is an eleven story structure that houses 800 inmates
in two-tiered cell blocks with open barred fronts. The modular
housing units on Rikers Island are generally one story wood-
framed structures appended to the Adolescent Reception and

Detention Center ("ARDC"), the Anna M. Kross Center
("AKC"), the George Motchan Detention Center ("GMDC")
and the Rose M. Singer Center ("RMSC"). The modular units
contain only dormitory style housing and are guarded by at
least two correction officers 24 hours per day.

*A. Plaintiffs' Fire Safety Concerns*

1. *Modular Units*

At the hearing plaintiffs presented evidence of several fire
safety problems in the modular units. To begin with, the
sprinkler systems were originally built as pre-action systems
and they did not fill with water until after a signal from the
smoke detectors. However, leaks in the modular unit roofs
would short these detectors, and as a consequence the signal
to the sprinkler systems became unreliable. Accordingly,
the Department of Correction undertook to convert the pre-
action systems to wet systems that simply needed a signal
from the sprinklers' heat detectors to begin releasing water.
Unfortunately, in several modular units wet systems were
apparently not installed, and as a result, pre-action sprinkler
systems prone to malfunction remained in place. (Tr. 88, 147–
49)

The plaintiffs also presented evidence of malfunctioning fire
alarms that were physically damaged or extremely dirty. (Tr.
339–40, 850) Further evidence was presented to show that
staff members, including a jail fire safety officer at GMDC,
could not reset an alarm when it went off accidentally or even
explain the functions of various fire alarm panels. (Tr. 274–
75, 334–35) The modular units presently have two means of
egress. The rear egress doors have magnetic locks that release
when an alarm is confirmed by a signal from the control
room. At times, these magnetic locks have malfunctioned, a
situation that caused the Department of Correction to padlock
some doors from the outside. These padlocks, the plaintiffs
contend, violate an order that requires the modular doors to
be "openable at all times by an electronic lock." Ex. 8 at ¶ 3.
Although the magnetic locks have been repaired, many of the
doors remain padlocked from the outside, creating a potential
fire hazard given the possible delay in opening the doors in
case of an emergency.

**\*2** Roof leaks are largely responsible for the fire alarm
and exit malfunctions. (Tr. 127–28) In 1997, the defendants
began to replace the defective roofs by using a sprayed
foam roofing system. While this system appears to have
reduced the number of leaks and the resultant damage to fire

safety equipment, the plaintiffs presented evidence from an architect, Elliot P. Rothman, who concluded that the new roofs were installed in a haphazard fashion and are likely to leak in the future. (Tr. 190, 209–10, 214–15) Lastly, there was a concern that the modular units are not compartmentalized and thus a fire in one area could spread throughout the entire structure.

### 2. Bronx House of Detention

Here, there were two major facility design problems highlighted by the plaintiffs. Presently, there is no fire compartmentalization, a problem the plaintiffs argue is significant since they contend there is no adequately secure area outside of the facility large enough to accommodate such an evacuation. A second concern relates to the sufficiency of egress. In the west wing dormitories on the second to sixth floors, there is only one means of egress—through a locked gate. Consequently, if a fire blocks that area the inmates on the west wing will be trapped. Another egress problem stems from the fact that the four stairways do not discharge directly outside. Rather, the stairways all lead to either the ground or first floors. As a result, a fire on either of these floors would make it extremely difficult to evacuate safely.

The plaintiffs also express concern with the smoke detection, alarm and sprinkler systems. In particular, the alarm system is old and prone to false signals. Automatic sprinklers are only provided on part of the ground floor and have not been regularly maintained. Smoke detectors are limited to the elevator lobbies.

### 3. Brooklyn House of Detention

To begin with, a new alarm system installed in 1995 is not deployed. (Tr. 604) In addition, smoke detectors installed in the elevator lobbies, law library, telephone equipment room and housing area day room were not operational. (Tr. 606) Deputy Commissioner Antonio Figueroa attributed the delay, at least in part, to "paperwork." (Tr. 62) Even were these systems operational, the plaintiffs offered testimony to the effect that additional smoke detectors should be installed throughout the building to render the jail reasonably safe. The plaintiffs also presented expert testimony that suggested the need for additional sprinklers in any area where combustible material is or may be stored. These areas include the basement, first and second floors and third floor kitchen—where high combustible loading occurs. (Tr. 623)

Smoke and fire compartmentalization exists only between floors. Accordingly, any smoke or fire condition that arises in one area will likely spread across the entire floor without containment. The facility, according to the plaintiffs, also suffers from egress problems. Despite the existence of two stairways that lead out of the building, there is in essence only one means of egress. (Tr. 69) The two stairways are located in the central core, approximately thirty feet apart. Plaintiffs contend that given the relatively close proximity of one stairway to the other, a serious fire could possibly block both exits. Finally, there are problems with the locking mechanisms in the facility. Many of the 120 cells are locked manually and would have to be individually unlocked by hand if a fire were to break out.

### 4. Maintenance of Fire Safety Equipment

 **\*3** The plaintiffs correctly assert that the maintenance of fire safety equipment is essential to protect inmates in case of fire and further that by definition the equipment remains unused for significant periods of time. Nevertheless, the fact is that the equipment must nonetheless be operational when an emergency arises. According to the plaintiffs, the Fire Safety Officer's ("FSO's") weekly inspections often failed to identify serious problems, such as fire extinguishers that required recharging or improperly blocked exits. (Tr. 778–79, 781–83) More troubling, the plaintiffs contend, is the failure to correct identified deficiencies. For instance, in 1996 and again in 1997 the defendants promised to repair a gate that impaired egress at the Bronx House of Detention. (Tr. 499–500) The gate, however, was not corrected until 1998—shortly before the fire safety hearing occurred. (Tr. 501)

In a similar vein, there were standpipes in the Brooklyn House of Detention that could not be opened by hand, that the defendant has promised to remedy since 1995. Again, the standpipes were not replaced until immediately prior to the hearing. (Tr. 507–11, 528–29) Figueroa conceded that many fire safety violations remained uncorrected from year to year, and as a general matter he could not explain the failure to act. (Tr. 118) According to the testimony of Nicholas Mazzola, a FSO with the Department of Correction, many of the deficiencies that went uncorrected for lengthy periods of time were capital projects that required significant funds. (Tr. 460)

### B. Department of Correction Response

1998 WL 799161

In response to these fire safety concerns raised long before the hearing, the Department of Correction to its credit undertook a comprehensive improvement program.[1] In the modular housing units, most of the leaking roofs that caused damage to fire safety equipment in general, and electromagnetic locks in particular, were replaced.

[1]    The fire safety improvements are being undertaken pursuant to three contracts. The C–138 contract entails fire safety improvements proposed for all of the facilities at issue in this litigation. (Tr. 26); Ex. 135. The C–104 contract is a capital program providing for extensive renovations in the borough correctional facilities, and fire safety is an integral component. (Tr. 26–27); Ex. 135. The C–141 contract affects all facilities and any work performed in the kitchen area, with a fire safety component also included. (Tr. 27); Ex. 135.

At the Bronx House of Detention, additional compartmentalization is planned that includes upgrading doors to enable them to be fire-rated, restoration of the fire ratings of interior partitions and improving the fire safety between utility chases and housing floors. (Tr. 46–48) Also, the defendants are constructing an additional means of egress that will serve the west dormitory areas, and the north stairs are being extended from the fifth to the sixth floor. (Tr. 49, 52) In addition, improvements include the installation of smoke detectors throughout the basement and ground floor, on the second through ninth floors with the exception of the cells, in the catwalks, dormitory areas, central core, day rooms at the end of the north and south wings, storage areas and in the air handling units. The defendants have removed combustible material previously stored in the seventh floor gym. Perhaps most importantly, the defendants are installing a centralized fire alarm system that features new panels and pull stations in the central core, day rooms in the north and south wings, housing floor dorms, first floor and basement.

**\*4**  With respect to the Brooklyn House of Detention, two additional means of egress will be constructed on the north side of the facility, providing another mode of exit from cell areas in the east and west wings. (Tr. 72) This project is presently in the design phase. The defendants have installed new smoke detectors on the first and second floors. In addition, smoke detectors will be installed in the third floor kitchen and in the catwalks. Similarly, there are plans to install sprinklers in the central core and in program spaces on the housing floors. (Tr. 77) Areas that contained large volumes of combustible materials, such as records and debris, have been cleaned out and the mechanical, electrical and

boiler rooms have been cleared. Finally, the defendants have installed an addressable supervised alarm system with pull stations, gongs, strobe lights and integrated smoke detectors.

## II. Discussion

"Ensuring compliance with a prior order is an equitable goal which a court is empowered to pursue even absent a finding of contempt." *Berger v. Heckler,* 771 F.2d 1556, 1569 (2d Cir.1985) (district court appropriately amended decree given "its duty to protect the integrity of its judgments"); *see also Juan F. By and Through Lynch v. Weicker,* 37 F.3d 874, 878–79 (2d Cir.1994) (adjustment of consent decree to ensure compliance proper despite absence of contempt finding). Accordingly, I need not find that the defendants are in contempt to issue an order that enforces the Consent Decrees between the parties.

Plaintiffs, a class of pretrial detainees, seek an order that enforces Section S of the original Consent Decree that requires the maintenance of "safe" correctional facilities. The Due Process clause of the Fourteenth Amendment governs claims brought by pretrial detainees with respect to conditions of confinement. *See Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The absence of adequate and reliable fire protection can give rise to a Fourteenth Amendment Due Process claim. *See Harrison v. Ienuso,* 1995 WL 375915, at \*2 (S.D.N.Y. Jun.23, 1995). Accordingly, a "safe" correctional facility for pretrial detainees must comport with the requisite standards of the Due Process clause of the Fourteenth Amendment. In *Harrison,* the court concluded that "fire safety conditions that are adequate, and do not subject detainees to a constant [and] imminent risk of death or injury impose no severe hardship on detainees and therefore do not offend the Constitution." *Id.* (citation and internal quotations omitted).

The plaintiffs, however, contend that the "constant and imminent risk" language articulated in *Harrison* must be interpreted consistently with the Supreme Court's decision in *Helling v. McKinney,* 509 U.S. 25, 32–34, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). I agree. In *Helling,* the Supreme Court held that a prisoner stated a viable Eighth Amendment claim given the potential health problems that might arise as a result of exposure to cigarette smoke. *Id.* at 28–29, 37. The defendant there argued that only deliberate indifference to current and serious inmate health problems can give rise to an Eighth Amendment claim. *Id.* at 34. The Supreme Court

Benjamin v. Kerik, Not Reported in F.Supp.2d (1998)
1998 WL 799161
Case 9:18-cv-00990-TJM-TWD    Document 20    Filed 07/23/19    Page 27 of 79

rejected this argument, and concluded that an allegation that prison officials exposed an inmate to levels of environmental tobacco smoke that "pose an unreasonable risk of serious damage to his future health" is actionable under the Eighth Amendment. *Id.* at 34–35.

**\*5** The Due Process rights of pretrial detainees "are at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts General Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *see also County of Sacramento v. Lewis,* 523U.S. 833, ——, 118 S.Ct. 1708, 1718, 140 L.Ed.2d 1043 (1998) ("Since it may suffice for Eighth Amendment liability that prison officials were deliberately indifferent to the medical needs of their prisoners ... it follows that such deliberately indifferent conduct must also be enough to satisfy the fault requirement for due process claims ...."); *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (same). Given that the rights of pretrial detainees under the Due Process clause of the Fourteenth Amendment are at the very least co-extensive with those of convicted prisoners under the Eighth Amendment, I conclude —consistent with *Helling*—that fire safety protections must be afforded at a level that does not expose the plaintiffs to an unreasonable risk of serious damage to their future health. *See Helling,* 509 U.S. at 33 (constitutional protection "against future harm to inmates is not a novel proposition").

While the conditions in the modular units, Bronx House of Detention and Brooklyn House of Detention pose an unreasonable risk of serious damage to the future health of pretrial detainees through fire, the improvements, both those implemented and scheduled, "have substantially reduced the extent to which judicial interference is warranted." *Coniglio v. Thomas,* 657 F.Supp. 409, 414 (S.D.N.Y.1987) (extensiveness of remedy curtailed by fire safety improvements made after the onset of litigation). While each of the proposed improvements should be timely made, it is particularly important that the defendants diligently act with respect to the conversion of all sprinklers in the modular units to wet systems, implementation of the centralized alarm system in the Bronx House of Detention and construction of the two additional means of egress in the Brooklyn House of Detention.[2]

2    The improvements are comprehensively detailed in Section I.B of this decision.

Therefore it is directed that: (1) to ensure that these improvements—necessary to the operation of constitutionally adequate fire safe facilities—are completely implemented, the defendants are to adhere to the currently proposed schedules for completion. At the Bronx House of Detention the improvements undertaken pursuant to the C–138 project —which include a new supervised fire alarm system and an electronically operated gang release system—are "expected to be completed by the end of calender year 1999." Ex. 135 at pp. 1–2. The contract for construction of a second means of egress at the Brooklyn House of Detention will be registered with the New York City Comptroller prior to the end of June 1999 and "is expected to take two years and therefore be completed by June 2001." Ex. 135 at p. 3. Design changes at the Brooklyn House of Detention—which include improvements in the fire alarm, smoke detection and fire suppression systems, as well as enhanced egress, fire separation and smoke management—are "scheduled and budgeted for Fiscal Year ("FY") 1999, and construction is scheduled to commence in FY 2000 and to be completed in FY 2002." Ex. 135 at p. 3. At modular housing units six and seven at GMDC on Rikers Island, automatic dry or wet sprinkler systems will be installed, egress improved and better fire and smoke detection systems added. Ex. 135, Attachment A. These improvements are "expected to begin in July 1998 and to take approximately six months to complete." Ex. 135 at p. 5.

**\*6** It is further directed that: (2) the defendants are to appraise the plaintiffs and the Office of Compliance Consultants ("OCC") of all progress and any potential delays in the improvement projects. This is to be accomplished by the submission of quarterly status reports, in letter form, beginning on January 4, 1999.[3] *Cf. United States v. Oregon State Medical Soc.,* 343 U.S. 328, 333 (1952) ("It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption.").

3    Thereafter, status reports are due on the first Monday in each subsequent quarter until further order of the Court.

Further it is directed that: (3) the defendants submit to the Court, within sixty days of the date hereof, a proposed internal procedure for responding to Fire Safety Unit reports that will ensure that deficiencies are promptly identified and corrected. Since the occurrence of fires and especially fires of a life-threatening nature are infrequent, safety equipment such as extinguishers may often remain dormant for extended periods of time. In an emergency, however,

the equipment must be in working order. Consequently, the failure when needed of such equipment could result in serious physical injury or the loss of life, and therefore must be functional to ensure constitutionally safe facilities. *See Jones v. City and County of San Francisco,* 976 F.Supp. 896, 908 (N.D.Cal.1997) (defendants abdicated constitutional responsibility to provide reasonably safe fire protections where, among other problems, fire-rated door assemblies and automatic sprinklers were not installed); *Coniglio,* 657 F.Supp. at 414 (smoke barriers and system of effective smoke management found "necessary to provide minimum fire safety for the plaintiff class as required by the Constitution").

Finally on an allied tack, the evidence suggests that not infrequently, the weekly inspections as presently carried out fail to identify serious problems, such as fire extinguishers that require recharging or improperly blocked exits that could leave individuals trapped should a fire occur. (Tr. 778–79, 781–83) Unfortunately, even when deficiencies were reported, the resultant fire safety violations often went uncorrected from year to year—without explanation. (Tr. 118; 507–11; 528–29) Given this pattern, taken together with the concern of both parties that fire safety equipment be functional at all times, an improved internal procedure is appropriate. The parties are directed to draft such a procedure in consultation with OCC, within sixty days of the date hereof, and to arrange a conference with the Court on or before January 15, 1999 should any problem arise. *See Hoptowit v. Spellman,* 753 F.2d 779, 784–85 (9th Cir.1985) (while the court "need not wait until actual casualties occur" to order relief it should not "tell the administrators of the prison how to cure the unconstitutional conditions").

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 1998 WL 799161

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3609089
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Samuel J. SMOLEN, Jr., Plaintiff,
v.
Brian FISCHER, Commissioner N.Y.S.
Department of Correctional Services; Ada
Perez, Superintendent Downstate Correctional
Facility; and R. Nguyen, R.N., Defendants.

No. 12 Civ. 1856(PAC)(AJP).
|
Aug. 23, 2012.

### REPORT AND RECOMMENDATION

ANDREW J. PECK, United States Magistrate Judge.

**\*1 To the Honorable Paul A. Crotty, United States District Judge:**
Pro se plaintiff Samuel J. Smolen Jr. brings this § 1983 action alleging violations of his federal constitutional rights by defendants Commissioner Brian Fischer, Superintendent Ada Perez and Nurse R. Nguyen arising out of alleged conditions of his confinement and failure to take corrective action to improve those conditions at the Downstate Correctional Facility. (Dkt. No. 2: Compl. ¶ II.) Presently before the Court are defendants' motions to dismiss. (Dkt. No. 14: Fischer & Perez Notice of Motion; Dkt. No. 27: Nguyen Notice of Motion.) For the reasons stated below, Fischer and Perez's motion to dismiss should be *DENIED* and Nguyen's motion to dismiss should be *GRANTED.*

### FACTS

In March 2009, Smolen was an inmate at Downstate. (Dkt. No. 2: Compl. at 3.) Smolen alleges that the storm windows in Downstate's cells are "made of poly-carbon and highly flammable." (Compl. at 2B, 2C.) On March 10, 2009, a storm window in an adjoining cell caught fire causing "thick toxic smoke" to fill up the "entire area." (Compl. at 3.) Smolen was unable to open his cell window because there was no knob or crank on the window. (Compl. at 2B, 3.) Smolen claims that because he could not open his cell window when "toxic

smoke" filled his cell, he suffered breathing difficulties, chest pains and post traumatic stress disorder and was taken to the prison hospital. (Compl. at 3.) Smolen further alleges that he is now on drug therapy to improve his ability to fully breathe. (Dkt. No. 25: Smolen Opp. Aff. at IV.)

Smolen alleges that Fischer and Perez knew of "the hazard of those windows ... from previous fires." (Compl. at 2B, 2C.) Smolen asserts that any time a serious fire breaks out at Downstate, "a full report of any fires and their causes must be submitted to the Commissioner," *i.e.,* Fischer. (Smolen Opp. Aff. at II.) [1] Smolen claims that Supt. Perez "was required to file all reports of past fires—[including] potentially and dangerous existing conditions at Downstate." (Smolen Opp. Aff. at V.)

[1]    Although certain factual allegations in Smolen's opposition affidavit are not contained in the complaint, this Court will deem the complaint amended to include those allegations since Smolen is a pro se plaintiff. *See, e.g., Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200 (2007) (Reversing dismissal of prisoner's § 1983 deliberate indifference suit where complaint's factual allegations satisfied Fed.R.Civ.P. 8 and "[p]etitioner, in addition, bolstered his claim by making more specific allegations in ... later filings."); *Anderson v. Davis Polk & Wardwell LLP,* 10 Civ. 9338, ––– F.Supp.2d ––––, 2012 WL 734120 at \*3 (S.D .N.Y. Mar. 6, 2012) (on a motion to dismiss, treating *pro se* "plaintiff's opposition papers to the extent that they raised new factual allegations as further amending his amended complaint"); *Sommersett v. City of N.Y.,* 09 Civ. 5916, 2011 WL 2565301 at \*3 (S.D.N.Y. June 28, 2011) (On a motion to dismiss " 'where a *pro se* plaintiff has submitted other papers to the Court, such as legal memoranda, the Court may consider statements in such papers to supplement or clarify the plaintiff's pleaded allegations.' "); *Green v. City of N.Y. Dep't of Corr.,* 06 Civ. 4978, 2008 WL 2485402 at \*4 (S.D.N.Y. June 19, 2008) ("In so construing the Amended Complaint, the Court has considered the facts alleged within the body of the complaint as well as the additional facts proffered in the affidavit Plaintiff submitted with his opposition papers.").

Additionally, Smolen alleges that there was no one to help him out of his keplock cell when the fire broke out because the corrections officer on duty was escorting other inmates to the mess hall. (Compl. at 2C, 3.) "[H]elp finally arrived" fifteen to twenty minutes after the fire had broken out. (Compl. at 3.) Smolen alleges that Commissioner Fischer is "responsible for staffing levels at [the facility] and was fully aware—that

Downstate C.F. was operating *understaffed ....*" (Smolen Opp. Aff. at II.)

Smolen alleges that Nurse Nguyen failed to adequately treat him while he suffered from "severe toxic smoke inhalation." (Compl. at 2D.) Smolen claims that Nurse Nguyen did not send Smolen to "an outside hospital for a full medical evaluation and treatment-by a medical doctor and inhalation specialist as was done for the staff members." (Compl. at 2D.) Smolen further claims that Nguyen "failed to order any tests at the time of the incident and failed to recommend any follow up tests and medical treatment." (Compl. at 2D.)

**\*2** Smolen's complaint asserts that defendants Commissioner Fischer and Supt. Perez: (1) knew or should have known of the "hazardous storm windows" but were deliberately indifferent in that they took no corrective action to replace the windows; (2) did not insure that the windows had knobs so they could be opened in case of an emergency such as fire; and (3) failed to insure that the housing unit is never left unattended by staff. (Compl.¶ II.) Smolen's complaint asserts that Nurse Nguyen failed to order any tests at the time of the incident and failed to recommend any follow up medical tests and medical treatment. (Compl. at 2D.) Smolen seeks compensatory and punitive damages. (Compl.¶ V.)

Defendants have moved to dismiss Smolen's complaint. (Dkt. No. 14: Fischer & Perez Notice of Motion; Dkt. No. 27: Nguyen Notice of Motion.) Fischer and Perez argue that Smolen's complaint fails to state a claim for relief under 42 U.S.C. § 1983 because: (1) Smolen's storm window claim does not involve a constitutional violation (Dkt. No. 15: Fischer & Perez Br. at 3–6), (2) defendants were not personally involved in any constitutional violation (*id.* at 6–7), and (3) defendants are entitled to qualified immunity (*id.* at 7–8). Nguyen argues that Smolen's complaint fails to state a claim for relief under 42 U.S.C. § 1983 because Nguyen was not deliberately indifferent to Smolen's medical needs (Dkt. No. 28: Nguyen Br. at 3–4) and Nguyen is entitled to qualified immunity (*id.* at 5).

## ANALYSIS

### I. THE STANDARDS GOVERNING A MOTION TO DISMISS

In two decisions in 2007 and 2009, the Supreme Court significantly clarified the standard for a motion to dismiss, as follows:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in *Twombly,* the pleading standard Rule 8 announces does not require "detailed factual allegations," but it *demands more than an unadorned, the-defendantunlawfully-harmed-me accusation.* A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."

> To survive a motion to dismiss, *a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."* A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' "

> **\*3** Two working principles underlie our decision in *Twombly.* First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.* Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. *Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.* Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"—"that the pleader is entitled to relief."

> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying

pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Ashcroft v. Iqbal,* 556 U.S. 662, 677–79, 129 S.Ct. 1937, 1949–50 (2009) (citations omitted & emphasis added) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556–57, 570, 127 S.Ct. 1955, 1965–66, 1974 (2007) (retiring the *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102 (1957), pleading standard that required denying a Rule 12(b)(6) motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.")). [2]

[2]    *Accord, e.g., Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 321 (2d Cir.2010), *cert. denied,* 131 S.Ct. 901 (2011); *Harris v. Mills,* 572 F.3d 66, 71–72 (2d Cir.2009); *Jones v. N .Y. Dep't of Corr. (DOC) Jail,* 11 Civ. 4477, 2011 WL 5865143 at *1–2 (S.D.N.Y. Nov. 22, 2011) (Peck, M.J.), report & rec. adopted, 2012 WL 1232963 (S.D.N.Y. Apr. 12, 2012) (Crotty, D.J.); *Lindner v. IBM Corp.,* 06 Civ. 4751, 2008 WL 2461934 at *3 (S.D.N.Y. June 18, 2008); *Joseph v. Terrence Cardinal Cooke Health Care Ctr.,* 07 Civ. 9325, 2008 WL 892508 at *1 (S.D.N.Y. Apr. 2, 2008); *Elektra Entm't Grp., Inc. v. Barker,* 551 F.Supp.2d 234, 237 (S.D.N.Y.2008); *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.,* 551 F.Supp.2d 210, 216–17 (S.D.N.Y.2008); *Diana Allen Life Ins. Trust v. BP P.L.C.,* 06 Civ. 14209, 2008 WL 878190 at *3 (S.D.N.Y. Mar. 31, 2008) (Crotty, D.J.).

Even after *Twombly* and *Iqbal,* the Court's role in deciding a motion to dismiss "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Bison Capital Corp. v. ATP Oil & Gas Corp.,* 10 Civ. 0714, 2010 WL 2697121 at *5 (S.D.N.Y. June 24, 2010) (Peck, M.J.) (quotations omitted), *report & rec. adopted,* 2010 WL 3733927 (S.D.N.Y. Sept. 16, 2010). [3]

[3]    *Accord, e.g., Tasini v. AOL, Inc.,* 11 Civ. 2472, –––– F.Supp.2d––––, 2012 WL 1066893 at *1 (S.D.N.Y. Mar. 30, 2012) ("The Court's function on a motion to dismiss is 'not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient.' "); *Saunders v. Coughlin,* 92 Civ. 4289, 1994 WL 88108 at *2 (S.D.N.Y. Mar. 15,

1994) (quoting *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980)).

Even after *Twombly* and *Iqbal,* the Court must construe a pro se complaint liberally and must use less stringent standards when reviewing a pro se complaint than if the complaint had been drafted by counsel. *See, e.g., Ercole v. LaHood,* No. 11–1780, 2012 WL 2345934 at *1 (2d Cir. June 21, 2012); *Harris v. Mills,* 572 F.3d at 72; *LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991). [4] However, "[d]ismissal under Rule 12(b)(6) is proper if the complaint lacks an allegation regarding an element necessary to obtain relief ...." 2 *Moore's Federal Practice* § 12.34[4][a] at 12–99 (2012). Thus, the " 'duty to liberally construe a plaintiff's complaint [is not] the equivalent of a duty to re-write it.' " *Id.,* § 12.34[1][b] at 12–79. [5]

[4]    *See also, e.g., Inesti v. Hicks,* 11 Civ. 2596, 2012 WL 2362626 at *6 (S.D.N.Y. June 22, 2012) (Peck, M.J.); *Scherman v. N .Y.S. Banking Dep't,* 09 Civ. 2476, 2010 WL 997378 at *4 (S.D.N.Y. Mar. 19, 2010) (Peck, M.J.), *aff'd,* 443 F. App'x 600 (2d Cir.2011); *Watson v. McGinnis,* 964 F.Supp. 127, 131 (S.D.N.Y.1997) (Kaplan, D.J. & Peck, M.J.); *Saunders v. Coughlin,* 1994 WL 88108 at *2 (citing *Hughes v. Rowe,* 449 U.S. 5, 101 S.Ct. 173 (1980)).

[5]    *Accord, e.g., Inesti v. Hicks,* 2012 WL 2362626 at *6; *Scherman v. N.Y.S. Banking Dep't,* 2010 WL 997378 at *4; *Joyner v. Greiner,* 195 F.Supp.2d 500, 503 (S.D.N.Y.2002) (action dismissed because pro se plaintiff "failed to allege facts tending to establish" that defendants violated his constitutional rights).

## II. *DEFENDANTS FISCHER AND PEREZ'S MOTION TO DISMISS SHOULD BE DENIED*

### A. *Legal Standards Governing § 1983 Eighth Amendment Deliberate Indifference To Prison Conditions Claims*

**\*4**  To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. *See* 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254–55 (1988). "Section 1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749 (1994).

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials and conduct that offends "evolving standards of decency." *Hudson v. McMillian,* 503 U.S. 1, 5, 8, 112 S.Ct. 995, 998, 1000 (1992). [6]

[6] *Accord, e.g., Hope v. Pelzer,* 536 U.S. 730, 737–38, 122 S.Ct. 2508, 2514 (2002); *Wilson v. Seiter,* 501 U.S. 294, 297, 308, 111 S.Ct. 2321, 2323, 2329 (1991); *Estelle v. Gamble,* 429 U.S. 97, 102, 104–05, 97 S.Ct. 285, 290, 291 (1976); *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925 (1976).

To establish an Eighth Amendment violation based on a claim that a prison official placed an inmate's health in danger by prison conditions (such as exposure to toxic substances), the inmate must show that the prison official acted with "deliberate indifference" to "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *E.g., Helling v. McKinney,* 509 U.S. 25, 33, 113 S.Ct. 2475, 2480 (1993); *Estelle v. Gamble,* 429 U.S. at 104–05, 97 S.Ct. at 291. [7] "It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. at 32, 113 S.Ct. at 2480.

[7] *See also, e.g., Manneci v. Pollard,* 132 S.Ct. 617, 625 (2012); *Fransua v. Vadlamudi,* No. 05–1715, 2008 WL 4810066 at *1 (2d Cir. Nov. 3, 2008); *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006); *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003); *Selby v. Coombe,* 17 F. App'x 36, 37 (2d Cir.2001) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

As the Second Circuit has explained, "the deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). [8] The objective test as it applies to exposure to toxic substances has been expressed as follows:

[8] *Accord, e.g., Cole v. Fischer,* 416 F. App'x 111, 113 (2d Cir.2011); *Goris v. Breslin,* 402 F. App'x 582, 584 (2d Cir.2010); *Fransua v. Vadlamudi,* 2008 WL 4810066 at *1; *Salahuddin v. Goord,* 467 F.3d at 279–81; *Smith v. Carpenter,* 316 F.3d at 183; *Selby v. Coombe,* 17 F. App'x. at 37; *Chance v. Armstrong,* 143 F.3d at 702.

Under the objective element of the test, the measure of a "sufficiently serious" deprivation is "contextual and responsive to contemporary standards of decency." ... "[F]or a claim ... based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." A prisoner need not show actual injury, as "the Eighth Amendment protects against sufficiently imminent dangers as well as current unnecessary and wanton infliction of pain and suffering." ... [T]he Eighth Amendment inquiry in plaintiff's case focuses on the danger posed by the material itself-that is, whether the nature and levels of plaintiff's exposure to toxic or noxious substances was such as to pose "an unreasonable risk" of serious damage to the health of any inmate exposed to it. This requires a fact-finder to assess

> the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the toxin] ... [and] whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.

*5 *Jackson v. Goord,* 664 F.Supp.2d 307, 316 (S.D.N.Y.2009) (citations omitted). The subjective test as applied to toxic exposure is as follows:

> Under the subjective test, a prison official must act with " 'deliberate indifference' to inmate health or safety." This means that "a prison official must know of and disregard an excessive risk to inmate health or safety; the official must ... be aware of facts from which the inference could be drawn that substantial risk of serious harm exists, ... draw the inference and fail to take reasonable measures to abate it." This element "entails something more than mere negligence ... but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Plaintiff need not show actual knowledge of the risk of harm, but rather can
>
> present [ ] evidence showing that a substantial risk ... was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it.

*Jackson v. Goord,* 664 F.Supp.2d at 316–17 (citations omitted).

### B. *Application Of Standards To Smolen's Claims Against Fischer And Perez*

#### 1. *The Eighth Amendment's Objective Requirement*

Smolen claims that he was exposed to "toxic smoke" for at least fifteen minutes when a fire broke out around his cell, and that he tried to open his cell window but was unable because there was no knob or crank attached. (*See* pages 2–3 above). Due to toxic smoke from the fire, Smolen asserts that he sustained severe chest pain, breathing difficulty and post traumatic stress disorder. (*See* page 2 above.)

"[T]he Supreme Court has found that exposure to toxic and unsafe substances can constitute an unreasonable risk of serious danger to an inmate's health." *Jackson v. Goord,* 664 F.Supp.2d 307, 322–23 (S.D.N.Y.2009) (citing *Helling v. McKinney,* 509 U.S. 25, 33–34, 113 S.Ct. 2475, 2480–81); *see also, e.g., Davis v. New York,* 316 F.3d 93, 100–01 (2d Cir.2002) (The plaintiff "further alleged that the smoke caused him to suffer dizziness, difficulty breathing, blackouts, and respiratory problems. These assertions are not mere conclusory allegations, but may be sufficient to create an issue of fact as to the level of smoke to which Davis was exposed and, thus, whether his Eighth Amendment rights were violated."); *Warren v. Keane,* 196 F.3d 330, 333 (2d Cir.1999) ("We hold that after *Helling,* it was clearly established that prison officials could violate the Eighth Amendment through deliberate indifference to an inmate's exposure to levels of ETS [environmental tobacco smoke] that posed an unreasonable risk of future harm to the inmate's health."); *LaBounty v. Coughlin,* 137 F.3d 68, 72 (2d Cir.1998) (upholding denial of defendants' summary judgment motion where prisoner "claim[ed] that he was exposed to friable asbestos while incarcerated ... and defendants knowingly failed to protect him from such exposure" in violation of the Eighth Amendment.); *Wright v. N.Y.S. Dep't of Corr. Servs.,* 06 Civ. 3400, 2008 WL 5055660 at \*10 (S.D.N.Y. Oct. 10, 2008) ("Exposure to unsafe levels of toxic substances ... may suffice as sufficiently dangerous conditions to satisfy the objective element of an Eighth Amendment claim."), *report & rec. adopted,* 2008 WL 5084193 (S.D.N.Y. Nov. 24, 2008), *aff'd,* 372 F. App'x 175 (2d Cir.2010); *Denis v. N.Y.S. Dep't of Corr. Servs.,* 05 Civ. 4495, 2006 WL 217926 at \*18 (S.D.N.Y. Jan. 30, 2006) (Peck, M.J.) ("Here, as in *Davis,* [plaintiff] alleges that inmates smoked 'everyday' in the housing unit and bathrooms, and that the ETS [environmental tobacco smoke] exacerbated his chronic sinusitis and caused him constant pain. [Plaintiff], like *Davis,* satisfies the objective prong sufficient to preclude summary judgment for defendants." (citation omitted)), *report & rec. adopted,* 2006 WL 406313 (S.D.N.Y. Feb. 22, 2006).

**\*6** Defendants claim that "[t]here is no allegation that the material and construction of the storm windows caused the fires or created a condition that posed a future risk to health and safety." (Dkt. No. 15: Fischer & Perez Br. at 5.) Smolen is not claiming that the storm windows caused the fire; he is claiming that the fire caused storm windows to burn and release toxic smoke and that he could not open the windows because no knobs were attached to his window. (*See* page 2 above.) If Smolen is able to prove these factual allegations, a reasonable jury could find that defendants' failure to replace Downstate's storm windows with safer windows, despite their knowledge of the hazard from these windows (see pages 2–3 above), constituted an unreasonable risk of harm to Smolen's health in violation of the Eighth Amendment, *i.e.,* satisfied the objective prong.

#### 2. *The Eighth Amendment's Subjective Requirement*

Smolen claims that: (1) defendants Fischer and Perez knew that the storm windows were made of poly-carbon and highly flammable (*see* page 3 above); (2) defendants knew of "the hazard of those [storm] windows ... from previous fires" (*see* page 2 above); and (3) defendants knew that "most cell window knobs were missing making it impossible to open [the windows] in case of a fire" (Dkt. No. 2: Compl. at 2B). Smolen contends that any time a serious fire breaks out at Downstate, "a full report of any fires and their causes must be submitted to the Commissioner," *i.e.,* Fischer, and that Supt. Perez "was required to file all reports of past fires— [including] potentially and dangerous existing conditions at Downstate." (*See* pages 2–3 above.)

Under the subjective test, defendants must be " 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, ... draw the inference and fail to take reasonable measures to abate it.' " *Jackson v. Goord,* 664 F.Supp.2d 307, 316 (S.D.N.Y.2009) (quoting *Trammell v. Keane,* 338 F.3d 155, 164 (2d Cir.2003)). Claiming that defendants knew of the excessively risky conditions from previous fires, Smolen shows that " 'a substantial risk ... was longstanding ... suggest[ing] that the [defendants] ... had been exposed to information concerning the risk and thus must have known about it.' " *Jackson v. Goord,* 664 F.Supp.2d at 317 (quoting *Farmer v.. Brennan,* 511 U.S. 825, 842,

114 S.Ct. 1970, 1981 (1994)).[9] Smolen sufficiently pleads that defendants disregarded the excessively risky conditions because the storm windows were not replaced with safer windows between the time previous fires had broken out and the day of the fire at issue in this case.

[9]    See also, e.g., *Bell v. Luna,* No. 10CV8, —— F.Supp.2d ——, 2012 WL 696218 at *8 (D.Conn. Mar. 1, 2012) (plaintiff met subjective prong regarding an unhygienic mattress after repeated complaints); *Koehl v. Bernstein,* 10 Civ. 3808, 2011 WL 2436817 at *15 (S.D.N.Y. June 17, 2011) (Plaintiff's "allegations are sufficient to allow the conclusion that [defendant] was aware of the risk [plaintiff] faced and that he deliberately disregarded this risk.... [Plaintiff] has stated a claim that his 60 day assignment by [defendant] to double bunk in a cell with 'chain smokers' constituted cruel and unusual punishment."), *report & rec. adopted,* 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011); *D'Attore v. New York City,* 10 Civ. 3102, 2011 WL 3629166 at *8 (S.D.N.Y. June 2, 2011) ("Plaintiff sufficiently pleads facts suggesting that defendants were aware that the inadequate conditions in the prison posed a substantial risk of serious harm to him, and disregarded that risk."), *report & rec. adopted as modified on other grounds,* 2011 WL 3629018 (S.D.N.Y. Aug. 17, 2011); *Lyerly v. Phillips,* 04 Civ. 3904, 2005 WL 1802972 at *5–6 (S.D.N.Y. July 29, 2005) (defendants' motion to dismiss denied where inmate asserts he was double-bunked with an inmate who smoked and he notified nurse that he had asthma).

Smolen's factual allegations, if proven at trial, would allow a reasonable fact-finder to conclude that defendants Fischer and Perez were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, ... and fail[ed] to take reasonable measures to abate it." See *Jackson v. Goord,* 664 F.Supp.2d at 316 (quotation omitted).

**\*7** Thus, Smolen has sufficiently pled facts supporting the objective and subjective prongs of the deliberate indifference standard.

### C. Smolen Has Sufficiently Pled Fischer And Perez's Personal Involvement

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *accord, e.g., Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 1948 (2009) ( "Because vicarious liability is inapplicable to ... § 1983

suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010); *Warheit v. City of N.Y.,* 271 F. App'x 123, 126 (2d Cir.2008); *Dyno v. Vill. of Johnson City,* 240 F. App'x 432, 434 (2d Cir.2007), *cert. denied,* 552 U.S. 1310, 128 S.Ct. 1874 (2008).[10]

[10]    See, e.g., *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006); *Gill v. Tuttle,* 93 F. App'x 301, 302 (2d Cir.2004); *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d Cir.2004); *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003), *cert. denied,* 543 U.S. 1093, 125 S.Ct. 971 (2005); *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999); *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Robles v. Khahaifa,* No. 09CV718, 2012 WL 2401574 at *8 (W.D.N.Y. June 25, 2012); *Allan v. Woods,* No. 05–CV–1280, 2008 WL 724240 at *5 (N.D.N.Y. Mar. 17, 2008) ("Personal involvement is a prerequisite to the assessment of damages in the section 1983 case, and *respondeat superior* is an inappropriate theory of liability."); *Tafari v. Annets,* 06 Civ. 11360, 2008 WL 2413995 at *10 (S.D.N.Y. June 12, 2008) (Peck, M.J.), *report & rec. adopted,* 2008 WL 4449372 (S.D.N.Y. Oct. 2, 2008), *aff'd,* 363 F. App'x 80 (2d Cir.), *cert. denied,* 130 S.Ct. 3475 (2010); *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1109 (S.D .N.Y.1995) (Sotomayor, D.J. & Peck, M.J.) ("In order to maintain a cause of action [under § 1983] against any official, a plaintiff must show that the defendant was personally involved in the alleged deprivation of his constitutional rights, since the doctrine of *respondeat superior* does not apply to § 1983 actions.").

In 1995, the Second Circuit held that:

[t]he personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly

negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d at 873. [11] However, in 2009, the Supreme Court held that:

[11] *Accord, e.g., Ziemba v. Clark,* 167 F. App'x 831, 833 (2d Cir.2006); *Samuels v. Selsky,* 166 F. App'x 552, 556 (2d Cir.2006); *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 229 (2d Cir.2004); *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d at 127; *Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 753 (2d Cir.2003); *Hernandez v. Keane,* 341 F.3d at 145; *Wright v. Smith,* 21 F.3d at 501; *see also, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002).

In a § 1983 suit ...—where masters do not answer for the torts of their servants—the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title not withstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose ... liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

*Ashcroft v. Iqbal,* 556 U.S. at 677, 129 S.Ct. at 1949. Although the Second Circuit has not weighed in on what remains of *Colon* after *Iqbal,* several decisions in this district have concluded that by specifically rejecting the argument that "a supervisor's mere knowledge of his subordinate's discriminary purpose amounts to the supervisor's violating the Constitution," *id., Iqbal* effectively nullified several of the classifications of supervisory liability enunciated by the Second Circuit in *Colon. See, e.g., Bellamy v. Mount Vernon Hosp.,* 07 Civ. 1801, 2009 WL 1835939 at *6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third *Colon* categories pass *Iqbal* 's muster—a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices

occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated—situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate."), *aff'd,* 387 F. App'x 55 (2d Cir.2010). [12] While *Colon* permitted supervisory liability in situations where the supervisor knew of and acquiesced in a constitutional violation committed by a subordinate, these post-*Iqbal* district court decisions reason that *Iqbal* 's "active conduct" standard imposes liability only where that supervisor directly participated in the alleged violation or had a hand in creating a policy or custom under which the unconstitutional practices occurred.

[12] *See, e.g., James v. Orange Cnty. Corr. Facility,* 09 Civ. 7226, 2011 WL 5834855 at *4 (S.D.N.Y. Nov. 18, 2011)* ("There has been considerable division among the district courts of the Second Circuit as to whether *Iqbal* abrogates several factors of the *Colon* test and if so to what extent." (citing cases)); *Joseph v. Fischer,* 08 Civ. 2824, 2009 WL 3321011 at *14 (S.D.N.Y. Oct. 8, 2009)* ("[U]nder *Iqbal,* ... [a] defendant is not liable under section 1983 if the defendant's failure to act deprived the plaintiff of his or her constitutional right."); *Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal."* ).

**\*8** These decisions may overstate *Iqbal* 's impact on supervisory liability. *Iqbal* involved allegations of intentional discrimination. *Ashcroft v. Iqbal,* 556 U.S. at 666, 129 S.Ct. at 1942. Where the alleged constitutional violation involved "invidious discrimination in contravention of the First and Fifth Amendments," *Iqbal* held that "plaintiff must plead and prove that the defendant acted with discriminatory purpose," whether the defendant is a subordinate or a supervisor. *Id.* at 676–77, 129 S.Ct. at 1948–49. It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* at 677, 129 S.Ct. at 1949. Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth, Eighth or Fourteenth Amendments, the personal involvement analysis set forth in *Colon* may still apply. [13]

[13] *See, e.g., Inesti v. Hicks,* 11 Civ. 2596, 2012 WL 2362626 at *11 (S.D.N.Y. June 22, 2012) (Peck, M.J.); *Hodge*

*v. Sidorowicz*, 10 Civ. 0428, 2011 WL 6778524 at * 16 (S.D.N.Y. Dec. 20, 2011), *report & rec. adopted*, 2012 WL 701150 (S.D.N.Y. Mar. 6, 2012) (Crotty, D.J.); *Sash v. United States*, 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) (Peck, M.J.); *see also, e.g., Chao v. Ballista*, 630 F.Supp.2d 170, 178 n. 2 (D.Mass. July 1, 2009) (noting that the "state of mind required to make out a supervisory claim under the Eighth Amendment —i.e., deliberate indifference—requires less than the discriminatory purpose or intent that Iqbal was required to allege in his suit ...."); Michael Avery et al., *Police Misconduct: Law & Litigation* § 4:5 (2009) (discussing the impact of *Iqbal* on supervisor liability in § 1983 and *Bivens* actions); *cf. Caiozzo v. Koreman*, 581 F .3d 63, 66 (2d Cir.2009) (the standard is the same for both Eighth Amendment and Fourteenth Amendment deliberate indifference claims).

Smolen alleges that defendants Fischer and Perez knew about the unsafe prison windows. Specifically, Smolen contends that anytime a serious fire breaks out at Downstate, "a full report of any fires and their causes must be submitted to the Commissioner," *i.e.,* Fischer. (*See* page 2 above.) Smolen also claims that Supt. Perez "was required to file all reports of past fires-[including] potentially and dangerous existing conditions." (*See* pages 2–3 above.) Since Smolen's claim does not require a showing of discriminatory intent, but instead relies on the deliberate indifference standards of the Eighth Amendment, the *Colon* factors apply in determining defendants' personal involvement. *Inesti v. Hicks*, 2012 WL 2362626 at *11 ("Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth, Eighth or Fourteenth Amendments, the personal involvement analysis set forth in *Colon* may still apply.").

Based on Smolen's allegations that Fischer and Perez had knowledge of "the hazard of [the storm] windows" and lack of "cell window knobs" from previous fires (*see* page 3 above), they could be found to be personally involved in the alleged violations under *Colon* 's second factor (failure to remedy the wrong after being informed of the violation through a report or appeal) and fifth factor (exhibition of deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring). *See, e.g., D'Attore v.. New York City*, 10 Civ. 3102, 2011 WL 3629166 at *10 (S.D.N.Y. June 2, 2011) ("Plaintiff's allegations that he wrote letters to defendants ... evidence a possible failure by them to remedy a wrong after being informed through a report or appeal [*i.e.,* Colon

's second factor], and thus plaintiff sufficiently pleads that defendants disregarded a risk of excessive harm of which they were aware." (citation & quotations omitted)); *Jackson v. Goord*, 664 F.Supp.2d 307, 324 (S.D.N.Y.2009) ("Based on plaintiff's assertions that [defendant Superintendent] received complaints from [plaintiff] and from a number of other inmates and that [defendant] was aware of the harmful environmental conditions, [defendant] could be found to have been personally involved in the alleged violations under two of the *Colon* circumstances: (1) failure to remedy a wrong after being informed of the violation through a report or appeal, or (2) exhibition of deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." (citations omitted)).

**\*9** Accordingly, assuming the truth of Smolen's factual allegations of personal involvement of Fischer and Perez, as the Court must in considering a motion to dismiss, Fischer and Perez's motion to dismiss Smolen's claims for lack of personal involvement should be *DENIED*. [14] The Court notes, however, that Smolen's allegations regarding defendants' personal involvement are weak and Smolen might be subject to Rule 11 sanctions if he has no basis for his factual allegations. However, Smolen's complaint (supplemented by his opposition affidavit, *see* page 2 n. 1 above), accepted as true, contains sufficient factual matter to survive a motion to dismiss and to state a claim to relief that is plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. at 678, 129 S.Ct. at 1949 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). It certainly is plausible that the prison Superintendent and the Commissioner would be notified about serious fires, and that one or both would be responsible for deciding whether to replace the windows. *See, e.g ., Denis v. N.Y.S. Dep't of Corr. Servs.,* 05 Civ. 4495, 2006 WL 217926 at *21 (S.D.N.Y. Jan. 30, 2006) (Peck, M.J.) (where Commissioner was alleged to be "responsible for the creation or continuance of" DOCS' "Smoke Free Policy," that "is sufficient personal involvement." And "if the problem is not with DOCS' Smoke Free Policy but rather the failure to adequately enforce it at the facility level, then the Superintendents would be liable.").

14      Fischer and Perez also have moved to dismiss on qualified immunity grounds. (Dkt. No. 15: Fischer & Perez Br. at 7–8.) They merely claim that since there is

no Constitutional violation, they are entitled as a matter of law to qualified immunity. (*Id.*) The simple answer to this ground is that the Court has found that Smolen has sufficiently pled an Eighth Amendment violation.

### III. *SMOLEN'S EIGHTH AMENDMENT DELIBERATE INDIFFERENCE TO MEDICAL NEEDS CLAIM AGAINST NURSE NGUYEN SHOULD BE DISMISSED FOR FAILURE TO PLEAD FACTS SATISFYING THE SUBJECTIVE ELEMENT*

#### A. *Legal Standards Governing § 1983 Eighth Amendment Deliberate Indifference To Inmate's Medical Needs*

As discussed above, to establish an Eighth Amendment violation based on a claim that a prison official has placed an inmate's health in danger, the inmate must show that the prison official acted with "deliberate indifference" to the inmate's serious medical needs. *E.g., Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 2480 (1993); *Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 291 (1976). [15]

[15]    *See also, e.g., Fransua v. Vadlamudi,* No. 05–1715, 2008 WL 4810066 at *1 (2d Cir. Nov. 3, 2008); *Salahuddin v. Goord,* 467 F .3d 263, 280 (2d Cir.2006); *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003); *Selby v. Coombe,* 17 F. App'x 36, 37 (2d Cir.2001) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)); *Robles v. Khahaifa,* No. 09CV718, 2012 WL 2401574 at *6 (W.D.N.Y. June 25, 2012).

As stated above, "the deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). [16] "Objectively, the alleged deprivation must be 'sufficiently serious'...." *Id.* at 553; *Smith v. Carpenter,* 316 F.3d at 183–84 ("The objective 'medical need' element measures the severity of the alleged deprivation ...."). [17] " 'The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ....' " *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324 (1991) (citation omitted); *see also, e.g., Dean v. Coughlin,* 804 F.2d at 215 (" '[T]he essential test is one of medical necessity and not one simply of desirability.' "). Thus, the constitutional protection is limited to " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d at 702; [18]

*accord, e.g., Fransua v. Vadlamudi,* 2008 WL 4810066 at *1; *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' "); *Robles v. Khahaifa,* 2012 WL 2401574 at *6.

[16]    *Accord, e.g., Cole v. Fischer,* 416 F. App'x 111, 113 (2d Cir.2011); *Goris v. Breslin,* 402 F. App'x 582, 584 (2d Cir.2010); *Fransua v. Vadlamudi,* 2008 WL 4810066 at *1; *Salahuddin v. Goord,* 467 F.3d at 279–81; *Smith v. Carpenter,* 316 F.3d at 183–84; *Selby v. Coombe,* 17 F. App'x. at 37; *Chance v. Armstrong,* 143 F.3d at 702.

[17]    *See also, e.g., Fransua v. Vadlamudi,* 2008 WL 4810066 at *1; *Salahuddin v. Goord,* 467 F.3d at 279–81; *Selby v. Coombe,* 17 F. App'x at 37; *Chance v. Armstrong,* 143 F.3d at 702; *Robles v. Khahaifa,* 2012 WL 2401574 at *6.

[18]    The Second Circuit in *Chance v. Armstrong* identified several factors that are relevant in determining whether a serious medical condition exists, including " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.' " 143 F.3d at 702.

**\*10** The Second Circuit has stated that determining whether a deprivation of medical care is objectively serious entails two inquiries:

> Determining whether a deprivation is an objectively serious deprivation entails two inquiries. *The first inquiry is whether the prisoner was actually deprived of adequate medical care.* As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, "prison officials who act reasonably [in response to an inmate health risk] cannot be found liable ..." and, conversely, failing "to take reasonable measures" in response to a medical condition can lead to liability.

> Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a

medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry "focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." Thus, although we sometimes speak of a "serious medical condition" as the basis for [such a] claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

*Salahuddin v. Goord,* 467 F.3d at 279–80 (citations omitted, emphasis added).

Where the plaintiff alleges delay or interruption in treatment rather than failure to receive treatment, "the serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner." *Smith v. Carpenter,* 316 F.3d at 186. "[I]t's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for [these] purposes." *Id.* (citing *Chance v. Armstrong,* 143 F.3d at 702–03). "The absence of adverse medical effects or demonstrable physical injury is one ... factor that may be used to gauge the severity of the medical need at issue. Indeed, in most cases the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith v. Carpenter,* 316 F.3d at 187 (citations omitted).

**\*11** "Subjectively, the charged official must act with a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d at 553. [19] "The required state of mind, equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (quotations omitted, quoting *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting

*Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979 (1994))). [20]

19    *Accord, e.g., Fransua v. Vadlamudi,* 2008 WL 4810066 at *1; *Salahuddin v. Goord,* 467 F.3d at 280–81; *Smith v. Carpenter,* 316 F.3d at 184 ("[T]he subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind."); *Selby v. Coombe,* 17 F. App'x at 37; *Chance v. Armstrong,* 143 F.3d at 702.

20    *See also, e.g., Mayo v. Cnty. of Albany,* 357 F. App'x 339, 341 (2d Cir.2009) ("A plaintiff bringing a deliberate indifference claim must therefore demonstrate that the defendant deliberately disregarded knowledge of the harm he knew he could cause as a result of his actions."); *Ross v. Westchester Cnty. Jail,* 10 Civ. 3937, 2012 WL 86467 at *5 (S.D.N.Y. Jan. 11, 2012) ("Deliberate indifference is a mental state akin to 'recklessness,' and is measured using a 'subjective test' that discerns whether the defendant was 'actually aware of an excessive risk to an inmate's health or safety,' and therefore 'act[ed] with a sufficiently culpable state of mind.' " (citation omitted)); *Mercado v. City of N.Y.,* 08 Civ. 2855, 2011 WL 6057839 at *4 (S.D.N.Y. Dec. 5, 2011).

Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison [officials or] guards in intentionally denying or delaying access to medical care." *Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 291 (1976) (fn.omitted). However, an "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle v. Gamble,* 429 U.S. at 105–06, 97 S.Ct. at 292; *accord, e.g., Burton v. N.Y. S. Dep't of Corr.,* 93 Civ. 6028, 1994 WL 97164 at *2 (S.D.N.Y. Mar. 21, 1994) (Sotomayor, D.J.). "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ...." *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292. [21] As the Supreme Court has stated, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292; *accord, e.g., Smith v. Carpenter,* 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."); *Hathaway v. Coughlin,* 99 F.3d at 553; *Burton v. N.Y.S. Dep't of Corr.,* 1994 WL 97164 at *2.

21    *Accord, e.g., Salahuddin v. Goord,* 467 F.3d at 280; *Hathaway v. Coughlin,* 99 F.3d at 553; *Felipe v. N.Y.S.*

*Dep't of Corr. Servs.,* No. 95–CV–1735, 1998 WL 178803 at *3 (N.D.N.Y. Apr. 10, 1998) (Pooler, D.J.).

### B. *Application Of The Legal Standard To Smolen's Claim Against Nurse Nguyen*

Smolen claims that Nurse Nguyen did not adequately treat him by failing to (1) send Smolen to "an outside hospital for a full medical evaluation and treatment-by a medical doctor and inhalation specialist" and (2) "order any tests at the time of the incident and failed to recommend any follow up tests and medical treatment." (*See* page 3 above.)

Smolen, in his opposition to Nurse Nguyen's motion, concedes that Nurse Nguyen placed Smolen in the prison infirmary for observation. (Smolen Opp. Aff. to Nguyen Motion ¶ 14 & Ex.: Unusual Incident Report (Smolen "complained of tightness in his chest and possible smoke inhalation; he was kept in the facility infirmary for observation.").) Smolen notes that two of the Correction Officers who also were exposed to the smoke were taken to the hospital (Smolen Opp. Aff. to Nguyen Motion ¶ 4), but the third officer remained on duty (Unusual Incident Report). In any event, there is no evidence that Nguyen was the medical staff who sent the two officers to the hospital, but even if he was, that is not sufficient to establish that Nguyen was deliberately indifferent in the way he treated Smolen.

**\*12** Accepting Smolen's allegations as true for purposes of this motion, nevertheless they do not indicate that Nguyen "act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result." *See Fransua v. Vadlamudi,* No. 05–1715, 2008 WL 4810066 at *1 (2d Cir. Nov. 3, 2008); *see also, e.g., Byng v. Wright,* 09 Civ. 9924, 2012 WL 967430 at *11 (S.D.N.Y. Mar. 20, 2012) ("Even had [the defendant doctor] mistakenly represented [plaintiff's] medical data [to another defendant doctor], this error alone would not carry [plaintiff's] burden of coming forward with evidence of a culpable state of mind. Mere negligence is insufficient to satisfy the subjective prong of the deliberate indifference standard."); *Pooler v. Nassau Univ. Med. Ctr.,* No. 10–CV–119, ––– F.Supp.2d ––––, 2012 WL 975048 at *14 (E.D.N.Y. Mar. 23, 2012) (Defendant "found that plaintiff was neither depressed nor suicidal, and concluded that he was not in need of medication. [Defendant] offered plaintiff mental health services and counseling .... [Defendant's] actions under these circumstances ... do not rise to the level of deliberate medical indifference as a matter of law."); *Robles v. Khahaifa,* No. 09CV718, 2012 WL 2401574 at *8 (W.D.N.Y. June 25, 2012) ("As for subjective element,

plaintiff has not suggested that defendants wantonly wished to cause him to suffer or lay out that defendants had the sufficiently culpable state of mind to establish this element.").

Thus, accepting Smolen's version of events as true and drawing all reasonable inferences in his favor, no reasonable fact-finder could conclude that Nguyen acted with deliberate indifference to Smolen's medical needs. Nguyen's motion to dismiss should be *GRANTED.* [22]

[22] Because Smolen's claims do not satisfy the subjective prong for deliberate indifference, there is no need to discuss whether Smolen's claims fulfill the objective requirement. The Court also need not address Nguyen's qualified immunity defense. *See, e.g., Goris v. Breslin,* 402 F. App'x 582, 584 (2d Cir.2010) (Court need not reach subjective prong where plaintiff failed to satisfy the objective prong); *Robles v. Khahaifa,* 2012 WL 2401574 at *9 ("Given that no constitutional violation was found, this Court need not address defendants' alternative contention that they deserve qualified immunity for their actions."); *see also Silvera v. Dep't of Corr.,* No. 09–CV–1398, 2012 WL 877219 at *14 (D.Conn. Mar. 14, 2012) ("Where the Court finds that no constitutional violation has occurred, the Court need not address the issue of qualified immunity.").

### *CONCLUSION*

For the reasons stated above, Fischer and Perez's motion to dismiss (Dkt. No. 14: Fischer & Perez Notice of Motion) should be *DENIED* and Nguyen's motion to dismiss (Dkt. No. 27: Nguyen Notice of Motion) should be *GRANTED.*

### *FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. [23] Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty, 500 Pearl Street, Room 735, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Crotty (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of

those objections for purposes of appeal. *Thomas v. Am,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFLCIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v.. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

23    If the pro se plaintiff requires copies of any of the cases reported only in Westlaw, plaintiff should request copies from defense counsel. *See Lebron v. Sanders,* 557 F.3d 76, 79 (2d Cir.2009); SDNY–EDNY Local Civil Rule 7.2.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3609089

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 765315
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Samuel J. SMOLEN, Jr., Plaintiff.

v.

Brian FISCHER, Commissioner N.Y.S.
Department of Correctional Services; Ada
Perez, Superintendent Downstate Correctional
Facility, and R. Nguyen, Defendants.

No. 12 Civ. 1856(PAC)(AJP).
|
Feb. 28, 2013.

*ORDER ADOPTING R & R*

Honorable PAUL A. CROTTY, District Judge.

**\*1** *Pro se* plaintiff Samuel J. Smolen, Jr. ("Smolen")
initiated this § 1983 action against Commissioner Brian
Fischer ("Fischer"), Superintendent Ada Perez ("Perez"),
and Nurse R. Nguyen ("Nguyen") on March 13, 2012.
Magistrate Judge Andrew J. Peck issued two Reports and
Recommendations [1] (the "R & Rs"): first, on August 23,
2012, he recommended that the Court grant Nguyen's motion
to dismiss but deny those of Fischer and Perez (the "MTD R
& R"); and, second, on November 27, 2012, he recommended
that the Court grant the summary judgment motion of both
Perez and Fischer (the "SJ R & R").

[1]    All facts are taken from the R & Rs unless otherwise
       indicated.

Smolen was an inmate at Downstate Correctional Facility
("Downstate") when, on March 10, 2009, the storm window
in an adjoining cell caught fire, filling the entire area with
smoke. Smolen was unable to open his own window and, as a
result of smoke inhalation, has since suffered from breathing
difficulties, chest pains, and post-traumatic stress disorder.
When help eventually arrived, fifteen to twenty minutes after
the fire broke out, Smolen was taken to see Nurse Nguyen,
who declined to send Smolen to a hospital and failed to order
any tests or recommend follow-up evaluations or treatment.

Smolen alleges that, due to previous fires, Fischer and Perez
knew that Downstate's windows were hazardous but were
deliberately indifferent to the risk they created, that they
failed to insure that the windows could be opened in case of
emergency, and that they failed to keep sufficient staff on hand
such that no one was available to help Smolen out of his cell
when the fire broke out. He also alleges that Nguyen failed to
provide adequate medical treatment.

"Prison officials" liability for confinement conditions is
governed by the Eighth Amendment and is determined
by a two-part test. First the deprivation alleged must be,
objectively, sufficiently serious ... [and] a prison official's act
or omission must result in the denial of the minimal civilized
measure of life's necessities. Second, a prison official must
have a sufficiently culpable state of mind." *Jackson v.
Goord,* 664 F.Supp.2d 307, 315–16 (S.D.N.Y.2009) (internal
quotations omitted). Initially, Judge Peck recommended
denying Fischer and Perez's motion lo dismiss because "they
could be found to be personally involved in the alleged
violations" (MTD R & R at 17) through their "failure to
replace Downstate's storm windows with safer windows,
despite their knowledge of the hazard from these windows,
[which] constituted an unreasonable risk of harm" (*id.*
at 11), and their "disregard[ of] the excessively risky
conditions." (*Id.* at 12.) After the conclusion of the discovery
process, however, he recommended granting summary
judgment on their behalf, concluding that "[p]rior to March
10, 2009, contrary to Smolen's *ipse dixit,* [Superintendent]
Perez was not on notice from any reports that the storm
windows could potentially pose a danger to the health and
safety of the inmates in the event of a fire" (SJ R & R at 12),
and that "even if Commissioner Fischer received every report
of fires at Downstate from 2007 until March 10, 2009—and
there is no evidence that he did—he would not have been on
notice of any fire hazards from the storm windows." (*Id.* at
15.)

**\*2** Additionally, "the Eighth Amendment imposes a duty
upon prison officials to ensure that inmates receive adequate
medical care," which is violated by "deprivations denying the
minimal civilized measure of life's necessities" where "the
charged official ... act[ed] with a sufficiently culpable state
of mind." *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d
Cir.2006). Alleging that a medical provider was "negligent in
diagnosing or treating a medical condition does not state a
valid claim of medical mistreatment.... Medical malpractice
does not become a constitutional violation merely because
the victim is a prisoner." *Estelle v. Gamble,* 429 U.S. 97, 106

(1976). Accordingly, Judge Peck recommended that the Court dismiss the claim against Nguyen because the complaint "do[es] not indicate that Nguyen acted or failed to act while actually aware of a substantial risk that serious inmate harm will result." (R & R at 24.)

In reviewing a report and recommendation, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C). Because no objections have been filed, the Court reviews the R & Rs for "clear error on the face of the record." *Feehan v. Feehan,* No. 09 Civ. 7016, 2011 WL 497776. at *1 (S.D.N.Y. Feb. 10, 2011). Finding none, the Court adopts Judge Peck's recommendations.

The Clerk of Court is directed to enter judgment and close this case. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. *See Coppedge v. U.S.,* 369 U.S. 438 (1962).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 765315

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3300695
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Bryan CHRISTIAN, Plaintiff,
v.
Carolyn SAUNDERS, et al., Defendants.

17-CV-2587 (GBD) (BCM)
|
Signed 02/28/2018

**Attorneys and Law Firms**

Bryan Christian, Brooklyn, NY, pro se.

Bridgette Marie Nunez, New York City Law Depart. Office of the Corporation Counsel, New York, NY, for Defendants.

# REPORT AND RECOMMENDATION TO THE HON. GEORGE B. DANIELS

BARBARA MOSES, United States Magistrate Judge

**\*1**  Plaintiff Bryan Christian, proceeding *pro se*, alleges that he was denied medical care, subjected to "deplorable and inhumane" conditions of confinement, and put at risk of physical harm from other inmates while detained at the Otis Bantum Correctional Center (OBCC) intake unit on Rikers Island in January 2017. Before me for report and recommendation is defendants' motion (Dkt. No. 25) to dismiss Christian's Complaint (Dkt. No. 2) pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons that follow I respectfully recommend that the motion be GRANTED except as to plaintiff's conditions-of-confinement and inadequate medical care claims against defendant Captain Kirkland, which should be permitted to proceed.

# I. BACKGROUND

## A. Allegations of Fact

Plaintiff alleges that he was taken to OBCC on Monday, January 16, 2017, immediately after his discharge from Brookdale Hospital, where he received treatment for a fungal infection and pain in his right foot. Compl. ¶ 3. [1] The hospital sent "paperwork" stating that plaintiff was prescribed an antibiotic and a painkiller as follow-up treatment for his foot condition. *Id.* Upon arrival at the OBCC intake area, however,

plaintiff was detained in "holding pen # 2," *id.* ¶ 4, where he remained for the next five days, until Saturday, January 21, 2017, without any medical attention. *Id.* ¶¶ 13, 35.

[1]     Plaintiff does not allege his status during the period at issue. He invokes both the Eighth Amendment, generally applicable to convicted prisoners, and the Fourteenth Amendment, generally applicable to pretrial detainees. *See* Compl. ¶¶ 47, 48. According to defendants, "plaintiff was a parole violator at the time of the incidents alleged in the Complaint," and was therefore a pretrial detainee for purposes of the claims he asserts in this action. *See* Def. Mem. dated Aug. 4, 2017 (Dkt. No. 26), at 5 n.2. For purposes of this Report and Recommendation I assume that plaintiff was a pretrial detainee during the relevant period and analyze his claims accordingly. *See, e.g., Patterson v. Ponte,* 2017 WL 1194489, at *1 n.2 (S.D.N.Y. Mar. 30, 2017) ("While no party has indicated whether Mr. Patterson is a pretrial detainee or a convicted prisoner, I will assume that he is the former, as he would be entitled to somewhat greater constitutional protection."), *report and recommendation adopted,* 2017 WL 1405753 (S.D.N.Y. Apr. 17, 2017), *appeal dismissed* (Aug. 14, 2017).

Plaintiff alleges that late Monday night or early Tuesday morning he informed a "John Doe" officer that his foot hurt and requested his medication. Compl. ¶¶ 5, 6. The officer replied that plaintiff "would not be able to take any medication without first being processed." *Id.* ¶ 10. Plaintiff took off his right boot to show the officer the condition of his foot. Although the officer agreed that the foot "looks bad," he told plaintiff that he "might not see a doctor for two (2) or three (3) days" because "foot fungus" was "not a priority." *Id.* ¶¶ 8-12.

On Tuesday evening, January 17, 2017, plaintiff "explained and showed" the condition of his right foot to defendant Captain Kirkland, who "assured" plaintiff that "he would send [him] to medical," but did not. Compl. ¶ 14. In the memorandum that plaintiff filed in opposition to defendants' motion to dismiss, he adds that when he showed his foot to Kirkland "there was bleeding and an odor from the fungus," yet he still was not granted "access to medical services." Pl. Opp. Mem. filed Dec. 26, 2017 (Dkt. No. 40), at ECF page 3.

**\*2**  Also on Tuesday, the population of holding pen #2 "ballooned" from "about ten" detainees to "nearly forty." Compl. ¶ 15. According to plaintiff, "[t]here was no room to move around without stepping into or onto someone," the pen was "flooded with garbage including leftover food trays" with "gnats flying around them, half filled milk

containers and cereal spilled on the floor, with a stench of body odor." *Id.* ¶ 16. Plaintiff became "dizzy and nauseous," and requested cleaning supplies. *Id.* ¶ 17. When a John Doe captain responded that the pen was too crowded for cleaning, plaintiff repeated that he felt sick and threatened that if the pen were not cleaned he would "write a complaint." *Id.* ¶ 19. Corrections Officer Crump then said, "That makes you a snitch and snitches get beat up or worse," *id.* ¶ 20, which plaintiff interpreted as a threat to his physical safety because "other detainees were listening." *Id.* ¶ 21. When plaintiff asked Crump if he was, in fact, threatening plaintiff, Crump responded, "Just don't die." *Id.* ¶ 22. Plaintiff reported the incident to the John Doe captain, who told plaintiff, "If you stop talking, you'll be alright. Just leave it alone." *Id.* ¶ 23.

On Thursday afternoon, January 19, 2017, the number of detainees in holding pen #2 "went down to about fifteen." Compl. ¶ 24. Using a "brown paper bag over my hand," plaintiff attempted to sweep the garbage into a pile, which he used to "cover up what was clearly human excrement on the floor." *Id.* ¶ 25. Plaintiff had been sleeping only three to four feet away from "the raw human waste." *Id.* ¶ 26.

Also on Thursday, plaintiff stopped Captain Kirkland, "again showed him" that the fungus had "spread," and told him "that I needed to see medical." Compl. ¶ 27. Captain Kirkland told plaintiff he "had to wait," and that there was "nothing he could do at the moment." *Id.* ¶ 28. When plaintiff "angrily protested," Captain Kirkland "summoned an officer," who placed plaintiff in a "single cell" in the intake area, in handcuffs, for approximately an hour. *Id.* ¶ 29. While still handcuffed, plaintiff "stood up to the bars," at which point a "helper" (apparently an inmate with maintenance duties) "slammed" a mop against the bars, sending mop water into plaintiff's mouth, and said "snitch, you can't live nowhere in the building." *Id.* ¶ 30. Shortly thereafter, the inmate in the next cell "slung a cup of what looked and smelled like urine which hit me in the face and neck." *Id.* ¶ 31.

Plaintiff informed defendant Captain Kamara that Officer Crump had called him a "snitch" in front of other inmates, and explained that as a result he "was already experiencing problems" including having a "mop slung at [him]" and "urine thrown in [his] face." Compl. ¶ 33. Plaintiff requested to be "taken out of the area," *id.,* but Kamara "walked away" after remarking, "I've seen worse happen to people who snitch." *Id.* ¶ 34.

Plaintiff was "finally seen by the medical staff at approximately 2:00 a.m. [on] Saturday January, 21, 2017." Compl. ¶ 35. By then, the "infection had spread across the entire foot." *Id.* ¶ 43. Plaintiff's foot "had to be soaked in a solution," a "cream was applied," and plaintiff was "referred to a foot specialist." *Id.* ¶ 35. The doctor informed plaintiff that "the fungus could've been prevented from spreading with proper hygiene care." *Id.* Plaintiff does not allege that he suffered continuing or permanent pain or problems connected with the fungal infection in his right foot.

Plaintiff filed grievances describing these events on January 26, 2017, re-submitted them five days later, requested a "grievance hearing" on February 9, 2017 – which he did not receive – and then "addressed the matter to the grievance commanding officer and the CORC" (presumably referring to the Central Office Review Committee) on February 17, 2017. Compl. ¶¶ 37-39. Once again, plaintiff received no response. *Id.* ¶ 39.

### B. Procedural History

Plaintiff filed this action on April 11, 2017, naming as defendants the Warden of the OBCC (later identified as Carolyn Saunders), Captain Kirkland, Captain Kamara, Officer Crump, "Captain John Doe," and "Corrections Officer John Doe." Compl. at ECF pages 1-2. By Order of Service dated May 5, 2017 (Dkt. No. 8), Your Honor requested that Warden Saunders, Captain Kirkland, Captain Kamara, and Officer Crump waive service. [2] Warden Saunders, Captain Kirkland, and Captain Kamara did so on May 15, 2017. (Dkt. No. 11.) However, the New York City Department of Corrections (DOC) filed an unexecuted waiver of service on behalf of Officer Crump, explaining that it had been unable to identify him or her as there were "multiple staff with such name." (Dkt. No. 12.)

[2]     Because the Complaint did not supply sufficient information to permit the government to identify "Captain John Doe" and "Corrections Officer John Doe," no *Valentin* order was issued as to them. *See* Order of Service at 1 n.1.

**\*3** Defendants Saunders, Kirkland, and Kamara filed their motion to dismiss on August 4, 2017. After receiving several extensions, plaintiff filed his opposition memorandum on December 26, 2017, by which time he had apparently been released from custody and was living in New York City. I accepted the submission even though it was filed well after the

2018 WL 3300695

extended deadline. (Dkt. No. 41.) Defendants timely replied on January 12, 2018. (Dkt. No. 42.)

The motion to dismiss is within the scope of my reference. (Dkt. No. 7.)

## II. DISCUSSION

### A. Legal Standards

#### 1. Rule 12(b)(6)

Fed. R. Civ. P. 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." If that "short and plain statement" fails to present "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," the deficient claims may be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

When faced with a Rule 12(b)(6) motion, the trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, those factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. The court may not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Geldzahler v. New York Med. Coll.*, 663 F.Supp.2d 379, 385 (S.D.N.Y. 2009). At a minimum, the complaint must "give each defendant 'fair notice of what the plaintiff's claim is and the ground upon which it rests.' " *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001)

(quoting *Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847, 851 (2d Cir. 1961) ).

A *pro se* plaintiff is " 'entitled to special solicitude,' " and the court must "read his pleadings 'to raise the strongest arguments that they suggest.' " *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (per curiam) ). "This policy of liberally construing *pro se* submissions is driven by the understanding that '[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.' " *Triestman*, 470 F.3d at 475 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) ). Therefore, "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (internal quotation marks and citation omitted).

**\*4** Consistent with that approach, factual allegations made in a *pro se* plaintiff's opposition papers may be considered "as supplementing the Complaint, at least to the extent they are consistent with the allegations in the Complaint." *George v. Pathways to Hous., Inc.*, 2012 WL 2512964, at \*6 n.7 (S.D.N.Y. June 29, 2012). See also *Scott v. Warden & Adm'r of Jurisdiction Correction Dep't & Med. Dep't*, 2010 WL 3785252, at \*4 (S.D.N.Y. Aug. 23, 2010) ("Because the plaintiff is proceeding *pro se*, the Court may also rely on the plaintiff's opposition papers in assessing the legal sufficiency of his claims."). Nevertheless, a *pro se* plaintiff, like any other plaintiff, "must state a plausible claim for relief," *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013), and the district court cannot "cannot invent factual allegations that [the plaintiff] has not pled." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010).

#### 2. Section 1983

Plaintiff's claims arise under 42 U.S.C. § 1983, which permits civil suits against those who, acting "under color" of state law, have deprived the plaintiff of "any rights, privileges, or immunities secured by the Constitution" or laws of the United States. "Section 1983 does not create any federal rights; rather, it provides a mechanism to enforce rights established elsewhere." *Soberanis v. City of New York*, 244 F.Supp.3d 395, 400 (S.D.N.Y. 2017) (citing *Gonzaga Univ. v. Doe*, 536

U.S. 273, 285, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) ). To state a claim under § 1983, "a plaintiff must allege that (1) the defendant was a state actor, i.e., acting under color of state law, when he committed the violation and (2) the defendant deprived the plaintiff of 'rights, privileges or immunities secured by the Constitution or laws of the United States.' " *Milan v. Wertheimer*, 808 F.3d 961, 964 (2d Cir. 2015) (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743-44 (2d Cir. 2003) ).

### 3. Individual Liability

"[I]n order to establish a defendant's individual liability" under § 1983, a plaintiff must allege facts that show that defendant's "personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138-39 (2d Cir. 2013). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937. "Personal involvement is a question of fact and must be satisfied as to each individual defendant," including defendants who are alleged to have acted in a supervisory capacity. *Powell v. City of New York*, 2016 WL 4159897, at *9 (S.D.N.Y. July 14, 2016) (quoting *Lloyd v. City of New York*, 43 F.Supp.3d 254, 266 (S.D.N.Y. 2014) ), *report and recommendation adopted*, 2016 WL 4147203 (S.D.N.Y. Aug. 3, 2016); *see also Iqbal*, 556 U.S. at 677, 129 S.Ct. 1937 ("each Government official, his or her title notwithstanding, is only liable for his or her own misconduct"). Thus, for example, where the underlying constitutional tort requires a showing of "deliberate indifference," plaintiffs are required to plead that each supervisory defendant "kn[e]w of, and disregard[ed], an excessive risk to inmate health or safety." *Powell*, 2016 WL 4159897, at *10 (quoting *Turkmen v. Hasty*, 789 F.3d 218, 250 (2d Cir. 2015), *rev'd on other grounds sub nom. Ziglar v. Abbasi*, —— U.S. ——, 137 S.Ct. 1843, 198 L.Ed.2d 290 (2017) ) (internal quotation marks omitted; alterations in the original).

### 4. Qualified Immunity

"As a general matter, correctional officers who violate a plaintiff's constitutional rights are nevertheless entitled to [ ] immunity if their 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Rodriguez v. City*

*of New York*, 2016 WL 5476003, at *8 (S.D.N.Y. Sept. 29, 2016) (quoting *Stephenson v. Doe*, 332 F.3d 68, 77 (2d Cir. 2003) ). To determine whether a right is "clearly established" for purposes of a qualified immunity defense, courts in this Circuit consider "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). "Thus, qualified immunity protects government officials when they make 'reasonable mistakes' about the legality of their actions." *Id.* at 353 (quoting *Saucier v. Katz*, 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ).

### 5. Conditions of Confinement

**\*5** Claims by pretrial detainees for allegedly unconstitutional conditions of confinement are analyzed under the Due Process Clause of the Fourteenth Amendment. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). In order to survive a motion to dismiss, plaintiffs must plausibly satisfy a two-pronged test. The "objective prong" requires a plaintiff to plausibly allege that "the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process." *Id.* The "mental element prong" requires a plaintiff to plausibly allege that a defendant "acted with at least deliberate indifference to the challenged conditions." *Id.*

"[T]o establish an objective deprivation, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health, which includes the risk of serious damage to physical and mental soundness." *Darnell*, 849 F.3d at 30 (internal citation and quotation marks omitted). This branch of the test is the same as that used for claims brought by convicted prisoners, which are analyzed under the Eighth Amendment's prohibition of "cruel and unusual" punishment. *Id.* at 29-30.

"There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.' " *Darnell*, 849 F.2d at 30; *accord Cintron v. Doldo*, 688 Fed. App'x 44, 45 (2d Cir. 2017) (summary order) (quoting *Helling v. McKinney*, 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) ) ("[A] court should 'assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.' "). "[P]rison officials violate

the Constitution when they deprive an inmate of his 'basic human needs,' such as food, clothing, medical care, and safe and sanitary living conditions." *Walker,* 717 F.3d at 125 (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) ). "[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need.' " *Darnell,* 849 F.3d at 30 (quoting *Walker,* 717 F.3d at 125).

Where, as here, the plaintiff alleges that he was deprived of "safe and sanitary" living conditions, "serious injury is unequivocally not a necessary element." *Willey v. Kirkpatrick,* 801 F.3d 51, 68 (2d Cir. 2015). Moreover, there is no "bright-line durational requirement for a viable unsanitary-conditions claim," nor is "some minimal level of grotesquerie required." *Id.* Instead, "any analysis must consider both the duration and the severity of an inmate's experience of being exposed to unsanitary conditions." *Id. See also Darnell,* 849 F.2d at 21 ("[T]he proper inquiry for a conditions of confinement claim is by reference to the duration and severity of the conditions," but the claim does not require "a 'minimum duration' or 'minimum severity' " or any " 'serious injury' " to "reach the level of a constitutional violation.") (quoting *Willey,* 801 F.3d at 68); *Walker,* 717 F.3d at 127 ("unsanitary conditions lasting for mere days may constitute" a constitutional violation).

To establish the mental element prong of the test – that is, whether the defendant acted with a "sufficiently culpable state of mind," *Darnell,* 849 F.3d at 35 – the plaintiff must allege facts showing that each defendant knew or should have known of the condition that posed the excessive risk and chose to disregard it. *Cintron,* 688 Fed. App'x at 45 (quoting *Walker,* 717 F.3d at 125). The Due Process Clause (unlike the Eighth Amendment) "can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Darnell,* 849 F.3d at 35. However:

> **\*6** [T]o establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act

> with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.

*Id.* The deliberate indifference standard requires more than "mere negligence" on the part of the defendants. *Id.* at 36. In addition, the "reckless or intentional action (or inaction) required to sustain a § 1983 deliberate indifference claim must be the product of a voluntary act (or omission) by the official." *Id.* at 36 n.16.

### 6. Inadequate Medical Care

Claims by pretrial detainees for inadequate medical care are also analyzed under the Fourteenth Amendment. *Lloyd v. City of New York,* 246 F.Supp.3d 704, 717 (S.D.N.Y. 2017). The detainee must make two showings. First, "the alleged deprivation of adequate medical care must be 'sufficiently serious,' " *id.* (quoting *Spavone v. New York State Dep't of Corr. Servs.,* 719 F.3d 127, 138 (2d Cir. 2013) ), "in the sense that 'a condition of urgency, one that may produce death, degeneration, or extreme pain' exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir. 1996) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994) ). Second, the defendant must act "with a 'sufficiently culpable state of mind' in depriving the plaintiff of medical treatment." *Quinones v. City of New York,* 2017 WL 1322205, at *6 (S.D.N.Y. Jan. 6, 2017) (quoting *Nielsen v. Rabin,* 746 F.3d 58, 63 (2d Cir. 2014) ), *report and recommendation adopted,* 2017 WL 1322205 (Feb. 28, 2017) (Daniels, J.).

To satisfy the objective prong, the plaintiff must claim a deprivation that is "sufficiently serious" as measured by an inquiry into (1) "whether the prisoner was actually deprived of adequate medical care" and (2) "whether the inadequacy in medical care is sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279-80 (2d Cir. 2006) (internal quotation marks and citations omitted). Because " '[t]he objective component of an Eighth Amendment claim is ... [necessarily] contextual' and fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir. 2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (alterations in *Carpenter* ) ).

Nonetheless, "actual physical injury is not necessary" to an inadequate medical care claim. *Carpenter*, 316 F.3d at 188 (collecting cases), and a viable inadequate medical care claim "may be based on a defendant's conduct in exposing an inmate to an unreasonable risk of future harm." *Id.* It is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for [constitutional] purposes." *Id.* at 186 (citing *Chance v. Armstrong*, 143 F.3d 698, 702-703 (2d Cir. 1998) ).

Similarly, when the basis for a prisoner's inadequate medical care claim is a "temporary delay or interruption" in the provision of otherwise adequate medical treatment, "it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious.' " *Carpenter*, 316 F.3d at 185 (quoting *Chance*, 143 F.3d at 702) (emphasis in original). "In evaluating whether a delay in treatment is sufficiently serious, 'the actual medical consequences that flow from the alleged denial of care will be highly relevant.' " *Davis*, 2017 WL 4803918, at *8, 283 F.Supp.3d 108 (quoting *Carpenter*, 316 F.3d at 187). Once again, there is no requirement that the plaintiff have suffered an actual injury as the result of the delay. In delayed care cases, "we focus on the seriousness of the particular risk of harm that resulted from 'the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 236 (2d Cir. 2007) (summary order) (quoting *Carpenter*, 316 F.3d at 185). However, "[w]here the 'risk of harm' the plaintiff faced as a result of missed medication, or other delay in treatment, is 'not substantial,' there is no constitutional violation." *Henrius v. Cty. of Nassau*, 2015 WL 5542464, at *15 (E.D.N.Y. Sept. 16, 2015) (quoting *Bellotto*, 248 F. App'x at 237).

**\*7** The mental element prong of the test, for pretrial detainees, is judged by the same "deliberate indifference" standard articulated in *Darnell*. *See, e.g., Charles v. Cty. of Orange*, 2017 WL 4402576, at *10 (S.D.N.Y. Sept. 29, 2017) (quoting *Darnell*, 849 F.3d at 33 n.9) (The "[*Darnell*] standard for deliberate indifference applies to any underlying violation of the due process clause," including "failing to provide adequate medical care to a person in state custody, 'because deliberate indifference means the same thing for each type of claim under the Fourteenth Amendment.' "); *accord Lloyd*, 246 F.Supp.3d at 719; *Grimmett v. Corizon Med. Assocs. of New York*, 2017 WL 2274485, at *4 & 4 n.2 (S.D.N.Y. May 24, 2017); *Feliciano v. Anderson*, 2017 WL 1189747, at *10 (S.D.N.Y. Mar. 30, 2017). Accordingly, courts are to determine "whether the official 'knew, or should have known" that his or her conduct 'posed an excessive risk to health or safety.' " *Lloyd*, 246 F.Supp.3d at 719 (quoting *Darnell*, 849 F.3d at 33, 35). *See also Nielsen*, 746 F.3d at 63 (quoting *Salahuddin*, 467 F.3d at 280) ("In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health.").

### 7. Failure to Protect

The Constitution "imposes a duty on prison officials to 'take reasonable measures to guarantee the safety of the inmates.' " *Nunez v. Goord*, 172 F.Supp.2d 417, 430 (S.D.N.Y. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ). "In particular, a prison official has a duty to protect prisoners from violence from other prisoners." *Nunez*, 172 F.Supp.2d at 430. In order to state a claim "under the theory that prison officials failed to protect him or her," *Randle v. Alexander*, 960 F.Supp.2d 457, 473 (S.D.N.Y. 2013), an inmate must, once again, make two showings. "For the objective component of this type of claim to be satisfied, 'the inmate must show that he is incarcerated under conditions *posing a substantial risk of serious harm*.' " *Id.* (quoting *Farmer*, 511 U.S. at 835, 114 S.Ct. 1970) (emphasis supplied in *Randle* ). The mental element prong of the test, for pretrial detainees, is judged by the same "deliberate indifference" standard articulated in *Darnell. See, e.g., Charles*, 2017 WL 4402576, at *10. "At bottom, prison officials may not abuse prisoners directly, nor may they indirectly subject prisoners to harm by facilitating abuse at the hands of prisoners' fellow inmates." *Randle*, 960 F.Supp.2d at 471.

### B. Application of Standards

Construed to "raise the strongest arguments [it] suggests," *Triestman*, 470 F.3d at 477, Christian's Complaint asserts a conditions-of-confinement claim, arising out of the unsanitary conditions in pen #2, against all three moving defendants; an inadequate medical care claim, arising out of the same three defendants' alleged failure to provide needed medical attention to plaintiff over the five days that

he spent in pen #2; and a failure to protect claim against Captain Kamara. For the reasons set forth below, I conclude that plaintiff plausibly alleges facts sufficient to support his conditions-of-confinement and inadequate medical care claims against Captain Kirkland, and that Kirkland's qualified immunity defense fails, as to those claims, as a pleading matter. Plaintiff does not adequately allege constitutional claims against Warden Saunders or Captain Kamara. [3]

[3]    In their reply memorandum of law, defendants argue that plaintiff "abandoned" some of his claims when he submitted a hand-written opposition memorandum that "failed to address" certain of defendants' arguments in support of their motion to dismiss. Def. Reply Mem. at 2-3. The Court notes that the plaintiffs in all of the cases cited by defendants were counselled. *See Johnson v. City of New York*, 2017 U.S. Dist. LEXIS 81359, 2017 WL 2312924 (S.D.N.Y. May 26, 2017); *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 2014 U.S. Dist. LEXIS 133839 *1, 2014 WL 4723299 (S.D.N.Y. Sept. 23, 2014); *Bonilla v. Smithfield Assocs. LLC*, 2009 U.S. Dist. LEXIS 116233 *1, 2009 WL 4457304 (S.D.N.Y. Dec. 4, 2009); *Lipton v. Cnty. of Orange*, 315 F.Supp.2d 434 (S.D.N.Y. 2004). It would be inappropriate to apply those precedents here. Indeed, courts in our Circuit frequently analyze the claims of *pro se* plaintiffs on the merits even where those plaintiffs fail to file any opposition to Rule 12(b)(6) motions. *See, e.g., Narvaez v. City of New York*, 2017 WL 1535386, at *2 (S.D.N.Y. Apr. 17, 2017) (Daniels, J.) ("A *pro se* litigant's failure to oppose a 12(b)(6) motion does not by itself merit dismissal of his complaint. When presented with an unopposed motion, the Court must determine whether there are sufficient bases for granting the motion.") (internal citations omitted).

### 1. Conditions of Confinement

#### a. Objective Prong

**\*8**  Plaintiff alleges that he was kept for five days in a holding pen that was "flooded with garbage," including human excrement and food trays "with gnats flying around them," permeated by a "stench of body odor," and that, for at least two days, was crowded to the point that "there was no room to move around without stepping into or onto someone." Compl. ¶¶ 15-16. Plaintiff was subjected to those "deplorable and inhumane" conditions, *id.* ¶ 41, while he had an active "fungal infection," which went untreated during that time, and which "spread across [his] entire foot" as

a result. *Id.* Considered in the "aggregate," the conditions plaintiff alleges plausibly "rise to the level of a constitutional violation." *Darnell*, 849 F.3d at 30. *See, e.g., Walker*, 717 F.3d at 127 ("unsanitary conditions lasting for mere days may constitute an Eighth Amendment violation"); *id.* at 128 ("housing multiple inmates together in one cell can amount to an Eighth Amendment violation if combined with other adverse conditions") (internal quotations and citation omitted). "Causing a man to live, eat and perhaps sleep in close confines with ... human waste is too debasing and degrading to be permitted." *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972) (reversing dismissal of Eighth Amendment claim where inmate spent five days in a cell with a toilet that could only be flushed from outside the cell).

The doctor who treated plaintiff's foot on January 21, 2017 told him that "the fungus could've been prevented from spreading with proper hygiene care." Compl. ¶ 35. Remarkably, defendants use that statement to argue that plaintiff has not adequately alleged the causation element of his inadequate medical care claim – suggesting that it was the lack of "proper hygiene," rather than the delay in medical treatment, that caused the infection to worsen. Def. Mem. at 7. Taking plaintiff's well-pleaded factual allegations to be true, however – as required under Rule 12(b)(6) – the unsanitary conditions he alleges would have foreclosed any possibility of "proper hygiene."

Indeed, plaintiff plausibly alleges that the unsanitary condition of holding pen #2, the state of his untreated foot infection, the withholding of his previously-prescribed medication, and the denial of any other medical care for five days had a "mutually enforcing effect," *Walker*, 717 F.3d at 125, and created an especially risky and degrading five-day detention. Considering "both the duration and the severity" of plaintiff's "experience of being exposed to unsanitary conditions," and the "qualitative offense to [his] dignity", which must be given "due consideration" in assessing the severity of any such exposure, *Willey*, 801 F.3d at 68, I conclude that plaintiff has adequately alleged that the conditions of his detention "violat[ed] contemporary standards of decency" *Helling*, 509 U.S. at 36, 113 S.Ct. 2475, and constituted an objective deprivation of "safe and sanitary living conditions." *Walker*, 717 F.3d at 125.

#### b. Mental Element Prong

I also conclude that plaintiff has adequately alleged that Captain Kirkland "knew, or should have known" that the unsanitary conditions of confinement "posed an excessive risk" to his health. *Darnell*, 849 F.3d at 35. Plaintiff alleges that he "showed" his foot and "explained" that he had a fungal infection and pain to Kirkland twice during his five-day detention, Compl. ¶¶ 14, 27, 43, demonstrating that "there was bleeding and an odor from the fungus." Pl. Opp. Mem. at ECF page 3. Plaintiff does not explicitly discuss Kirkland's knowledge of the unsanitary conditions of plaintiff's confinement, but those conditions – the overcrowding of holding pen #2, the accumulated debris, the insects, and the smell, *see* Compl. ¶¶ 15-16 – would necessarily have been evident to anyone close enough to hold a conversation with plaintiff and look at his foot. Plaintiff first "explained and showed" his foot infection to Kirkland "sometime around Tuesday evening," *id.* ¶ 14, by which time the population of holding #2 had "ballooned" and the unsanitary conditions had developed. *Id.* ¶ 16. Two days later, on Thursday, plaintiff again showed Kirkland his foot, noting that that the fungus "had spread," and explained again that he needed to "see medical." *Id.* ¶ 27. This was the same day that he "cover[ed] up what was clearly human excrement on the floor," with other "garbage." *Id.* ¶¶ 25-26. Kirkland's response to plaintiff's second request for medical attention was to have him handcuffed. *Id.* ¶ 29. Applying the "less stringent standards" appropriate to a *pro se* complaint, *Erickson*, 511 U.S. at 94, 114 S.Ct. 1345, I find that plaintiff has adequately alleged facts showing that Kirkland "knew or should have known" that plaintiff was detained in an unsanitary holding cell with an active, untreated, and worsening infection, and that the situation was unreasonably risky to plaintiff's health.

**\*9** Plaintiff does not appear to assert a conditions-of-confinement claim against Captain Kamara. *See* Compl. ¶ 48 (characterizing his allegations against Kamara as a failure to "secure plaintiff's safety"). Nor does he allege that Kamara knew about his foot infection. Moreover, his allegations do not in any way link the unsanitary conditions of holding pen #2 to Kamara. In fact, his first (and only) conversation with Kamara took place after plaintiff was temporarily removed from holding pen #2 and placed in "a single cell." *Id.* ¶¶ 29-33. Therefore, even if I construed the Complaint to assert a conditions-of-confinement claim against Kamara, I would conclude that it fails against him for lack of the required *mens rea* showing.

The same is true as to Warden Saunders, against whom plaintiff does assert his conditions-of-confinement claim, *see* Compl. ¶ 41, but as to whom he fails adequately to allege either the mental element prong of the claim or any "personal involvement" in the challenged conditions. *Grullon*, 720 F.3d at 138-39. Plaintiff does not allege that he ever saw or spoke to Saunders, nor that she "kn[e]w of, and disregard[ed]," *Powell*, 2016 WL 4159897, at *10, the conditions in pen #2 or their impact on his foot infection. Instead, plaintiff alleges in wholly conclusory terms that Warden Saunders "knew or reasonably should've known [of] the customs and policy of the intake admissions process," including the "deplorable and inhumane" conditions, and "allowed [them] to continue." Compl. ¶ 41. This is insufficient. *See, e.g., Gumora v. City of New York*, 2018 WL 736018, at *6 (S.D.N.Y. Feb. 5, 2018) (plaintiff failed to adequately allege the personal involvement of the warden and commissioner defendants in his conditions-of-confinement claim where he alleged only that they "failed to tour the unit" and had received a written complaint about the unsafe conditions). I therefore recommend, respectfully, that plaintiff's conditions-of-confinement claim be dismissed as to all named defendants except Captain Kirkland.

### 2. Inadequate Medical Care

#### a. Objective Prong

Considered in the light most favorable to plaintiff, the Complaint alleges that plaintiff's foot condition was serious enough to require inpatient hospital treatment, Compl. ¶ 3; that he left the hospital with prescriptions for both a painkiller and an antibiotic, *id.* ¶¶ 3, 5; that his foot was painful, "look[ed] bad," was bleeding, and gave off an odor, *id.* ¶ 9; Pl. Opp. Mem. at ECF page 3; that in the absence of the prescribed treatment the condition visibly worsened during plaintiff's five-day wait in holding pen #2; and that plaintiff repeatedly showed the infected foot to DOC officers, and requested his prescribed medication and medical attention, to no avail. Compl. ¶¶ 8, 14, 27. The delay in medical treatment, coupled with the unsanitary conditions of holding pen #2, caused the infection to grow worse and "spread across [his] entire foot." *Id.* ¶ 43. *See also id.* ¶ 35 (alleging that the doctor plaintiff consulted on January 21, 2017 "informed me that the fungus could've been prevented from spreading with proper hygiene care").

Defendants correctly point out that the only "deprivation" of medical care plaintiff alleges is a five-day delay, *see* Def.

Mem. at 7-8, and that he does not allege that the medical care he ultimately received on January 21, 2017 was inadequate. *Id.* at 3, 7-8, 112 S.Ct. 995. Nor does plaintiff expressly allege that he suffered – or was at risk of – any permanent injury or adverse consequences to his foot. These factors, among others, may present significant obstacles as plaintiff attempts to develop the evidence necessary to demonstrate a "sufficiently serious" deprivation of medical care. *Lloyd*, 246 F.Supp.3d at 717; *see also Davis*, 2017 WL 4803918, at *8, 283 F.Supp.3d 108 (quoting *Carpenter*, 316 F.3d at 187) (" 'the actual medical consequences that flow' " from a "delay in treatment" is " 'highly relevant' " to the determination); *Carpenter*, 316 F.3d at 185 ("[T]he serious medical need inquiry must be tailored to the specific circumstances of each case.").

**\*10** At this stage of the proceedings, however, the Court "must accept the plaintiff's allegations as true and may not dismiss the case unless it is clear that it would be impossible for the plaintiff to make out a legally cognizable claim." *Chance*, 143 F.3d at 703. Applying that standard, I conclude that plaintiff has adequately alleged that the delay in his medical treatment subjected him to an unreasonable risk of harm. *See Carpenter*, 316 F.3d at 186; *Bellotto*, 248 F. App'x at 236.

Defendants' argument that plaintiff's inadequate care claim should be dismissed because he fails to plead that his foot infection was "caused by any purported delay in medical treatment," Def. Mem. at 7 (citing *Smith v. City of New York*, 2016 WL 7471334, at *4-5 (S.D.N.Y. Dec. 28, 2016) ) is inapposite. The plaintiff in *Smith* experienced a "four and a half hour" delay in receiving medical attention which caused him "pain and discomfort" but did not "exacerbate" his condition. 2016 WL 7471334, at *5. Plaintiff here, by contrast, alleges a five-day delay in treatment which, together with the unsanitary conditions of his confinement, caused his pre-existing foot infection to "spread," bleed, and smell, Compl. ¶¶ 9, 41; Pl. Opp. Mem. at ECF page 3, and required various remedial measures once he was permitted to access medical services. Withholding medical evaluation and treatment of a known – and worsening – infection for five days may, depending on the circumstances, constitute objectively unreasonable medical risk.[4] More fundamentally, I cannot conclude at this stage of the case that delaying treatment of a detainee's worsening foot infection for five days, while confining him in an unsanitary and overcrowded holding pen, is " 'so plainly trivial and insignificant as to be outside the domain of [constitutional] concern' " for the purposes of an inadequate care claim.

*Hamm v. Hatcher*, 2009 WL 1322357, at *7 (S.D.N.Y. May 5, 2009) (quoting *Chance*, 143 F.3d at 702) (denying motion to dismiss inadequate medical care claim alleging ten-day denial of prescribed anti-depressant).

[4]    Defendants cite two additional cases in support of their argument that a "fungal foot infection" is "not sufficiently serious to warrant constitutional protection." Def. Mem. at 6. One was decided on a motion for summary judgment and is therefore inapposite here. *See Hernandez v. Goord*, 2006 WL 2109432, at *1-6 (S.D.N.Y. July 28, 2006) (reviewing a substantial factual record and concluding that plaintiff's foot injury did not satisfy the objective prong of his claim). In the other, the plaintiff alleged that "medical staff immediately examined his foot" when he presented with "severe foot fungus," immediately began treatment, and sent him to a podiatrist the following week. *Thomas v. Schriro*, 2013 WL 3491079, at *2 (S.D.N.Y. July 12, 2013).

Because the circumstances alleged by plaintiff "could be [determined to be] 'sufficiently serious' " upon further development of the factual record, he has adequately pled the objective prong of his inadequate medical care claim. *Quinones*, 2017 WL 1322205, at *8 n.10 (quoting *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970) (concluding that *pro se* plaintiff satisfied the objective prong of his inadequate medical care claim by alleging a one-day delay in surgery, because "it is this Court's view that even [a brief] delay in surgery could be 'sufficiently serious,' if a fact-finder were to conclude that ... leaving the plaintiff in such a state, even for a short time, represented a denial of the 'minimal civilized measure of life's necessities' "). *See also Tiggs v. City of New York*, 2009 WL 602991, at *2 (S.D.N.Y. Feb. 24, 2009) (denying motion to dismiss *pro se* inadequate medical care claim based on failure to treat an insect bite that "may have been" seriously infected because, "depending on the appearance of Plaintiff's alleged injury when he requested and was denied medical assistance, Plaintiff may be able to establish that his medical need was 'sufficiently serious' to satisfy the objective prong of the deliberate indifferent test").

*b. Mental Element Prong*

**\*11** I also conclude that plaintiff has adequately alleged that Captain Kirkland "knew, or should have known" that a five-day delay in plaintiff's medical treatment "posed an excessive risk" to his health. *Darnell*, 849 F.3d at 35. As noted above, plaintiff twice showed his foot to Kirkland and

asked for medical attention, which Kirkland promised, but no one provided. However, plaintiff does not make any factual allegations connecting defendants Kamara or Saunders to his requests for medication and medical care. He therefore fails to adequately allege the mental element prong of his medical care claim, as well as the requisite personal involvement, as to both defendants.

### 3. Failure to Protect

Plaintiff's claim that defendant Captain Kamara failed to protect him against assault from other prisoners falls far short of the constitutional mark. Plaintiff's only factual allegation in this regard is that he informed Captain Kamara that Officer Crump called him a "snitch in front of other detainees," Compl. ¶ 33, who then "slung" a mop at him and threw urine in his face, and that Captain Kamara "demonstrated an indifference to [plaintiff's] security" by commenting that he'd seen worse, and by not relocating plaintiff. *Id.* ¶¶ 33, 46. It is well established that even affirmative "verbal harassment and name-calling on the part of prison officials do not constitute actionable constitutional violations." *Randle,* 960 F.Supp.2d at 472-73 (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir. 1986) ). Nor does Captain Kamara's alleged failure to relocate plaintiff (who by then was no longer handcuffed, *see* Compl. ¶ 35) constitute conduct "*posing a substantial risk of serious harm.*" *Randle,* 960 F.Supp.2d at 473 (quoting *Farmer,* 511 U.S. at 835, 114 S.Ct. 1970) (emphasis supplied in *Randle* ). *See, e.g., Dublin v. New York City Law Dep't,* 2012 WL 4471306, at *5 (S.D.N.Y. Sept. 26, 2012) (a failure-to-protect plaintiff must demonstrate that "grave harm" was "actual or imminent") (internal citations and quotations omitted).

### 4. Qualified Immunity

Defendant Kirkland's qualified immunity defense, *see* Def. Mem. at 21, fails with respect to plaintiff's conditions-of-confinement and inadequate medical care claims. Plaintiff's right to "safe and sanitary" conditions, *Walker,* 717 F.3d at 125, is well-established, *see, e.g., id.* at 125-29; *Willey,* 801 F.3d at 66-68; *Darnell,* 849 F.3d at 29-35, as is his right to

adequate medical care. *See, e.g., Hudson,* 503 U.S. at 8, 112 S.Ct. 995; *Chance,* 143 F.3d at 702; *Carpenter,* 316 F.3d at 185; *Spavone,* 719 F.3d at 138. Moreover, it would not be a "reasonable mistake," *Saucier,* 533 U.S. at 206, 121 S.Ct. 2151, to think that detaining a person with a serious and worsening foot infection in unsanitary conditions for five days, without medical care, did not violate those rights.

### III. CONCLUSION

For the reasons set forth above, I respectfully recommend that defendants' motion to dismiss be DENIED as to plaintiff's conditions-of-confinement and inadequate medical care claims against defendant Kirkland, and that it otherwise be GRANTED. Captain Kirkland should be ordered to answer the Complaint within 14 days of the Court's decision. *See* Fed. R. Civ. P. 12(a)(4)(A).

Attachment

### NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from this date to file written objections to my Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007, and to the chambers of the Honorable Barbara Moses at the same address. Any request for an extension of time to file objections must be directed to Judge Daniels. Failure to file timely objections will preclude appellate review. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir. 2010).

### All Citations

Slip Copy, 2018 WL 3300695

---

     © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 2053829
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Mark DUBLINO, Plaintiff,

v.

Timothy MCCARTHY et al., Defendants.

9:19-CV-0381 (GLS/DJS)
|
Signed 05/09/2019

**Attorneys and Law Firms**

MARK DUBLINO, 18-B-0793, Plaintiff, pro se, Auburn Correctional Facility, P.O. Box 618, Auburn, NY 13021.

**DECISION and ORDER**

Gary L. Sharpe, U.S. District Judge

**I. INTRODUCTION**

**\*1** The Clerk has sent to the Court for review a pro se civil rights complaint filed by plaintiff Mark Dublino pursuant to 42 U.S.C. § 1983 ("Section 1983"), together with an application to proceed in forma pauperis (IFP) and motion for a preliminary injunction. Dkt. No. 1 ("Compl."); Dkt. No. 2 ("IFP Application"); Dkt. No. 3 ("Preliminary Injunction Motion"). [1] Plaintiff is incarcerated at Auburn Correctional Facility and has not paid the filing fee for this action.

[1]     Following plaintiff's submission of his complaint and IFP Application, the action was administratively closed based on plaintiff's failure to submit the Inmate Authorization Form required in this District. Dkt. No. 5. Plaintiff then properly filed the Inmate Authorization Form required in this District, and this action was re-opened. Dkt. Nos. 9, 10.

**II. IFP APPLICATION**

Upon review, the Court finds that plaintiff has submitted a completed and signed IFP Application, (Dkt. No. 2), which demonstrates economic need. *See* 28 U.S.C. § 1915(a)(2). Plaintiff has also filed the inmate authorization form required in this District. Dkt. No. 9. Accordingly, plaintiff's IFP Application is granted.

**III. SUFFICIENCY OF THE COMPLAINT**

**A. Governing Legal Standard**

Section 1915(e) directs that, when a plaintiff seeks to proceed in forma pauperis, "(2) ... the court shall dismiss the case at any time if the court determines that – ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [2] Thus, even if a plaintiff meets the financial criteria to commence an action in forma pauperis, it is the court's responsibility to determine whether the plaintiff may properly maintain the complaint that he filed in this District before the court may permit the plaintiff to proceed with this action in forma pauperis. *See id.*

[2]     To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

Likewise, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A; *see Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both sections 1915 and 1915A are available to evaluate prisoner pro se complaints).

In reviewing a pro se complaint, the court has a duty to show liberality toward pro se litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution ... in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted). Therefore, a court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Although the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.' " *Id.* at 679 (quoting *Fed. R. Civ. P. 8(a)(2)*). *Rule 8* "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.* (internal quotation marks and alterations omitted).

### B. Overview of Plaintiff's Complaint and Supplemental Submissions

**\*2** Plaintiff's complaint is comprised of a cover page and attachment that identifies the defendants in this action. *See generally* Compl. The complaint does not contain a statement of claims or a request for relief. *Id.* However, attached as an exhibit to plaintiff's Preliminary Injunction Motion is a typed set of "claims," with supporting documentary evidence. *See* Dkt. No. 3-4 ("Claims and Supporting Documents"). These "claims" include factual allegations of wrongdoing against the individuals named in the complaint as defendants, as well as requests for relief. *Id.* The Court therefore construes the "claims" to be part of the complaint.

In addition, less than four weeks after plaintiff signed his complaint, he submitted a two-page "affidavit" with the following notation at the top of each page: "Attach to Claim #6." Dkt. No. 11 ("Supplement to Complaint"). [3]

[3]    Roughly one week after this action was opened, and two weeks before the Supplement to Complaint was filed, plaintiff submitted a cover letter to which he attached an affidavit and additional documentary evidence. Dkt. No. 6. Because plaintiff indicates in his cover letter that the affidavit and additional documentary evidence are offered in further support of his claims and request for injunctive relief, and does not ask the Court to attach these documents to his complaint, the Court does not consider this submission as an attempt to supplement

the complaint with new claims arising out of events that allegedly occurred after the complaint was signed.

Supplemental pleadings are governed by *Rule 15(d) of the Federal Rules of Civil Procedure*, which permits the Court, "on motion," to allow the filing of a supplemental pleading "setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." *Fed. R. Civ. P. 15(d)*. "[T]he purpose of a supplemental complaint is to allow the inclusion of new defendants and new claims arising since the date of the original pleading, if the new claims are 'adequately related to the original claims.' " *Smith v. Goord*, No. 04-CV-6432, 2006 WL 2850597, at \*1 (W.D.N.Y. Sept. 22, 2006).

The Local Rules of Practice for this District require that any proposed supplemental pleading contain paragraphs that are numbered "consecutively to the paragraphs contained in the pleading that it seeks to supplement." N.D.N.Y. L.R. 7.1(a)(4). Although plaintiff has not filed a motion to supplement, and his proposed supplemental pleading does not include numbered paragraphs, the Court will overlook these procedural defects and accept the supplemental submission in light of plaintiff's pro se status and the early stage of this action.

Accordingly, and for the sake of clarity, the Clerk is directed to file as part of the complaint (1) a copy of the Claims and Supporting Documents, (Dkt. No. 3-4), immediately following the signature page of the complaint, and (2) a copy of the Supplement to Complaint, (Dkt. No. 11), immediately following the Claims and Supporting Documents insert. References in this Decision and Order will be made to the complaint as supplemented. [4]

[4]    As discussed more fully below, liberally construed, the Supplement to Complaint asserts wrongdoing against the Hearing Officer, "Babin," who presided over plaintiff's disciplinary hearing that began on March 26, 2019. The Clerk is therefore directed to amend the docket to add Hearing Officer Babin, Auburn Correctional Facility, as a defendant.

In the future, plaintiff is advised that piecemeal submissions will not be considered or combined with other filings. Plaintiff is further advised that, to the extent he sought for the Court to consider one or more of his other filings as part of his complaint, he must file a complete pleading by way of a single document in the form required by Local Rule 10.1, which will be treated as an amended complaint that supersedes the original pleading as supplemented.

### C. Summary of the Complaint as Supplemented

**\*3** In his complaint, plaintiff asserts claims arising out of his confinement at Auburn Correctional Facility ("Auburn C.F.") and Wende Correctional Facility ("Wende C.F."). *See generally* Compl. The following facts are set forth as alleged by plaintiff in his complaint.

On September 18, 2018, while plaintiff was at Auburn C.F. "receiving notary services on many legal documents from [defendant] librarian Brenda Walsh[,]" defendant Corrections Officer Grady and defendant Corrections Officer Kirkwood entered the library and issued plaintiff a "disciplinary report regarding being out of place." Compl. at 22. Plaintiff explained that defendant Corrections Officer Wheeler "gave [him] permission to receive notary service from the law library[,]" but he was nonetheless placed in keeplock as a result of the charge. *Id.*

On September 25, 2018, Corrections Lieutenant Abate (not a party) found plaintiff not guilty on three of the five charges and removed him from keeplock status. Compl. at 22. As a result of the charges, plaintiff was denied access to "assistance [and] library materials" for eight days. *Id.*

On October 5, 2018, plaintiff was advised by defendant Corrections Officer Vendetti at 1:15 P.M. that he had an attorney visit. Compl. at 6. At 1:35 P.M., plaintiff met with his attorney who was handling his direct appeal. *Id.* Because the private attorney rooms remained under construction due to "contractor issue[s,]" plaintiff's meeting took place in the "common area with other visitors and inmates along with Corrections Officers." *Id.*

During the meeting, plaintiff's attorney advised plaintiff that he had been waiting to meet plaintiff for "at least two hours," and was told that the wait was because plaintiff was showering. Compl. at 6. Plaintiff asked the desk visiting room officer (not a party) why he was not notified earlier of his attorney's arrival, and the officer responded that defendant Vendetti told him that plaintiff was showering. *Id.*

Plaintiff's meeting with his attorney was "awkward and uncomfortable[,]" and ended prematurely at 3:00 P.M., when all daily visits conclude. Compl. at 6. Plaintiff filed a grievance regarding the inadequacies surrounding his meeting, and learned through the grievance process that "the first call" to notify plaintiff of his visitor occurred at 12:50 P.M. *Id.* The Inmate Grievance Review Committee (IGRC)

granted plaintiff's grievance to the extent that the IGRC agreed that "visits should be called in a just and timely manner." *Id.* Plaintiff "agreed with the response and appealed to the Superintendent[,]" defendant McCarthy, who "upheld the findings" and granted the appeal to that extent. *Id.*

On October 20, 2018, while plaintiff was incarcerated at Wende C.F. for a court appearance, "[t]he visiting room reception officers" denied plaintiff a visit with his attorney. Compl. at 9. Plaintiff's visit was "scheduled as follow up from the shortened visit [he] had [with his attorney] on October 5, 2018[.]" *Id.*

On October 30, 2018, while plaintiff was incarcerated at Auburn C.F., defendant Vendetti prevented him from attending law library services by not opening his cell during "automatic law library callout." Compl. at 22.

On December 7, 2018, plaintiff's attorney traveled to Auburn C.F. for "a confirmed attorney visit[.]" Compl. at 9. Prior to this date, plaintiff's counsel had contacted defendant Liaison Officer Anthony Smith and defendant Liaison Associate Officer Leanne Callahan to obtain approval for this visit. *Id.* at 9, 11. When the attorney arrived at Auburn C.F., he was incorrectly advised that plaintiff was "on a court transfer" and at Wende C.F. *Id.* at 9. Although plaintiff was being housed at Wende C.F., he was moved there on November 28, 2018, following his placement in keeplock at Auburn C.F. the previous day. *Id.*

**\*4** On December 22, 2018, plaintiff "inquired about possible missing mail" to defendant Corrections Sergeant Sheftic and defendant Steward Vanni. Compl. at 17. Plaintiff did not receive a response to his inquiries. *Id.*

On December 28, 2018, when plaintiff was back at Auburn C.F., defendant Walsh refused plaintiff's request to notarize certain documents after reading the contents of those documents. Compl. at 24.

On December 31, 2018, at approximately 4:00 P.M., the water feed to plaintiff's toilet was shut off. Compl. at 24. Later that day, defendant Corrections Officer Remington conducted a random search of plaintiff's cell. *Id.* During the search, defendant Remington indicated on a cell search checklist that plaintiff's toilet was working even though it was not. *Id.*

The next day, defendant Corrections Officer Penello threatened plaintiff that his toilet would not be fixed if he

asked about it again. Compl. at 24. On or about January 3, 2019, plaintiff was transferred to Wende C.F. *Id.*

On January 16, 2019, plaintiff again raised a concern about missing mail to defendant Sheftic, as well as defendant Deputy of Programs Shanke. Compl. at 17. On January 30, 2019, plaintiff also complained to defendant Corrections Sergeant Carhardt about possible missing mail. *Id.* Plaintiff did not receive an "answer or resolution" from any of these officials. *Id.*

On February 4, 2019, plaintiff received sixteen legal parcels from "multiple legal sources." Compl. at 17. Defendant Corrections Officer Powell brought the parcels to plaintiff at his cell. *Id.* The dates on the parcels "covered a time period" of November 29, 2018 through January 31, 2019. *Id.*

On February 22, 2019, plaintiff "was expecting [a] scheduled attorney visit around noon." Compl. at 12. As plaintiff was returning from lunch, he overheard a "company officer" state that "company 13 cell 24 has a visit." *Id.* The referenced cell belonged to plaintiff. *Id.*

"A few minutes later[, the] company officer opened cell 34." Compl. at 12. The inmate confined to that cell stated that he did not have a visit scheduled. *Id.* The A-man for Block C, defendant Corrections Officer Simmons, then "confirmed the visit was for an attorney for 13 company cell 34." *Id.* The inmate confined to that cell refused the visit, and plaintiff's cell was never opened. *Id.* As a result, plaintiff "missed the opportunity to visit with [his] attorney." *Id.*

The next day, plaintiff spoke with defendant Simmons. Compl. at 12. She "checked her board" from the previous day and acknowledged that she made a mistake. *Id.* However, on the same day that plaintiff was denied his attorney visit, his attorneys successfully met with another inmate at Auburn C.F. "without incident." *Id.*

In addition to submitting a grievance regarding this incident, plaintiff wrote to Corrections Sergeant Sirvent (not a party). Compl. at 12. On March 1, 2019, after meeting with plaintiff to discuss the incident, Sergeant Sirvent arranged for plaintiff to have a private telephone call with his attorney in the Media Center. *Id.* Plaintiff declined the arrangement because "a phone call[,] although appreciated[,] isn't a visit." *Id.*

On March 3, 2019, plaintiff "received an erroneous disciplinary inmate misbehavior report" authored by defendant Corrections Officer Pickett, charging him with a disciplinary violation after officials were unable to locate a razor during a random search of plaintiff's cell. Compl. at 27. Although plaintiff produced the razor for defendant Corrections Officer Nowak, he was placed in keeplock the next day. *Id.*

**\*5** On March 6, 2019, plaintiff spoke with defendant Nowak about the misbehavior report. Compl. at 27. Defendant Nowak acknowledged seeing the razor and indicated that he would be a witness for plaintiff at his disciplinary hearing. *Id.*

The next morning, plaintiff received "another erroneous disciplinary misbehavior report[,]" which was authored by defendant Nowak. Compl. at 27. The misbehavior report charged plaintiff with "not following a direct order and interference during ... count." *Id.*

On March 8, 2019 and March 12, 2019, disciplinary hearings were conducted by different Corrections Lieutenants regarding the misbehavior reports. Compl. at 27. Plaintiff "was exonerated and found not guilty of all allegations" and removed from keeplock. *Id.* However, as a result of plaintiff's keeplock confinement, he "lost the time to work on [his] legal issues using the law library for research." *Id.*

On or about March 20, 2019, plaintiff was charged with violating multiple prison rules. Compl. at 28-29. As a result of the charges, plaintiff was afforded a Tier III disciplinary hearing, which began on March 26, 2019. *Id.* at 28. Defendant Babin presided over plaintiff's hearing, which was conducted without plaintiff having access to an employee assistant. *Id.*

After plaintiff identified fourteen witnesses and "provided an actual innocence statement," defendant Babin closed the hearing to investigate. Compl. at 28. During the adjournment, plaintiff was confined in the Special Housing Unit (SHU). *Id.*

The hearing was resumed on April 4, 2019, during which time defendant Babin indicated that he was unable to contact any of the witnesses plaintiff identified. Compl. at 28. Plaintiff then provided the names of five more staff officers as potential witnesses, and "stressed the need of providing the names of the other ... three officers who were involved with the alleged incident." *Id.* Defendant Babin again adjourned the hearing. *Id.*

On April 11, 2019, plaintiff's hearing was resumed. Compl. at 28. Defendant Babin stated that he interviewed one

corrections official, one nurse, and one inmate regarding the incident giving rise to the charges against plaintiff. *Id.* Plaintiff was not given an opportunity to provide defendant Babin with questions for these witnesses, and "no recorded testimony or written responses" from these witnesses was introduced. *Id.* The inmate who was questioned also "confirm[ed] the alleged incident was not committed by [plaintiff]." *Id.* at 29.

Defendant Babin found plaintiff guilty of several of the charges and sentenced him to thirty days of SHU confinement, without giving him credit for the twenty-three days of SHU confinement he had served since the charges were brought against him. Compl. at 29. Defendant Babin also imposed a loss of one month of "good behavior" time. *Id.*

In addition to the aforementioned events, between August 2018 and March 2019, plaintiff was also denied access to the law library, legal assistance, notary services, and legal documents by various corrections officials at Auburn C.F. and Wende C.F., lost an attorney, and experienced problems with accessing a properly working computer and typewriter. Compl. at 20, 22-27. With respect to these deprivations that occurred as Auburn C.F., plaintiff names Auburn C.F., as well the following individuals, as defendants: Corrections Counselor Jones; Law Library Supervisor Michael C. Polcovich; Corrections Officer Vullwhite; Corrections Officer Knapp; Corrections Officer Vanderwerff; Corrections Officer "D"; Corrections Officer Milnane; Corrections Sergeant Carhart; Corrections Captain Norris; Deputy of Security Corey; Deputy Superintendent Schenk; and the Commissioner of the Commission of Correction Thomas J. Loughren.[5]

5    As noted below in Section III.D, plaintiff's claims arising out of his confinement at Wende C.F. are transferred to the Western District of New York.

*6 Construed liberally, plaintiff asserts the following claims with respect to alleged wrongdoing that occurred during his incarceration at Auburn C.F.: (1) First Amendment access-to-courts claims based on the alleged denials of access to the law library, legal assistance, legal property, typewriter and computer services, and counsel; (2) a First Amendment free-flow-of-mail claim; (3) a First Amendment claim for denial of access to notary services; (4) a First Amendment retaliation claim; (5) First and Sixth Amendment interference with access-to-counsel claims; (6) Fourteenth Amendment due process claims based on the alleged

issuance of false misbehavior reports and imposition of disciplinary penalties; (7) an Eighth Amendment conditions-of-confinement claim; and (8) a claim for violations of New York State Department of Corrections and Community Supervision (DOCCS) directives.[6]

6    Plaintiff also asserts a Fourteenth Amendment substantive due process claim. *See* Compl. at 20. "Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense ... but not against government action that is 'incorrect or ill-advised' " *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (internal citations omitted). "To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Okin v. Village of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8 (1998)). The Court does not construe the complaint to assert such a claim.

Plaintiff has sued the named defendants in their individual and official capacities, and seeks both monetary and injunctive relief. Compl. at 2, 6, 9, 12, 17, 20. For a complete statement of plaintiff's claims, reference is made to the complaint.

### D. Severance and Transfer of Claims Arising Out of Wende C.F.

Rule 21 of the Federal Rules of Civil Procedure permits the Court to sever any claim against a party and proceed with that claim separately. Fed. R. Civ. P. 21. In deciding whether to sever a claim, the Court should consider the following:

> (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.

*Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 580 (E.D.N.Y. 1999). "A claim may be severed based upon lack of a significant relationship between defendants or solely for the purpose of facilitating transfer. Where the administration of justice would be materially advanced by severance and transfer, a court may properly sever the claims against one or more defendants for the purpose of permitting the transfer of the action against other defendants." *Cain v. New York State Bd. of Elections*, 630 F. Supp. 221, 225-26 (E.D.N.Y. 1986). "A decision to sever lies within the discretion of the Court." *Id.* at 225.

Here, plaintiff's claims arising out of his confinement at Wende C.F. are more appropriately heard in the Western District of New York, where that facility is located. The allegations pertaining to Wende C.F. involve different defendants than the allegations pertaining to Auburn C.F., and, although plaintiff may assert similar legal theories in support of some of his claims arising out of both locations, the witnesses and documentary proof will be distinct. In addition, the Court is sensitive to the burden, upon both the individuals and the taxpayers of New York, of requiring individuals who are employed and most likely reside in the Western District to travel to the Northern District to defend against allegations that occurred in the Western District.

**\*7** For the foregoing reasons, plaintiff's claims arising out of wrongdoing that allegedly occurred at Wende C.F. (and the named defendants against whom those claims are asserted) are severed from this complaint and venue of those claims (and defendants) is transferred to the Western District in the interests of justice and judicial efficiency. The Court makes no ruling as to the sufficiency of the claims asserted against the named defendants from Wende C.F., thereby leaving that determination to the Western District of New York.

**E. Analysis of Claims Arising Out Auburn C.F.**

Plaintiff asserts claims pursuant to Section 1983, which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted). "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

**1. Eleventh Amendment Immunity**

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana*, 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. *Gollomp v. Spitzer*, 568 F.3d 355, 365-66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through Section 1983, *see Quern v. Jordan*, 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the claims asserted in plaintiff's complaint. *See generally Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38-40 (2d Cir. 1977); *Dawkins v. New York*, No. 5:93-CV-1298 (RSP/GJD), 1996 WL 156764 at *2 (N.D.N.Y. 1996).

State immunity extends not only to the states, but also to state agencies. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf*, 506 U.S. 139, 142-47 (1993); *McGinty v. New York*, 251 F.3d 84, 95 (2d Cir. 2001) ("The Eleventh Amendment extends immunity not only to a state, but also to entities considered 'arms of the state.' "); *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 414 (2d Cir. 1999) ("An official arm of the state enjoys the same Eleventh Amendment immunity from suit in federal court as is enjoyed by the state itself."). Thus, plaintiff's claims against Auburn C.F. fail because it is a "branch" of the New York State Department of Corrections and Community Supervision, and is therefore absolutely immune from this lawsuit. *Will v. Michigan Dep't of Police*, 491 U.S. 58, 71 (1989); *Rivera v. Goord*, 119 F. Supp. 2d 327, 336 (S.D.N.Y. 2000) (defendant correctional facility immune from suit since it is a branch of a state agency, the Department of Corrections); *Simmons v. Gowanda Corr. Facility*, No. 13-CV-0647, 2013 WL 3340646, at *1 (W.D.N.Y. July 1, 2013) ("[T]he New York State Department of Corrections and [the named correctional facility] enjoy the same Eleventh Amendment immunity from suit in federal court as enjoyed by the state itself."); *Millhouse v. New York State Dep't*

*of Corr. Servs.*, No. 9:09-CV-1297 (LEK/RFT), 2009 WL 10675929, at *3 (N.D.N.Y. Dec. 31, 2009) ("[A] state correctional facility, which has no separate legal existence, is generally referred to as a "branch" of DOCS and, as such, is immune from § 1983 liability.").

**\*8** Similarly, plaintiff's claims for money damages against the named defendants in their official capacities fails because the Eleventh Amendment bars suits for damages against state officials acting in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (a claim for damages against state officials in their official capacity is considered to be a claim against the State and is therefore barred by the Eleventh Amendment); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron*, 996 F.2d 1439, 1441 (2d Cir. 1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities.")

Accordingly, to the extent that plaintiff seeks any relief against Auburn C.F., or monetary damages under Section 1983 against any non-severed defendant in his or her official capacity, such claims are dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) as barred by the Eleventh Amendment. [7]

[7]    In *Ex Parte Young*, 209 U.S. 123 (1908), the Supreme Court established an exception to state sovereign immunity in federal actions where an individual brings an action seeking injunctive relief against a state official for an ongoing violation of law or the Constitution. Under the doctrine, a suit may proceed against a state official in his or her official capacity, notwithstanding the Eleventh Amendment, when a plaintiff, "(a) alleges an ongoing violation of federal law, and (b) seeks relief properly characterized as prospective." *See In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (quotations and citations omitted); *see also Santiago v. New York State Dep't of Corr. Serv.*, 945 F.2d 25, 32 (2d Cir. 1991) (holding that such claims, however, cannot be brought directly against the state, or a state agency, but only against state officials in their official capacities). In this case, as discussed more fully below, plaintiff has not alleged facts which plausibly suggest the existence of

an ongoing violation of law or the Constitution. *See generally* Compl.

## 2. Access-to-Courts Claims

In *Bounds v. Smith*, the Supreme Court held that access to the courts is a fundamental right that requires prison authorities to "assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. 817, 828 (1977). The right of access to the courts is also implicated when a prisoner experiences interference with his mail. *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003).

The "right of access to the courts" requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." *Bounds*, 430 U.S. at 828, *modified on other grounds by Lewis v. Casey*, 518 U.S. 343, 350 (1996); *see also Bourdon v. Loughren*, 386 F.2d 88, 92 (2d Cir. 2004). [8] "However, this right is not 'an abstract, freestanding right....' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " *Collins v. Goord*, 438 F. Supp. 2d 399, 415 (S.D.N.Y. 2006) (quoting *Lewis*, 518 U.S. at 351).

[8]    "[A] person's right of access to the courts has been found to arise not only under the First Amendment but under other parts of the Constitution, including the Due Process Clause of the Fourteenth Amendment." *Lasher v. Dagostino*, No. 9:16-CV-0198 (BKS), 2016 WL 1717205, at *4 (N.D.N.Y. Apr. 28, 2016) (collecting cases).

**\*9** To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating that (1) the defendant acted deliberately, and (2) the plaintiff suffered an actual injury. *Lewis*, 518 U.S. at 353; *Konigsberg v. Lefevre*, 267 F. Supp. 2d 255, 261 (N.D.N.Y. 2003) ("Prison officials may only be held liable for such injury if they frustrated or impeded a prisoner's efforts to pursue a non-frivolous legal claim.").

"A hypothetical injury is not sufficient to state a claim for violation of the right of access to the courts." *Amaker v. Haponik*, No. 98-CV-2663, 1999 WL 76798, at *3 (S.D.N.Y. Feb. 17, 1999). Instead, a plaintiff must demonstrate "actual injury" by establishing that the denial "hindered his efforts" to pursue a non-frivolous legal claim. *Lewis*, 518 U.S.

at 349, 351-53 (noting that "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense"). "Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis,* 320 F.3d at 352 (citing *Jermosen v. Coughlin,* 877 F. Supp. 864, 871 (S.D.N.Y. 1995)).

The Supreme Court has stated that in order to allege a denial of access to the courts claim, "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint." *Christopher v. Harbury,* 536 U.S. 403, 415 (2002). The Supreme Court instructed that the underlying claim "must be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." *Id.* at 415-16. "[T]he complaint should state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued, and a like plain statement should describe any remedy available under the access claim and presently unique to it." *Id.* at 417-18 (footnote omitted).

"Finally, ... the injury requirement is not satisfied by just any type of frustrated legal claim." *Lewis,* 518 U.S. at 354. Rather, the injury must be to an inmate's ability "to attack [his] sentence[ ], directly or collaterally, [or] ... to challenge the conditions of [his] confinement." *Id.* at 355. "Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.*

Here, plaintiff does not allege that he has been continuously denied access to legal mail, legal materials, legal assistance, or the law library while incarcerated at Auburn C.F. Rather, he alleges that he was denied access to the law library on three isolated occasions, experienced a delay in receipt of legal mail, was deprived of legal property during transports (which was eventually returned to him), and at times was unable to use a typewriter or computer because the machines did not work. Compl. at 20, 22-27.[9] Moreover, the complaint is devoid of any allegations which plausibly suggest that plaintiff suffered an "actual injury" in any legal proceeding as a result of the alleged issues plaintiff experienced with access to his mail, the law library, legal assistance, legal property, or a properly functioning typing machine. Indeed, the complaint lacks any allegations explaining how any of these alleged issues "hindered" his pursuit of a legal claim.

*Lewis,* 518 U.S. at 351 ("[P]rison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." (internal quotation marks and citations omitted); *see Warburton v. Underwood,* 2 F. Supp. 2d 306, 312 (W.D.N.Y. 1998) (dismissing claim for interference with access to courts where plaintiff did not make showing as to how challenged conduct hindered him).

9    Plaintiff alleges that he was denied access to the law library at Auburn C.F. on the following days: October 30, 2018; November 10, 2018; and December 22, 2018. Compl. at 22, 24. Plaintiff further alleges facts which plausibly suggest that he received law library services on October 31, November 3, November 6-9, November 11, and December 28, 2018. *Id.*

 **\*10**   Accordingly, plaintiff's First Amendment access-to-courts claim is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 3. Free-Flow-of-Mail Claim

"In addition to the right of access to the courts, a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis,* 320 F.3d at 351. A prisoner's mail may only be restricted to further " 'one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.' " *Id.* (quoting *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir. 1986)). "The First Amendment protects prisoners' access to mail directly, unlike the right of access to courts, which protects prisoners' access to mail only derivatively and with respect to given claims." *Bellezza v. Holland,* No. 09-CV-8434, 2011 WL 2848141, at *6 (S.D.N.Y. July 12, 2011) (dismissing access-to-the-courts claim for failure to allege injury, but holding that plaintiff adequately alleged a violation of his right to send and receive mail). "It is thus not necessary to allege actual injury when asserting a violation of one's right to the free flow of mail." *Antrobus v. City of New York,* No. 11-CV-2524, 2014 WL 1285648, at *4 (S.D.N.Y. Mar. 27, 2014) (citations omitted).

As courts have attempted to balance the competing interests implicated when facilities place restrictions on prison mail, the courts have "consistently afforded greater protection to

legal mail than to non-legal mail[.]" *Davis*, 320 F.3d at 351. "While a prisoner has a right to be present when his legal mail is opened, ... an isolated incident of mail tampering is usually insufficient to establish a constitutional violation." *Davis*, 320 F.3d at 351 (citations omitted). However, in *Washington v. James*, the Second Circuit found that "as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis*, 320 F.3d at 351 (citing *Washington*, 782 F.2d at 1139); *see Turner v. Safley*, 482 U.S. 78, 84-91 (1987) (prison regulations impinging constitutional rights must be "reasonably related to legitimate penological interests").

Here, plaintiff alleges that he experienced a delay in receiving "sixteen legal ... parcels" addressed to him "from multiple legal sources." Compl. at 17. Plaintiff also specifically identifies each piece of mail, its date, the dates he was incarcerated at Auburn C.F., and the date he received this mail. *Id.* at 19.

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, *see Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court finds that plaintiff's free-flow-of-mail claim against defendants Sheftic, Vanni, Shanke, and Carhardt survives sua sponte review and requires a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

**\*11** The Court, however, reaches a different conclusion with respect to defendants Powell and McCarthy. The only allegation in the complaint regarding defendant Powell is that he delivered plaintiff sixteen parcels of mail on February 4, 2019. Compl. at 17. Plaintiff does not allege that he made defendant Powell aware, prior to this date, that he was missing mail. Nor does plaintiff allege any facts which plausibly suggest that defendant Powell was responsible for the delay in plaintiff's receipt of his mail. Thus, there is no basis for the Court to infer that defendant Powell, solely through delivering plaintiff his mail, was personally involved in the alleged constitutional violation.

With respect to defendant McCarthy, the complaint alleges that he is "ultimately responsible for subordinates['] actions." Compl. at 17. Prior to *Iqbal*, the Second Circuit held

that supervisory personnel may be considered "personally involved" in an alleged constitutional violation only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)). [10]

> [10]  The Second Circuit has not yet addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of *Iqbal* on *Colon* because the complaint "did not adequately plead the Warden's personal involvement even under *Colon*); *see also Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) (expressing "no view on the extent to which [*Iqbal*] may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations[.]" (citing *Grullon*, 720 F.3d at 139)). For purposes of this Decision and Order, the Court assumes that all five categories under *Colon* remain valid.

Plaintiff does not allege any facts which plausibly suggest that he complained to defendant McCarthy about missing mail, or that defendant McCarthy otherwise became aware of plaintiff's missing mail before it was delivered to him. Nor does he allege facts which plausibly suggest that he was denied access to legal mail pursuant to a custom or policy at Auburn C.F. Moreover, a "failure to remedy" theory of liability is not available against a supervisor with respect to discrete and completed violations. *See Jackson*, 256 F.3d at 96 (citing *Blyden*, 186 F.3d at 259, 264 and *Wright*, 21 F.3d at 501); *see also Young v. Kihl*, 720 F. Supp. 22, 23 (W.D.N.Y. 1989) ("[T]he wrong must have been ongoing or otherwise capable of mitigation at the time the supervisory official was apprised thereof."). Thus, plaintiff's claim against defendant McCarthy can only be based on the fourth *Colon* factor.

"An allegation that a defendant failed to adequately train or supervise subordinates implicates the fourth *Colon* factor, *i.e.*, that 'the defendant was grossly negligent in supervising

subordinates who committed the wrongful acts.' " *Samuels v. Fischer*, 168 F. Supp. 3d 625, 638 (S.D.N.Y. 2016) (quoting *Colon*, 58 F.3d at 873). To support a finding of personal involvement on that basis, a "plaintiff must show that the defendant knew or should have known that there was a high degree of risk that his subordinates would behave inappropriately, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to Plaintiff." *Id.* (internal quotation marks and citation omitted). "Vague and conclusory allegations that a supervisor failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability." *White v. Fischer*, No. 9:09-CV-0240 (DNH/DEP), 2010 WL 624081, at *6 (N.D.N.Y. Feb. 18, 2010).

*12 The complaint is devoid of any allegations which plausibly suggest that defendant McCarthy knew or should have known there was a high degree of risk that his subordinates would behave inappropriately with respect to the handling of legal mail. *See Nash v. McGinnis*, 585 F. Supp. 2d 455, 460 (W.D.N.Y. 2008) ("Although plaintiff need not plead facts in great detail, the formulaic allegation that [the Superintendent] was aware of the alleged violations and did nothing to stop them from occurring, without some factual allegations to explain the basis for that conclusion, is insufficient to render it plausible that [the Superintendent] was personally involved in the alleged constitutional deprivations."); *Diaz v. Burns*, No. 6:10-CV-6595, 2013 WL 5951866, at *5 (W.D.N.Y. Nov. 6, 2013) ("Essentially Plaintiff is asking the Court to hold that the filing of grievances is sufficient to put a supervisory official on notice that the grievant will be subjected to unconstitutional conduct at the hands of his or her staff members. The Court agrees with Defendants that Plaintiff has not sufficiently alleged personal involvement by Commissioner Fischer and Superintendent Kirkpatrick in any of the asserted constitutional violations."). Rather, plaintiff's claim against defendant McCarthy is entirely conclusory, and appears to be based solely on his role as Superintendent of Auburn C.F., which is not a basis for supervisory liability. *See Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (per curiam) ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." (internal quotation marks omitted)); *Rose v. Garritt*, No. 16-CV-3624, 2018 WL 443752, at *5 (S.D.N.Y. Jan. 16, 2018) ("To the

extent Plaintiff alleges that Lee and Burnett were aware of the violent proclivities of Freeman and C.O. Miller before the excessive force incident, the Complaint does not plausibly allege that Lee and Burnett were personally on notice of the likelihood that they would assault Plaintiff."); *Rahman v. Fischer*, No. 08-CV-4368, 2010 WL 1063815, at *5 (S.D.N.Y. Mar. 22, 2010) (finding allegation that defendant "received 'several' complaints of staff assaulting prisoners" as "an insufficient allegation of notice of any policy or custom of assaults by correction officers").

Accordingly, plaintiff's free-flow-of-mail claim against defendants Powell and McCarthy is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 4. First Amendment Access to a Notary

The Supreme Court has also held that "indigent inmates must be provided at state expense with paper and pen to draft legal documents with notarial services to authenticate them, and with stamps to mail them." *Bounds*, 430 U.S. at 824-25. "However, '[t]here is no constitutional right to a notary service five days a week,' ... and 'it is within the discretion of prison officials to establish reasonable procedures governing access to prison legal facilities, including access to notary publics.' " *Flowers v. Dalsheim*, 826 F. Supp. 772, 774-75 (S.D.N.Y. 1993) (quoting *Washington v. Vincent*, 361 F. Supp. 942, 943 (S.D.N.Y. 1973)).

The governing DOCCS guidelines, set forth in Directive No. 4483, call upon facilities to establish a schedule ensuring "inmates in general population with reasonable access to the services of a notary public within 72 hours of request excluding weekends and holidays," and "[i]nmates confined to special housing, keeplock and protective custody" with access to "notarial services at least two times per week." [11] In *Washington v. Vincent*, the court upheld facility procedures providing inmates with notary services at least twice per week. *See* 361 F. Supp. at 943.

---

[11]     The Court takes judicial notice of Directive 4483. *See, e.g., Williams v. Fischer*, No. 11-CV-0379 (NAM/TWD), 2015 WL 1137644, at *4 n.7 (N.D.N.Y. Mar. 11, 2015) (taking judicial notice of DOCCS Directive 4202); *Phelan v. Zenzen*, No. 10-CV-06704, at *4 (W.D.N.Y. Nov. 6, 2012) (taking judicial notice of DOCCS Directive 4421).

In this case, plaintiff alleges that he obtained notary services from defendant Walsh on September 18, 2018, but thereafter experienced complications. Compl. at 22-27. More specifically, plaintiff alleges that on October 31, 2018, defendant Walsh denied him notary services, and between November 6 and November 9, 2018, no notary was available in the prison library, which prevented him from obtaining notary services until November 11, 2018. *Id.* at 22. Plaintiff further alleges that he submitted a request for notary services on December 22, 2018, which was ignored, and on December 28, 2018, defendant Walsh agreed to notarize only certain of the documents plaintiff sought to have notarized. *Id.* at 24. In addition, on February 6, 2019, defendant Walsh refused to notarize plaintiff's "legal requests related to DOCCS[,]" and advised him that she had been "instructed not to." *Id.* at 27.

**\*13** In total, these allegations plausibly suggest, at most, that plaintiff experienced an eleven-day delay in access to notary services on one occasion, a seven-day delay in access to notary services on a separate occasion, and a refusal to have certain documents notarized on two occasions. Plaintiff does not allege any facts which plausibly suggest that any of the documents that defendant Walsh refused to notarize were legal documents that needed to be notarized for a legal proceeding. Nor does he allege facts which plausibly suggest that he suffered an actual injury as a result of either the delays in access to a notary, or the refusal to notarize certain documents. *See Ramsey v. Coughlin,* 1 F. Supp. 2d 198, 205 (W.D.N.Y. 1998) (slow response time for notary services not prejudicing ongoing lawsuit states no constitutional violation); *Hudson v. Robinson,* 678 F.2d 462, 466 (3d Cir. 1982) (inmate required to wait ten days to have a document notarized who suffered no "actual injury" as a result of that delay did not state a claim for denial of access to the courts).

Accordingly, plaintiff's First Amendment denial of access to notary services claim is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 5. Retaliation Claim

Courts must approach claims of retaliation " 'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official–even those otherwise not rising to the level of a constitutional violation–can be characterized as a constitutionally proscribed

retaliatory act.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir. 2003) (*quoting Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002)). To state a plausible claim, a plaintiff asserting a First Amendment retaliation claim must advance "non-conclusory" allegations establishing "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action." *Davis,* 320 F.3d at 352 (*quoting Dawes,* 239 F.3d at 492). "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir. 1983). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir. 2003).

The filing of a prison grievance is a constitutionally protected activity for the purpose of meeting the first prong of the retaliation test. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir. 1996); *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir. 1988) (same).

Here, plaintiff alleges that on October 5, 2018, defendant Vendetti delayed plaintiff's visit with his criminal appellate attorney. Compl. at 6. Plaintiff has also attached to his complaint copies of a grievance and Superintendent's response regarding this incident, wherein plaintiff states in the "Appeal Statement," among other things, that "[o]n 8/30/18 [he] submitted a grievance which involved [defendant] Vendetti[, and] consisted of the same issue (not being released for institution privileges)[.]" *Id.* at 7. In addition, plaintiff alleges that defendant Vendetti denied him law library services on October 30, 2018, by refusing to open his cell door, in retaliation for a "previous grievance." Compl. at 22.[12]

[12]  Plaintiff also alleges in conclusory fashion that he has "grieved some ... issues" related to law library services and legal assistance, and "due to this ... had retaliatory acts committed against [him] in treatment cell confinement[.]" Compl. at 20. These allegations are entirely conclusory. Moreover, the complaint fails to identify any individual(s) other than defendant Vendetti who allegedly took "adverse action" against plaintiff in retaliation for him filing one or more grievances.

**\*14** Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's retaliation claim against defendant Vendetti survives sua sponte review and requires a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

### 6. Access-to-Counsel Claims

The Supreme Court long ago held that "in order to challenge unlawful convictions and to seek redress for violations of their constitutional rights[,] ... inmates must have a reasonable opportunity to seek and receive the assistance of attorneys." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *partially overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989). In addition, under the Sixth Amendment, a criminal defendant has the right to effective assistance of counsel. This protection "applies to a defendant's trial and first appeal as of right, [though] not to appeals afforded on a discretionary basis, collateral proceedings, or civil proceedings such as civil rights claims challenging prison conditions." *Bourdon*, 386 F.3d at 96 (citing *Pennsylvania v. Finley*, 481 U.S. 551, 555-57 (1987)).

These protections, however, have limits, as the Supreme Court has held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89 (upholding, among other things, restrictions on inter-inmate correspondence as reasonably related to prison officials' legitimate security concerns). In the specific context of criminal defendants' access to attorneys, the Second Circuit has found that regulations restricting defendants' contact with their attorneys are "unconstitutional where they unreasonably burdened the inmate's opportunity to consult with his attorney and to prepare his defense." *Benjamin v. Fraser*, 264 F.3d 175, 187 (2d Cir. 2001) (quotation and citation omitted). "Examples of unconstitutional limits on prisoners' rights to counsel include a ban on all visits by paralegals employed by criminal defense counsel and repeated delays in meetings between prisoners and attorneys that resulted in attorneys forgoing the meetings." *Schick v. Apker*, No. 07-CV-5775, 2009 WL 2016926, at \*2 (S.D.N.Y. July 10, 2009) (citations omitted). Conversely, courts have found that denying an inmate one method of communicating confidentially with his attorney does not give rise to a constitutional violation. *Lowery v. Westchester Cty. Dep't of Correction*, No. 15-CV-4577, 2017 WL 564674, at \*3-4 (S.D.N.Y. Feb. 10, 2017) (collecting cases); *Groenow v. Williams*, No. 13-CV-3961, 2014 WL 941276, at \*7 (S.D.N.Y. Mar. 11, 2014) ("Because Groenow has not alleged that he was denied all opportunities to consult confidentially with his attorney, he has not plausibly alleged a Sixth Amendment violation" even though "monitoring telephone calls with his attorney most likely had a chilling effect on Groenow's ability to communicate effectively with his attorney"); *Schick*, 2009 WL 2016926, at \*2 (finding, where the plaintiff "neither allege[d] nor offer[ed] evidence that defendants restricted other means of access to his attorneys, such as mail, monitored telephone calls, and in-person visits regarding pending criminal matters[,]" that refusing to grant plaintiff's request for an unmonitored call with his criminal appellate attorney on three occasions "did not 'unreasonably burden' his opportunity to consult with counsel and to prepare his appeal"); *Bellamy v. McMickens*, 692 F.Supp. 205, 214 (S.D.N.Y. 1988) ("[S]tates have no obligation to provide the best manner of access to counsel. Rather, restrictions on inmates' access to counsel via the telephone may be permitted as long as prisoners have some manner of access to counsel.").

**\*15** Here, plaintiff alleges that on two occasions between August 2018 and March 2019, while he was incarcerated at Auburn C.F., he was denied a scheduled visit with his criminal appellate attorney. Compl. at 9, 12. Plaintiff further alleges that on one occasion when he met with his attorney, his visit was delayed, and occurred in an area in which other corrections officials and inmates were present. *Id.* at 6.

As an initial matter, with respect to the two scheduled visitations that did not occur, the complaint lacks any allegations which plausibly suggest that plaintiff missed these visits as a result of a prison rule, policy, or practice. Indeed, plaintiff does not allege that any of the named defendants were personally involved in more than one incident in which a scheduled visit did not occur. Nor does plaintiff allege that he was prevented from speaking with his criminal appellate attorney by telephone before or after either missed visit. In fact, by his own allegations, plaintiff was offered an opportunity to have a "semi-private" telephone call with his appellate attorney after one of his scheduled visits did not occur, and he turned down this offer. Compl. at 12, 27. Thus, plaintiff has failed to allege facts which plausibly suggest that any of the named defendants "unreasonably burdened [his] opportunity to consult with his attorney and to prepare his defense" through actions which caused him to miss two visits.

Similarly, with respect to plaintiff's shortened visit with his attorney in a non-private area of Auburn C.F., as noted, the complaint lacks allegations which plausibly suggest that plaintiff was denied other means of communicating privately with his criminal appellate attorney before or after this visit. Moreover, denying an inmate a private room to meet with his attorney on one occasion, by itself, does not amount to a constitutional violation. *See Schick*, 2009 WL 2016933, at *10 ("The Constitution simply does not guarantee Plaintiff unlimited communications with several attorneys, or the means of communication that Plaintiff might consider the most convenient or productive.").

Accordingly, plaintiff's access-to-counsel claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

## 7. False Misbehavior Report Claims

Plaintiff alleges that he was issued false misbehavior reports on the following dates and by the following defendants: (1) on March 3, 2019, by defendant Pickett; (2) on March 6, 2019, by defendant Nowak; and (3) on March 20, 2019, by an unidentified official. Compl. at 27-28. [13]

[13]   Plaintiff also alleges that defendants Grady and Kirkwood issued him a misbehavior report on September 18, 2018, and that three of the five charges in that report were dismissed, but he does not allege that the misbehavior report was entirely unwarranted or based on false statements. *See* Compl. at 22.

It is well settled that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982 (1988)); *accord Pittman v. Forte*, No. 9:01-CV-0100, 2002 WL 31309183, at *5 (N.D.N.Y. July 11, 2002) (Sharpe, M.J.); *see Santana v. Olson*, No. 07-CV-0098, 2007 WL 2712992, at *2 (W.D.N.Y. Sept. 13, 2007) ("[T]he filing of a false misbehavior report by a correctional officer does not state a claim for relief."). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there has been more, such as "retaliation against the prisoner for exercising a constitutional right." *Boddie*, 105 F.3d at 862. Here, plaintiff alleges no facts which plausibly suggest that any of the named defendants who allegedly

issued him a false misbehavior report did so in retaliation for his exercise of a constitutional right. In addition, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing." [14] *Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986) (rejecting prisoner's "but for" argument as to guard who prepared misbehavior report but was not involved in Tier III hearing) (citation omitted).

[14]   "The only constitutional violation that could occur in this situation is if plaintiff were not provided adequate due process in any proceeding which is based upon the misbehavior report. In that case, the claim is not based on [the] truth or falsity of the misbehavior report but instead on the conduct of the hearing itself." *Santana*, 2007 WL 2712992, at *2. Plaintiff's Fourteenth Amendment due process claim arising from one of his disciplinary hearings is addressed separately, below.

*16 Accordingly, plaintiff's false misbehavior report claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

## 8. Disciplinary Due Process Claim

To successfully state a claim under Section 1983 for denial of due process, a plaintiff must establish both the existence of a protected liberty or property interest, and that he or she was deprived of that interest without being afforded sufficient process. *Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004) (citing *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989)). Due process generally requires that the state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003).

An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The duration of the challenged confinement, while not determinative, is a significant factor under *Sandin*. The Second Circuit generally takes the position that normal confinement in a segregated housing unit of 101 days or less does not constitute an "atypical and significant hardship" under *Sandin*. *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citing *Sealey v. Giltner*, 197 F.3d 578, 589-90 (2d Cir. 1999)). [15] The "atypicality" inquiry under *Sandin* is normally

a question of law. *Colon*, 215 F.3d at 230-31; *Sealey*, 197 F.3d at 585. In making that determination the Court must consider the specific circumstances of the confinement, including both the duration and the conditions thereof. *Id.*

[15]  A New York state inmate confined in SHU is placed in a solitary confinement cell for twenty-three hours a day. The inmate may exercise in the yard for one hour each day; is limited to two showers a week; and may not work or attend programming. *See Colon v. Howard*, 215 F.3d 227, 230 (2d Cir. 2000); N.Y. Comp. Codes R. & Regs., tit. 7, §§ 304.1-.14 (2008). An inmate on "keeplock" is confined to his cell, room or housing unit and does not enjoy full participation in the normal prison routine. *See Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989); N.Y. Comp. Codes R. & Regs. tit. 7, § 251-1.6 (2008).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty or property interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *See Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

Here, liberally construed, plaintiff's complaint alleges that defendant Babin denied him due process during his disciplinary hearing arising out of charges in a misbehavior report issued on March 20, 2019, by refusing to call or interview certain witnesses, not allowing him to question the witnesses that were interviewed, and disregarding a witness's statement of plaintiff's innocence. Compl. at 28-29. The complaint further alleges that defendant Babin sentenced plaintiff to thirty days of SHU confinement beyond the twenty-three days plaintiff spent in SHU while awaiting the completion of his disciplinary hearing, as well as one month of lost good time credits. *Id.* at 29.

**\*17** As an initial matter, plaintiff filed his supplemental pleading regarding his disciplinary sentence on the same date that the sentence was imposed. *See* Compl. at 28-29. As of that date, plaintiff had served only twenty-three days in SHU while awaiting the completion of his disciplinary hearing. *Id.*

It is impossible that plaintiff could have administratively appealed or exhausted a claim arising out of his disciplinary hearing at the time he filed his supplemental pleading. Thus, plaintiff's claim is premature.

In any event, neither a twenty-three day confinement in SHU, nor a fifty-three day confinement in SHU, by itself, implicates atypicality. *See Colon*, 215 F.3d at 231; *Elleby v. Martucello*, No. 9:16-CV-1335 (MAD/DEP), 2018 WL 3769965, at *3 (N.D.N.Y. Aug. 9, 2018) ("The Court notes that Plaintiff was sentenced to 90 days in SHU which, without additional allegations, is insufficient to establish that he suffered from an atypical and significant confinement as required by *Sandin*."). Because plaintiff has not even completed his disciplinary sentence, and the complaint is totally devoid of any facts regarding the conditions of his SHU confinement during the twenty-three day period he has already served, there is no basis for this Court to infer that plaintiff's SHU conditions differed in any way from normal SHU conditions, or that the confinement was an atypical and significant hardship in relation to the ordinary incidents of prison life. Thus, plaintiff has also failed to plead the existence of a valid liberty interest with respect to his SHU confinement. *See, e.g.*, *Elleby*, 2018 WL 3769965, at *3 ("Plaintiff does not allege that the conditions in which he was kept were more onerous than normal SHU conditions. Because Plaintiff fails to allege that he suffered from an atypical and significant confinement, Magistrate Judge Peebles correctly found Plaintiff's due process claim should be dismissed."); *Shuler v. Brown*, No. 9:07-CV-0937, 2009 WL 790973 (TJM/GHL), at *1, *9 (N.D.N.Y. Mar. 23, 2009) (adopting the view "that a motion to dismiss can be granted where a prisoner who served less than 101 days in the SHU alleges that his procedural due process rights were violated but does not allege conditions more severe than normal SHU[,]" noting that a prisoner's right to relief under a procedural due process theory based solely on a contention "that his SHU confinement lasted for a period of something less than 101 days, without alleging that he served that SHU term under conditions more severe than normal SHU conditions, ... is purely speculative").

Based upon the foregoing, plaintiff's due process claim is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. [16]

[16]  The Court would also note that plaintiff's disciplinary sentence involves "mixed sanctions," *i.e.*, "sanctions that affect both (a) the duration of his imprisonment

and (b) the conditions of his confinement." *Peralta v. Vasquez*, 467 F.3d 98, 103 (2d Cir. 2006). In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court held that a Section 1983 action seeking money damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction unless that "conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal ... or called into question by a federal court's issuance of a writ of habeas corpus...." *Heck*, 512 U.S. at 487 (internal citation omitted). In *Edwards v. Balisok*, 520 U.S. 641 (1997), the Supreme Court made clear that *Heck*'s favorable termination rule applies to challenges made under Section 1983 to procedures used in disciplinary proceedings that deprived a prisoner of good time credits. *See Peralta*, 467 F.3d at 103. In *Peralta*, the Second Circuit held that "a prisoner subject to such mixed sanctions can proceed separately, under § 1983, with a challenge to the sanctions affecting his conditions of confinement without satisfying the favorable termination rule, *but ... he can only do so if he is willing to forgo once and for all any challenge to any sanctions that affect the duration of his confinement.*" *Id.* (emphasis in original).

### 9. Conditions-of-Confinement Claim

**\*18** The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. The Second Circuit, in addressing the needs protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds sub nom. Bell v. Wolfish*, 441 U.S. 520 (1979); *Lareau v. Manson*, 651 F.2d 96, 106 (2d Cir. 1981). To demonstrate that the conditions of confinement constitute cruel and unusual punishment in violation of the Eighth Amendment, a plaintiff must satisfy both an objective and subjective element. *See Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996). A plaintiff must demonstrate that (1) the conditions of confinement resulted in "unquestioned and serious deprivations of basic human needs," *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985); *see also Jolly*, 76 F.3d at 480, and (2) the defendants acted with "deliberate indifference." *Wilson v. Seiter*, 501 U.S. 294, 303-04 (1991).

The first prong is objective and requires that prison officials provide inmates with "basic human needs, one of which is 'reasonable safety.' " *Helling v. McKinney*, 509 U.S. 25, 30,

33 (1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199 (1989)). "The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). In particular, "a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Id.* As the Supreme Court has made clear, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Here, plaintiff alleges that the water feed to his toilet was turned off on December 31, 2018, at approximately 4:00 P.M. Compl. at 24. Plaintiff further alleges that at some point later that day, defendant Remington became aware that plaintiff's toilet was not working when he conducted a random search of plaintiff's cell, and the next day, defendant Penello also became aware of the issue. *Id.*

Plaintiff does not allege when his toilet began working again. [17] Moreover, plaintiff does not allege that he experienced any complications as a result of not having a properly functioning toilet, either in the form of exposure to human waste or physical discomfort caused by an inability to use the toilet in his cell. Accordingly, the complaint fails to allege facts which plausibly suggest that the conditions of plaintiff's confinement resulted in "unquestioned and serious deprivations of basic human needs." *See, e.g., Thomas v. Demeo*, No. 15-CV-9559, 2017 WL 3726759, at \*6 (S.D.N.Y. Aug. 28, 2017) (no claim for unsanitary cell conditions, since plaintiff did not allege details showing "the duration and the severity of [his] experience being exposed to unsanitary conditions" (quoting *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015)); *Whitted v. Lazerson*, No. 96-CV-2746, 1998 WL 259929, at \*3 (S.D.N.Y. May 21, 1998) ("The temporary deprivation of the right to use the toilet, in the absence of serious physical harm or a serious risk of contamination, simply does not rise to the level of an Eighth Amendment violation."); *Odom v. Keane*, No. 95-CV-9941, 1997 WL 576088, at \*4-5 (S.D.N.Y. Sept. 17, 1997) (Sotomayor, J.) (holding that the absence of a working toilet in one's prison cell for approximately ten hours, absent an allegation that the prisoner risked contamination by contact with human waste, "does not rise to the level of cruel and unusual punishment").

17    Plaintiff separately alleges that he was transferred to
Wende C.F. at some point on January 3, 2019. Compl.
at 19. Thus, at most, plaintiff did not have a properly
working toilet for roughly three days. However, the Court
has no basis to infer that the duration of the alleged
deprivation was anything more than several hours.

**\*19**  In addition, while plaintiff identifies two defendants
who were allegedly aware that plaintiff did not have a working
toilet less than one day after the issue arose, the complaint
lacks any allegations which plausibly suggest that either
of these individuals were also aware that plaintiff faced a
substantial risk of serious harm based on the non-working
toilet. Thus, the complaint also fails to allege facts which
plausibly suggest that any named defendant from Auburn C.F.
acted with "deliberate indifference" to plaintiff's basic human
needs.

Accordingly, plaintiff's conditions-of-confinement claim is
dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and U.S.C.
§ 1915A(b) for failure to state a claim upon which relief may
be granted.

### 10. Violation of DOCCS Directives

In one section of the complaint, plaintiff alleges that "staff
officers" from Auburn C.F. have failed to "follow or respect
their own directives on how to handle legal work only in the
presence of an inmate." *See* Compl. at 20. A section 1983
claim brought in federal court is not the appropriate forum to
raise violations of prison regulations. *See Hyman v. Holder*,
No. 96-7748, 2001 WL 262665, at \*6 (S.D.N.Y. Mar. 15,
2001) (concluding that allegations that prison officials failed
to follow prison regulations are not sufficient to give rise to a
Section 1983 claim). Because an official's failure to comply
with a DOCCS directive does not give rise to a Section 1983
claim, all DOCCS asserted in plaintiff's complaint on that basis
are dismissed pursuant to 28 U.S.C. 1915(e)(2)(B) and 28
U.S.C. § 1915A(b) for failure to state a claim upon which
relief may be granted.

### IV. PRELIMINARY INJUNCTION MOTION

Preliminary injunctive relief " 'is an extraordinary and drastic
remedy, one that should not be granted unless the movant, by
a clear showing, carries the burden of persuasion.' " *Moore v.
Consolidated Edison Co. of New York, Inc.*, 409 F.3d 506, 510
(2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968,
972 (1997)). The standard a court must utilize in considering

whether to grant a request for injunctive relief is well-settled
in this Circuit. *Citigroup Global Mkts., Inc. v. VCG Special
Opportunities Master Fund Ltd.*, 598 F.3d 30, 35, 38 (2d
Cir. 2010). To prevail on a motion for preliminary injunctive
relief, a plaintiff must demonstrate irreparable harm and either
a substantial likelihood of success on the merits of the claim,
or sufficiently serious questions going to the merits and a
balance of hardships tipping decidedly in his favor. *Id.* at
35; *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 405-06 (2d Cir.
2011). However, when the moving party seeks a mandatory
injunction that alters the status quo by commanding a positive
act, the burden is "even higher." *Cacchillo*, 638 F.3d at
405-06; *see Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996).
Thus, a mandatory preliminary injunction "should issue only
upon a clear showing that the moving party is entitled to the
relief requested, or where extreme or very serious damage
will result from a denial of preliminary relief." *Citigroup
Global Markets*, 598 F.3d at 35 n.4 (internal quotation marks
omitted).

" ' 'A showing of irreparable harm is the single most important
prerequisite for the issuance of a preliminary injunction.' "
*Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110,
118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d
227, 234 (2d Cir. 1999)). Speculative, remote or future injury
is not the province of injunctive relief. *Los Angeles v. Lyons*,
461 U.S. 95, 111-12 (1983). Rather, a plaintiff seeking to
satisfy the irreparable harm requirement must demonstrate
that "absent a preliminary injunction [he or she] will suffer
an injury that is neither remote nor speculative, but actual and
imminent, and one that cannot be remedied if a court waits
until the end of trial to resolve the harm." *Faiveley*, 559 F.3d
at 118 (internal citation and quotation marks omitted).

**\*20**  Plaintiff's Preliminary Injunction Motion seeks wide-
ranging affirmative relief addressing potential future harm
associated with cell searches, attorney visits, harassment,
and access to mail, the law library, legal materials, and a
working typewriter. *See* Preliminary Injunction Motion at 1-2.
Plaintiff essentially seeks an order from this Court directing
DOCCS officials to properly follow DOCCS Directives and
not violate plaintiff's constitutional rights. *Id.* Plaintiff's
request is denied for several reasons.

First, the only claims that now remain in this action are
plaintiff's retaliation and free-flow-of-mail claims. Plaintiff
has not explained how his requested relief bears any
relationship to these claims, which relate to discrete events

that occurred on and before February 4, 2019, *i.e.*, more than two months before plaintiff filed his motion.[18]

[18]   With regard to legal mail, plaintiff seeks an order that he be provided with confirmation from the "mail room" when items delivered by him are placed in the mail. *See* Preliminary Injunction Motion at 2. Plaintiff's free-flow-of-mail claim, however, relates to incoming mail.

Second, much, if not all, of the injunctive relief plaintiff seeks would require restrictions placed on officials who are not defendants in the present action. Injunctive relief is available against non-parties only under very limited circumstances, none of which are present here. *See* Fed. R. Civ. P. 65(d)(2); *Doctor's Associates, Inc. v. Reinert & Duree, P.C.*, 191 F.3d 297, 302-03 (2d Cir. 1999); *United States v. Regan*, 858 F.2d 115, 120 (2d Cir. 1988); *see also In re Rationis Enterprises, Inc. of Panama*, 261 F.3d 264, 270 (2d Cir. 2001) ("A court may not grant a final, or even an interlocutory, injunction over a party over whom it does not have personal jurisdiction.").

Third, plaintiff's request for DOCCS officials to properly follow DOCCS Directives and not violate his constitutional rights is tantamount to a request that all officials at Auburn C.F. "obey the law." "Obey the law" injunctions are vague, do not require a defendant to do anything more than that already imposed by law, subject the defendant to contempt rather than statutorily prescribed sanctions, and are not readily capable of enforcement. As such, these injunctions are not favored. *See N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 435-36 (1941); *see also Rowe v. New York State Division of Budget*, No. 1:11-CV-1150 (LEK/DRH), 2012 WL 4092856, at *7 (N.D.N.Y. Sept. 17, 2012); *New York v. Shinnecock Indian Nation*, 560 F. Supp. 2d 186, 189 (E.D.N.Y. 2008). According to the Second Circuit, " '[u]nder Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law.' " *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240 (2d Cir. 2001) (quoting *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996)).

Fourth, plaintiff's fear that named and unnamed officials at Auburn C.F. might mistreat him in the future is purely speculative and, therefore, patently insufficient to make the showing required for the issuance of preliminary injunctive relief. *See Slacks v. Gray*, No. 9:07-CV-0501 (NAM/GJD), 2008 WL 2522075, at *1 (N.D.N.Y. June 25, 2008) (allegations of future injury without more do not establish a real threat of injury).

Fifth, plaintiff's submissions, which are construed to seek mandatory injunctive relief, fail to demonstrate, with evidence, a "clear and substantial" showing of a likelihood of success or that extreme or very serious damage will result if the motion is denied. Indeed, plaintiff offers no evidence to even meet the lesser standard required for a prohibitory injunction – a likelihood of success on the merits of his underlying claims, or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in his favor. *See Ivy Mar Co. v. C.R. Seasons Ltd.*, 907 F. Supp. 547, 561 (E.D.N.Y. 1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Res., Inc.*, 792 F. Supp. 924, 928 (S.D.N.Y. 1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."); *Moore*, 409 F.3d at 510 (preliminary injunctive relief " 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' ") (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *8 (N.D.N.Y. Feb. 28, 2012) ("Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief."); *Fox v. Anthony*, No. 6:10-CV-839 (GTS/ATB), 2010 WL 3338549, at *2 (N.D.N.Y. July 15, 2010) ("Plaintiff has submitted no evidence, other than his own speculation that defendants ... will retaliate against him when they find out that he filed this law suit. The same claim could be made by any inmate who names corrections officers as defendants in any action."), *report and recommendation adopted by* 2010 WL 3338558 (N.D.N.Y. Aug. 23, 2010).

**\*21** Based upon the foregoing, plaintiff's request for injunctive relief is denied.[19]

[19]   Plaintiff is advised that concerns regarding his current conditions of confinement at Auburn C.F. should be addressed through administrative channels at the facility and DOCCS and, if necessary, by means of a properly filed action.

## V. CONCLUSION

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that plaintiff's IFP Application (Dkt. No. 2) is **GRANTED**;[20] and it is further

20      Although his IFP Application has been granted, plaintiff
        will still be required to pay fees that he may incur in this
        action, including copying and/or witness fees.

**ORDERED** that the Clerk provide the Superintendent of the facility, designated by plaintiff as his current location, with a copy of plaintiff's authorization form (Dkt. No. 9), and notify the official that this action has been filed and that plaintiff is required to pay to the Northern District of New York the entire statutory filing fee of $ 350.00 pursuant to 28 U.S.C. § 1915;[21] and it is further

21      "28 U.S.C. § 1915 permits an indigent litigant to
        commence an action in a federal court without
        prepayment of the filing fee that would ordinarily be
        charged." *Cash v. Bernstein*, No. 09-CV-1922, 2010 WL
        5185047, at *1 (S.D.N.Y. Oct. 26, 2010). "Although
        an indigent, incarcerated individual need not prepay the
        filing fee at the time of filing, he must subsequently pay
        the fee, to the extent he is able to do so, through periodic
        withdrawals from his inmate accounts." *Id.* (citing 28
        U.S.C. § 1915(b) and *Harris v. City of New York*, 607
        F.3d 18, 21 (2d Cir. 2010)).

**ORDERED** that the Clerk provide a copy of plaintiff's authorization form (Dkt. No. 9) to the Financial Deputy of the Clerk's Office; and it is further

**ORDERED** that the Clerk file a copy of the Claims and Supporting Documents (Dkt. No. 3-4) immediately following the signature page of the complaint, and a copy of the Supplement to Complaint (Dkt. No. 11) immediately following the Claims and Supporting Documents insert; and it is further

**ORDERED** that the Clerk is directed to amend the docket to add Babin, Hearing Officer, Auburn Correctional Facility, as a defendant; and it is further

**ORDERED** that the claims arising out of plaintiff's confinement at Wende Correctional Facility are severed and transferred to the Western District of New York; and it is further

**ORDERED** that the Clerk shall advise the Clerk of the Western District of New York, in writing, of the entry of this Order and provide that Clerk with a certified copy of this Order and of the docket sheet for this action, together with all information necessary for the Western District Clerk to electronically access the documents filed in this action; and it is further

**ORDERED** that the Clerk shall remove Wende Correctional Facility, Mr. Klepp, Mr. Ferrell, Mr. Wade, J. Krygier, Mr. Kintzel, Mr. Sears, Mr. Shaneley, Mr. Brown, Mr. McQuire, Mr. Byron, Mr. Martin, Mr. Thomas, Mr. Lyman, Mr. Mancini, Mr. Barlow, Mr. Kroel, Mr. Bradley, Mr. Wade, Stewart Eckert, Benjamine A. Wilson, and Mr. Brown from the docket as defendants in the Northern District action; and it is further

**\*22 ORDERED** that plaintiff's First Amendment free-flow-of-mail claim against defendants Sheftic, Vanni, Shanke, and Carhardt and First Amendment retaliation claim against defendant Vendetti **SURVIVE** sua sponte review and require a response; and it is further

**ORDERED** that plaintiff's claims for monetary damages against Auburn Correctional Facility and the non-severed named defendants in their official capacity are **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) as barred by the Eleventh Amendment;[22] and it is further

22      Generally, when a district court dismisses a pro se action
        sua sponte, the plaintiff will be allowed to amend his
        action. *See Gomez v. USAA Fed. Savings Bank*, 171 F.3d
        794, 796 (2d Cir. 1999). However, an opportunity to
        amend is not required where the defects in the plaintiff's
        claims are substantive rather than merely formal, such
        that any amendment would be futile. *Cuoco v. Moritsugu*,
        222 F.3d 99, 112 (2d Cir. 2000); *see Pucci v. Brown*, 423
        F. App'x 77, 78 (2d Cir. 2011). Because these claims are
        barred by the Eleventh Amendment, leave to amend to
        would be futile.

**ORDERED** that all remaining claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted;[23] and it is further

23      Should plaintiff seek to pursue any of the claims
        dismissed without prejudice, he must file an amended
        complaint. Any amended complaint, which shall
        supersede and replace the original complaint in its
        entirety, must allege claims of misconduct or wrongdoing
        against each named defendant which plaintiff has a legal
        right to pursue, and over which jurisdiction may properly
        be exercised. Any amended complaint filed by plaintiff
        must also comply with the pleading requirements of
        Rules 8 and 10 of the Federal Rules of Civil Procedure.

2019 WL 2053829

**ORDERED** that Auburn Correctional Facility is **DISMISSED with prejudice** as a defendant; and it is further

**ORDERED** that the following individuals are **DISMISSED without prejudice** as defendants: Ms. Jones, Mr. Kirkwood, Mr. Wheeler, Ms. Vullwhite, Mr. Knapp, Mr. Norris, Mr. Vanderwerff, J. Remington, Mr. "D", Mr. Milnane, Mr. Nowak, Mr. Pickert, Mr. Penello, Mr. Corey, Mr. Grady, Anthony Smith, Ms. Simmons, Mr. Powell, Timothy McCarthy, Brenda J. Walsh, Michael C. Polcovich, Thomas J. Loughren, Leanne Callahan; and it is further

**ORDERED** that plaintiff's Preliminary Injunction Motion (Dkt. No. 3) is **DENIED without prejudice**; and it is further

**ORDERED** that the Clerk shall issue summonses and forward them, along with copies of the complaint, to the United States Marshal for service upon defendants Sheftic, Vanni, Shanke, Carhardt, and Vendetti. The Clerk shall forward a copy of the summons and complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that a response to the complaint be filed by defendants Sheftic, Vanni, Shanke, Carhardt, and Vendetti, or their counsel, as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with all requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions; motions will be decided on submitted papers, without oral argument, unless otherwise ordered by this Court. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so may result in the dismissal of this action**; and it is further

 **\*23  ORDERED** that the Clerk shall serve a copy of this Decision and Order on plaintiff.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 2053829

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-00990-TJM-TWD    Document 20    Filed 07/23/19    Page 72 of 79

Candelaria v. Coughlin, Not Reported in F.Supp. (1996)

1996 WL 88555, 7 NDLR P 466

1996 WL 88555

United States District Court, S.D. New York.

Juan CANDELARIA, Plaintiff, pro se

v.

Thomas A. COUGHLIN, III, et al., Defendants.

No. 91 Civ. 2978.
|
March 1, 1996.

**Attorneys and Law Firms**

Juan Candelaria, pro se.

Dennis C. Vacco, Attorney General of the State of New York (Clement J. Colucci, New York City, of counsel), for defendants.

OPINION

SAND, District Judge.

**\*1** Plaintiff Juan Candelaria ("Candelaria") is a former inmate of Green Haven Correctional Facility ("Green Haven") who is currently incarcerated at Clinton Correctional Facility ("Clinton"). He brings this civil rights action pursuant to 42 U.S.C. § 1983 against various state officials employed by the New York State Department of Correctional Services ("DOCS"). Plaintiff names as defendants the New York State Commissioner of the Department of Correctional Services, Thomas A. Coughlin, III; former Superintendent of Green Haven, Charles Scully; current Superintendent of Green Haven, Christopher Artuz; Facility Health Services Director, Dr. Jeanty; Correctional Officer Nielson; Correctional Officer Leclair; Correctional Officer Lachance; Correctional Officer Chimino; Correctional Officer McDermott; J.A. Battista; and Lieutenant Sanford. Plaintiff alleges that defendant prison officials negligently and/or deliberately failed to provide adequate responses to his medical and non-medical needs in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.[1] U.S. Const. amends. VIII, XIV. Plaintiff seeks monetary damages.

Both plaintiff and defendants move for summary judgment on the pleadings pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").[2] For the reasons set forth below, we deny plaintiff's and defendants' motions.

I.

BACKGROUND

Juan Candelaria, a paraplegic, entered the New York State penal system on December 26, 1989. He has been under the care and custody of DOCS at all times during this lawsuit. Plaintiff arrived at Green Haven on February 6, 1990, and was assigned to the Unit for the Physically Disabled ("UPD") because of his disability. *See* Plaintiff's Letter Dated December 12, 1994, in lieu of Amended Complaint, (hereinafter referred to as "Am. Compl.") at 2.

A. *Medical Claims*

1. The Wheelchair

Plaintiff states that while in Green Haven, prison personnel took away his wheelchair and gave him an inadequate and unsafe wheelchair. He claims that due to the deteriorated state of the wheelchair, on March 22, 1990, he fell off and suffered a herniated disc. *Id.* at 1. Plaintiff has submitted a copy of a doctor's report from an April 7, 1990, physical examination, which finds a "large disc herniation." Plaintiff's Rule 3(G) Statement ("Pl. Rule 3(G) Stat."); Pl Affirmation in Supp. of Mot. for Summ. J. ("Pl. Affirm.") Ex. 1. Plaintiff also claims that he broke his nose in this fall. A copy of the "Progress Notes" dated March 22, 1990, signed by facility medical personnel, indicates "severe nose bleed" and "edema," but does not indicate a broken nose. Pl. Rule 3(G) Stat.; Pl. Affirm. Ex. 26. Plaintiff claims that doctors recommended corrective surgery for injuries resulting from this fall, but that defendants deliberately ignored these recommendations. Am. Compl. at 1.

Plaintiff states that the wheelchair was inadequate because it lacked removable armrests. Plaintiff has provided at least two medical reports from 1990 and 1991, which demonstrate that doctors had requested that Candelaria be provided a wheelchair with removable armrests. Pl. Rule 3(G) Stat.; Pl. Affirm. Ex. 2. Plaintiff has also furnished a letter from a "Medical Auditor" dated October 24, 1990, which indicates that the Auditor, a medical doctor, "agree[s] that six months is a long time to wait for the ... wheelchair [you] need." *Id.* Defendants claim that removable armrests are not essential elements of a medically safe wheelchair and that the wheelchair occupant can use such armrests as weapons.

Defendants' Rule 3(G) Statement ("Defs. Rule 3(G) Stat."); Affidavit of James Manion, M.D. ¶ 4; Affidavit of Darly Jeanty, M.D. ¶ 7.

### 2. The Heating Pad

**\*2** On May 10, 1990, plaintiff was seen in Helen Hayes Hospital, West Haverstraw, New York, for follow-up treatment for the herniated disc. The attending physician, Dr. Lata Bhansali, ordered that plaintiff be provided with a heating pad. Pl. Rule 3(G) Stat.; Pl. Affirm. Ex. 12. Plaintiff claims that defendants deliberately ignored Dr. Bhansali's order. Defendants respond that because plaintiff is a paraplegic, allowing him to use a heating pad unattended could result in severe injury. Their logic is that someone without sensation in the lower parts of his body is unlikely to be able to protect himself from potential burns. They also claim that plaintiff was permitted to use the heating pad in the clinic. [3] Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs. Mem.") at 8.

### 3. The Blood in Plaintiff's Urine

Plaintiff also claims that he had been passing blood in his urine as early as December 26, 1989, when he arrived in DOCS' custody. Pl. Rule 3(G) Stat. ¶ 20. He claims that although defendants were aware of his condition, they failed to provide him with necessary antibiotics until after he had filed a lawsuit. Candelaria provides copies of urinalysis tests to substantiate this claim. Pl. Rule 3(G) Stat.; Pl. Affirm. Ex. 13. He asserts that the delay in treatment caused him to develop bladder and kidney infections. Am. Compl. at 2. Defendants posit that the blood in plaintiff's urine most probably resulted from his self-catheterization and that the treatment that plaintiff claims was belatedly provided was not, in fact, intended to be utilized in treating this particular medical condition. Defs. Mem. at 10.

### B. *Non-Medical Claims*

### 1. The Confinement in H-Block

On March 28, 1990, plaintiff was moved from the wheelchair-accessible UPD to general population confinement. Plaintiff was held in his new cell, H-Block cell #126, which is not wheelchair accessible, until August 14, 1990.

Plaintiff claims that he was moved to H-Block because he is Puerto Rican. Am. Compl. at 3. In response, defendants state that plaintiff was transferred from UPD to H-Block for his

own physical security; another inmate in UPD, with whom Candelaria had a dispute, had threatened to attack plaintiff. Defs. Ex. 11. Plaintiff asserts that the allegation by defendants that he was transferred for his own safety is without merit.

Plaintiff claims that he conditions of his life during his confinement in H-Block were "cruel and unusual." Am. Compl. at 2. According to plaintiff, he was forced to drag himself on the floor of the cell in order to move around. Additionally, he had to eat, sleep, defecate, and urinate on the floor because he could not reach the bed, toilet, or sink. Likewise, since the shower in H-Block was not wheelchair accessible, plaintiff was able to shower only by "flicking water towards [him]self." Pl. Rule 3(G) Stat. ¶ 11. Plaintiff has provided two medical reports signed by a doctor from the DOCS Division of Medical Services, which indicate the doctor's recommendations to house plaintiff is UPD (August 11, 1990) and to provide plaintiff with a chair in his cell to allow him to transfer himself from the toilet to the bed (June 15, 1990). Pl. Rule 3(G) Stat.; Pl. Affirm. Ex. 9.

### 2. The Inmate Assault

**\*3** On November 20, 1990, plaintiff was assaulted in the feed room by another inmate, Jenning. At least one of his injuries required six stitches. Pl. Rule 3(G) Stat.; Pl. Affirm. Ex. 15. Plaintiff claims that the attack was the result of defendants' negligence and indifference to his physical safety. Plaintiff states that defendants were in violation of prison policy and regulations requiring that an officer be present in the feed room and that his injuries resulted from defendants' failure to adhere to their own policy. Am. Compl. at 4. As an alternative argument, Candelaria claims that a correctional officer *was* present, but did nothing to stop the attack: "while plaintiff was being beaten, defendant Chimino was standing by and permitting the inmate to assault plaintiff." Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Pl. Mem.") at 22.

Officer Chimino filed an "Inmate Misbehavior Report," which stated that on November 20, 1990, he entered the UPD feed room after having heard yelling coming from the room. Pl. Rule 3(G) Stat.; Pl. Affirm. Ex. 17. Chimino reported that when he entered the room, plaintiff was already bleeding from the lip and that Candelaria attempted to swing his tray at Jenning. *Id.* Plaintiff was subjected to disciplinary measures, specifically one month of keeplock confinement, following the incident. *Id.*

### 3. The Fire

Case 9:18-cv-00990-TJM-TWD    Document 20    Filed 07/23/19    Page 74 of 79

Candelaria v. Coughlin, Not Reported in F.Supp. (1996)

1996 WL 88555, 7 NDLR P 466

On December 14, 1990, as a result of a fire in a neighboring cell, plaintiff complained of health problems relating to smoke inhalation and was taken to the clinic. In the clinic he was treated for hyperventilation. Pl. Rule 3(G) Stat.; Pl. Affirm. Ex. 23. Plaintiff claims that his respiratory passages have been damaged by the smoke he inhaled.

C. *Procedural Background*

1. Action I

Plaintiff filed a first law suit (hereinafter "Action I") on November 13, 1990. His complaint arose from an alleged assault on his person by a correctional officer at Green Haven and a subsequent hearing. Defendants in Action I moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6), and we granted their motion. *Candelaria v. Coughlin,* No. 91 Civ. 1117 (LBS), 1991 WL 113711 (S.D.N.Y. June 11, 1991). In that decision, we granted plaintiff leave to file an amended complaint, which he filed on July 8, 1991.

2. Action II

Plaintiff commenced the action now being addressed by this Court (hereinafter "Action II") on April 9, 1991. His complaint focused on inadequate medical treatment at Green Haven, specifically the condition of his wheelchair, his requests for a heating pad, and the blood in his urine. In addition to the medical claims, the complaint included non-medical claims relating to the conditions of his cell during his assignment in H-Block, the inmate assault, the verbal confrontation with a correctional officer, the disciplinary hearing, violations of the New York State Freedom of Information law, and the fire in the neighboring cell.

3. Prior Motions

**\*4** On September 3, 1991, plaintiff filed a motion for a preliminary injunction in Action II, requesting that defendants be ordered to provide various items for plaintiff's medical needs. On September 27, 1991, defendants filed a motion to dismiss the complaint in Action I, or in the alternative, for summary judgment, and to dismiss the complaint in Action II in its entirety. Plaintiff was transferred from Green Haven to Clinton on January 15, 1992; on January 30, 1992, he filed a second motion for a preliminary injunction in Action II, alleging inadequate medical facilities at Clinton, and requesting that defendants be ordered to transfer him back to Green Haven.

On March 17, 1992, this Court issued an opinion, *Candelaria v. Coughlin,* 787 F. Supp. 368 (S.D.N.Y.), aff'd, 979 F.2d 845 (2d Cir. 1992), granting defendants' motion in Action I in its entirety and denying defendants' motion to dismiss Action II. Plaintiff's first motion for injunctive relief, seeking medical supplies and treatment at Green Haven, was dismissed because plaintiff was no longer in Green Haven. Plaintiff's second motion for injunctive relief was denied because it was not addressed to officials at Clinton. The medical claims from Action II, therefore, remained.

4. Action III

On June 14, 1993, plaintiff submitted his First Amended Complaint in his third law suit, 93 Civ. 3212 (RWS) (hereinafter "Action III"), claiming that from April 1991 until January 1992 -- when he was transferred to Clinton -- various Green Haven medical personnel continuously refused to provide him with proper medical care, partly in retaliation for his first two lawsuits. Specifically, the lack of proper medical care consisted of the denial of a liquid diet required by his throat problems and the withholding of certain previously prescribed pain medications. On December 15, 1994, the Honorable Judge Robert Sweet granted defendants' motion for summary judgment in Action III. *Candelaria v. Coughlin,* No. 93 Civ. 3212 (RWS), 1994 WL 707004 (S.D.N.Y. Dec. 19, 1994).

5. Remaining Action II

By letter of December 5, 1994, defendants asked this Court to clarify whether the non-medical claims from Action II had been dismissed by the March 17, 1992, opinion. In response to this request, on December 7, 1994, we directed plaintiff to state which claims in 91 Civ. 2978 (LBS) (remaining Action II) he wished to pursue. The Order of December 7, 1994, also stated that all actions would be dismissed without prejudice unless plaintiff responded by January 23, 1995. Plaintiff responded by letter dated December 12, 1994.

In plaintiff's letter, which we treat as plaintiff's Amended Complaint, [4] he makes medical and non-medical claims. In both, he alleges that defendant prison officials, in violation of his Eighth and Fourteenth Amendment Rights, negligently and/or deliberately failed to provide adequate responses to his needs. Specifically, plaintiff's medical claims concern: (1) the injuries sustained from the fall from the faulty wheelchair; (2) the refusal of the prison medical staff to provide him with a heating pad to use in his cell to combat lower back pain; and (3) the failure to treat him for the blood in his urine.

1996 WL 88555, 7 NDLR P 466

Candelaria's non-medical claims involve: (1) the conditions of his H-block confinement; (2) the inmate assault; and (3) inadequate fire safety.

**\*5** Plaintiffs and defendants have both moved for summary judgment. Plaintiff has also moved to preclude defendants from filing a second motion for summary judgment.[5] For the reasons set forth below, we deny all the motions.

## II.

### DISCUSSION

A. *Standard for Summary Judgment*

Summary judgment is appropriate where the moving papers and affidavits submitted by the parties "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).* The court's role is not to resolve disputed factual issues, but rather to determine whether the record, taken as a whole, supports any issues that require a trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). On a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 26 (2d Cir. 1988). The court also must resolve all ambiguities and draw all reasonable inferences against the moving party. *Eastman Kodak Co. v. Image Technical Services, Inc.,* 112 S. Ct. 2072, 2076-77 (1992); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

Where, as in this case, a plaintiff submits his complaint pro se, the complaint must be liberally construed. *See Haines v. Kerner,* 404 U.S. 519, 520 (1972); *Platsky v. CIA,* 953 F.2d 26, (2d Cir. 1991). Thus the allegations of Candelaria's amended complaint, "'however inartfully pleaded,' are held 'to less stringent standards than formal pleadings drafted by lawyers.'" *Hughes v. Rowe,* 449 U.S. 5, 9 (1980) (citing *Haines,* 404 U.S. at 520).

The moving party bears the initial burden of establishing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). However, if the non-moving party would bear the burden of proof on a claim at trial -- as plaintiff would in this case -- the moving party may satisfy its burden by demonstrating an absence of evidence to support an essential element of the claim. *Id.* at 325. To defeat the motion, the non-moving party (here, plaintiff) must "do more than show that there is some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, but instead must point to evidence sufficient to establish each element of its case, *Celotex Corp.,* 477 U.S. at 322 -- evidence, that is, such that a reasonable jury could return a verdict for the non-moving party on that element. *Anderson,* 477 U.S. at 248-49; *Burke v. Jacoby,* 981 F.2d 1372, 1379 (2d Cir. 1992), *cert. denied,* 113 S. Ct. 2338 (1993). In this case, the parties have cross-moved for summary judgment.

B. *Legal Standard for Liability under 42 U.S.C. § 1983*

In *42 U.S.C. § 1983,* Congress created a civil cause of action against any person who, acting pursuant to state government authority or under the color of state law, abridges rights secured by the United States Constitution or by federal law. *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 924 (1982). In order to prevail on a claim under *§ 1983,* a plaintiff must prove that the defendant(s): (1) acted; (2) "under color of state law"; and (3) in a manner that deprived the plaintiff of "any rights, privileges, or immunities secured by the Constitution." *42 U.S.C. § 1983. See Parratt v. Taylor,* 451 U.S. 527, 535 (1981), *overruled in part on other grounds by Daniels v. Williams,* 474 U.S. 327, 3330-31 (1986). It has not been questioned that the authority of defendants, employees of the state prison system, arises under color of state law. Therefore, the question in this case is whether the defendants acted in a manner that deprived plaintiff Candelaria of his rights, privileges, or immunities.

C. *Medical Claims*

**\*6** Under the Eighth Amendment prohibition against "unnecessary and wanton infliction of pain," prisoners have the clearly established right to be free from deliberate indifference to their essential medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). In order to withstand a motion for summary judgment on his Eighth Amendment claim, plaintiff must establish that the prison officials were deliberately indifferent to his or her serious medical needs. *Id.*

Since the Supreme Court enunciated the law in *Estelle*, a two-part test, comprising a subjective and an objective inquiry, has developed for determining whether a plaintiff has stated a cognizable claim under the Eighth Amendment. The court must determine whether the defendant(s) acted "with a sufficiently culpable state of mind" and whether the

Case 9:18-cv-00990-TJM-TWD    Document 20    Filed 07/23/19    Page 76 of 79

Candelaria v. Coughlin, Not Reported in F.Supp. (1996)

1996 WL 88555, 7 NDLR P 466

alleged injury was "objectively harmful enough to establish a constitutional violation." *Hudson v. McMillian,* 503 U.S. 1, 8 (1992). Following *Estelle,* the Second Circuit has stated:

> Noting that inmates are utterly dependent upon their custodians, the [[[*Estelle*] Court was careful to observe that the Eighth Amendment forbids not only deprivations of medical care that produce physical torture and lingering death, but also less serious denials which cause or perpetuate pain. To assert otherwise would be inconsistent with contemporary standards of human decency.

*Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir. 1977) (following *Estelle*).

In determining a defendant's culpability, courts have examined the seriousness of a plaintiff's medical needs as well as the length of time such needs were ignored. *See Hathaway v. Coughlin,* 841 F.2d 48, 50 (2d Cir. 1988) (Motion to dismiss denied where plaintiff claimed that defendants' refusal to schedule corrective surgery over period of two years resulted in daily pain from condition that was neither life threatening nor fast degenerating). The Second Circuit has held that deliberate defiance of express medical instructions may constitute more than mere negligence.[6] *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir. 1987) (citing *Martinez v. Mancusi,* 443 F.2d 921, 924 (2d Cir. 1970)). The court in *Gill* also reiterated that deliberate interference with medically prescribed treatment may form the basis of an Eighth Amendment claim. *Id.* (citing *Robinson v. Via,* 821 F.2d 913, 924 (2d Cir. 1987) (holding that lack of permanent or severe injury does not justify granting of summary judgment on issue of excessive force)).

1. Subjective Inquiry

Since *Estelle,* the Supreme Court has established a subjective recklessness standard by which to determine deliberate indifference under the Eighth Amendment. *Farmer v. Brennan,* 114 S.Ct. 1970 (1994). "A prison official may be held liable under the Eighth Amendment for acting with deliberate indifference to prisoner health or safety only if

the official has *actual knowledge* that the prisoner faced a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 1977-84.

**\*7** In *Lowrance v. Coughlin,* 862 F.Supp 1090, 1115 (S.D.N.Y. 1994) (Sand, J.), we applied the *Farmer* test "requiring plaintiffs to prove subjective recklessness by demonstrating actual notice." *Lowrance* at 1116. In *Lowrance,* we found the defendants liable because prison medical staff had actual notice of plaintiff's injured knee, "yet failed to provide adequate care." *Id.* Actual notice was determined by the prison medical records.

In the instant case as well, defendants and prison medical staff had actual notice of all of plaintiff's complaints. The determinative question, then, concerns the adequacy of their response to plaintiff's needs.

2. Objective Inquiry

Prison officials have a duty to provide prisoners with the "reasonably necessary medical care which would be available to him or her ... if not incarcerated." *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir. 1989). "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle,* 429 U.S. at 103. Although prisons cannot be held to same standards of medical care as hospitals, *see Archer v. Dutcher,* 733 F.2d 14, 17 (2d Cir. 1984), *Estelle* established the responsibility of prison officials to provide inmates with a reasonable standard of medical treatment.

Here, Candelaria alleges that: (1) the faulty wheelchair supplied by DOCS resulted in injuries that were not adequately remedied; (2) the refusal to provide him with the doctor-ordered heating pad caused him to suffer additional pain; and (3) the refusal to treat the blood in his urine caused him to develop bladder and kidney infections. Defendants state that "although plaintiff's wheelchair may not have been the most convenient model available, it was safe and medically adequate." Defs. Mem. at 8. They claim that plaintiff was permitted to use a heating pad in the prison clinic, just not in his cell, for safety reasons: a paraplegic without feeling in his lower extremities has a high potential to burn himself.[7] In response to the claim concerning the blood in plaintiff's urine, defendants maintain that plaintiff has asserted medical claims that are, in fact, nonexistent.

Case 9:18-cv-00990-TJM-TWD Document 20 Filed 07/23/19 Page 77 of 79

Candelaria v. Coughlin, Not Reported in F.Supp. (1996)

1996 WL 88555, 7 NDLR P 466

A difference of opinion between an inmate and medical professionals, or even among medical professionals themselves, as to the appropriate course of treatment does not in and of itself constitute an Eighth Amendment violation. *Ross v. Kelly,* 784 F. Supp. 35 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 113 S.Ct. 828 (1992). In *Ross,* the court determined that almost all of the plaintiff's claims were really disagreements with prison medical personnel concerning the appropriate course of his treatment. *Id.* at 45. In that case, as in the instant matter, plaintiff was seen repeatedly by prison medical personnel and by numerous outside consultants. *Id.* at 46; *see* Pl. Rule 3(G) Stat.; Pl. Affirm. Exs. 1-31; Defs. Exs. 2-10. In *Ross,* the court concluded that treatment inconsistent with doctors' orders was the result only of an attempt on the part of defendants to ascertain "[the inmate's] problems and to determine the appropriate treatment." *Ross,* 784 F. Supp. at 46.

**\*8** Here, plaintiff asserts that all his medical claims are serious, while defendants maintain that they are not.[8] Both supply medical records to support their positions. In considering a summary judgment motion, all reasonable inferences must be drawn in favor of the nonmoving party, and all ambiguities and differences must be resolved to that party's benefit. *Patrick v. La Ferve,* 745 F.2d 153, 161 (2d Cir. 1984); *Vaughn v. Mobil Oil Corp.,* 708 F.Supp. 595, 596 (S.D.N.Y. 1989). On cross-motions for summary judgment, we are faced with conflicting factual assertions which are incapable of decisive resolution at this juncture. We thus cannot accept plaintiff's and defendants' respective assertions that there is no genuine issue of material fact. Accordingly, we deny both motions for summary judgment on the medical claims. Given that we deny defendants' motion for summary judgment on the medical claims, it is unnecessary to address plaintiff's assertion of claim preclusion. Plaintiff's motion to preclude defendants from filing for summary judgment is thus moot.

D. *Non-Medical Claims*

  1. Confinement in H-Block: Cruel and Unusual Living Conditions

Plaintiff contends that the living conditions to which he was subjected in H-Block violated his Eighth Amendment rights. Candelaria claims that despite his reporting to defendants the poor conditions of his confinement in H-Block, his confinement there continued -- as it had begun -- because he is Puerto Rican. Am. Compl. at 2. Defendants state, and provide evidence showing, that plaintiff was transferred from UPD

to H-Block for his own safety. Defs. Rule 3(G) Stat. ¶ 15; Defs. Mem. Ex. 11. Defendants also contend that conditions in H-Block, while not as inmate-friendly as those in UPD, did not constitute a departure from a "minimal civilized measure of life's necessities." Defs. Rule 3(G) Stat. ¶ 16; Defs. Mem. at 12, (quoting *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir. 1985)). As plaintiff pleads this claim under the Cruel and Unusual Punishment Clause of the Eighth Amendment, not under the Equal Protection Clause of the Fourteenth Amendment, the discussion that follows treats only the *conditions* of Candelaria's confinement in H-Block, rather than the *reasons* behind his transfer.

Conditions of confinement inflict cruel and unusual punishment when they result "in unquestioned and serious deprivations of basic human needs." *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981). In *Langley,* we wrote, "in judging the adequacy of challenged conditions, the central focus appears to be on whether they result 'in pain without any penological purpose.'" *Langley,* 715 F.Supp. at 542 (quoting *Rhodes v. Chapman,* 452 U.S. at 347). We noted that the judgment of prison administrators should be accorded the greatest deference when matters of prison security are involved. *Id.* at 543; *see, e.g., Whitley v. Albers,* 475 U.S. 312, 321-22 (1986). However, less deference is warranted when security concerns are not at issue. *Id.; see, e.g., Rhodes,* 452 U.S. at 362; *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1033 (2d Cir. 1985). Although security reasons may have been the cause of Candelaria's *transfer* to H-Block, the *conditions* in H-Block that form the basis of plaintiff's Eighth Amendment claim are unrelated to those security concerns.

  **\*9** Candelaria claims that he was forced to drag himself on the floor of the cell and to eat, sleep, defecate, and urinate on the floor because he could not reach the bed, toilet, or sink. He also claims that because the shower in H-Block was not wheelchair accessible, he was able to shower only by "flicking water towards [him]self." Pl. Rule 3(G) Stat. ¶ 11. It is the cumulative effects of these individual conditions that must be weighed. *See, e.g., Rhodes,* 452 U.S. at 362-363 (Brennan, J., concurring).

If credited by a trier of fact, these allegations certainly permit the conclusion that the conditions in H-Block threatened plaintiff's mental and physical well-being. *See, e.g., Ramos v. Lamm,* 639 F.2d 559, 566-78 (10th Cir. 1980), *cert. denied,* 450 U.S. 1041 (1981). The existence of these unsanitary conditions is beyond any possible penological justification and therefore is inconsistent with the standards inherent in

Case 9:18-cv-00990-TJM-TWD    Document 20    Filed 07/23/19    Page 78 of 79
Candelaria v. Coughlin, Not Reported in F.Supp. (1996)
1996 WL 88555, 7 NDLR P 466

the Eighth Amendment. *See, e.g., LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir. 1972), *cert. denied,* 414 U.S. 878 (1973); *Wright v. McMann,* 387 F.2d 519, 525-26 (2d Cir. 1967), *cert. denied,* 409 U.S. 885, 93 (1972).

We thus cannot agree with defendants that these conditions, as described by plaintiff, necessarily adhere to a "minimal civilized measure of life's necessities." *Anderson v. Coughlin,* 757 F.2d at 35. However, given that defendants do not concede the accuracy of Candelaria's description of his living conditions, *see* Defs. Mem. ¶ 16, we are unable to conclude, at this juncture, that an Eighth Amendment violation has occurred. Faced with conflicting factual allegations in the context of cross-motions for summary judgment, we deny both motions as they pertain to the conditions in H-Block.

### 2. Inmate Assault: Deliberate Indifference
Plaintiff claims that he suffered an assault on the physical integrity of his person as a direct result of defendants' gross negligence and deliberate indifference to his physical safety. He makes two contradicting claims: (1) that defendants were negligent in not having a guard in the feed room and that this negligence rises to the level of deliberate indifference[9] and (2) that a defendant Correctional Officer stood by while plaintiff was being assaulted, in deliberate indifference to plaintiff's safety.

Addressing the first set of facts, there is a body of law holding that the failure to act can amount to deliberate indifference. A municipality, for example, can be held to the standard of "deliberate indifference" where the failure is one of training. *See, e.g., City of Canton v. Harris,* 489 U.S. 378, 109 (1989) (failure to train police officers to respond properly in certain situations evidences deliberate indifference). Alleging defendants' general failure to protect, Candelaria has attempted to make an omission-as-action claim.

Plaintiff's second set of facts -- that a correctional officer was present, but did not attempt to stop the assault -- presents a much clearer case of deliberate indifference in that plaintiff can point to a specific instance of inaction. In response to plaintiff's allegation, defendants contend that plaintiff has failed to establish that the assault was anticipated, thereby converting the event to a mere negligence claim which is not actionable under § 1983. The Courts have addressed this issue in detail. In *Morales v. New York State Department of Corrections,* 842 F.2d 27 (2d Cir. 1988), the Second Circuit examined an inmate's allegation that the correctional officer on duty had failed to intercede to halt an attack by a fellow prisoner. On facts strikingly similar to those alleged here, the Second Circuit found that such inaction was sufficient basis for a § 1983 claim of deliberate indifference.

**\*10** In addressing plaintiff's motion for summary judgment, we must adopt defendants' version of the facts -- which comports with plaintiff's first set of facts: that no officer was present -- and conclude that, absent further evidence, summary judgment is inappropriate. On the record as it stands, we are unable to determine whether the failure to have a Correctional Officer in the prison feed room constitutes deliberate indifference to inmate safety or whether it demonstrates merely negligence. We thus deny plaintiff's motion for summary judgment on this claim.

Treating defendants' motion for summary judgment, we seek to adhere to plaintiff's description of the facts. Factual ambiguities permeate plaintiff's claim of deliberate indifference. We have addressed plaintiff's first factual scenario in the preceding paragraph and have concluded that the record simply does not warrant a grant of summary judgment in either party's favor. Were we instead to adopt plaintiff's second factual allegation -- that the officer passively watched the attack -- our conclusion would favor Candelaria. Thus, neither set of facts supports a grant of summary judgment for defendants. Accordingly, we deny defendants' motion on the deliberate-indifference claim.

### 3. Unsafe Dwelling: Cruel and Unusual Living Conditions
As a result of the fire in the nearby cell, plaintiff suffered smoke inhalation-related problems for which he sought treatment at the prison clinic. Plaintiff claims that defendants failed to provide him with adequate safety protection from a serious fire hazard, thus violating his Eighth Amendment rights. Defendants respond that plaintiff has once again made out a mere negligence claim.

Defendants no doubt have a duty to provide adequate fire safety for the inmates in Green Haven, including plaintiff. *See e.g., Ruiz v. Estelle,* 679 F.2d 1115, 1153, *vacated in part as moot,* 688 F.2d 266 (5th Cir. 1982), *cert. denied,* 460 U.S. 1042 (1983). Candelaria alleges a lack of useable fire protections at Green Haven. He states that there was neither an electronic cell locking system nor useable fire extinguishers. Pl. Mem. at 19. Defendants state that they had in place adequate fire safety measures. Defs. Rule 3(G) Stat. ¶ 13.

Case 9:18-cv-00990-TJM-TWD   Document 20   Filed 07/23/19   Page 79 of 79
Candelaria v. Coughlin, Not Reported in F.Supp. (1996)
1996 WL 88555, 7 NDLR P 466

Plaintiff responds that "while defendants maybe had adequate safety measures, the available estinguishers [sic] and other safety devises [sic] were not operable or usable on December 14, 1990." Plaintiff's Letter Dated July 27, 1995, ¶ 9.

Such dissension plainly reveals the existence of a genuine issue of material fact -- namely, whether defendants provided satisfactory fire safety measures. We are thus unable to grant summary judgment to either party on this issue.

### III.

### CONCLUSION

For all of the foregoing reasons, we deny defendants' motion for summary judgment in its entirety. Plaintiff's motion for summary judgment on the merits is denied and his motion for summary judgment on procedural grounds is moot.

**\*11**  The parties have sixty days in which to submit a pre-trial order. We mark the case ready for trial as of June 3, 1996.

SO ORDERED.

1    Plaintiff, a paraplegic, also claims that the level of his medical care violated the Americans with Disabilities Act of 1990 (ADA) and the Rehabilitation Act of 1973. The substance of this claim does not appear to differ from his constitutional claims, and as we are denying summary judgment, we will not specifically address this claim.

2    Plaintiff also moves to preclude a portion of defendants' motion for summary judgment. Plaintiff claims that because a prior motion by defendants to dismiss the medical claims was denied, defendants' motion for summary judgment on the medical claims is now precluded. Plaintiff's motion is addressed below, even though, in light of our holdings herein, it is moot.

3    As it appears from the Record that there was no clinic heating pad during this period, *see* Defs. Ex. 2, entry for June 9, 1990, we interpret defendants' claim as stating that plaintiff *would have been* allowed to use the clinic heating pad, as soon as one became available.

4    On January 5, 1995, by memorandum order, this Court declared that plaintiff's letter of December 12, 1994, sufficiently indicated the claims that plaintiff wished to pursue.

5    Presumably, defendants' *first* summary judgment motion was that made on September 27, 1991, seeking to dismiss the Complaint in Action II in its entirety.

6    Mere negligence is not actionable under 42 U.S.C. § 1983.

7    According to plaintiff, however, it was a doctor familiar with plaintiff's paraplegia who originally recommended the heating pad.

8    Plaintiff's claims have already survived a motion to dismiss. In our earlier opinion, we denied defendants' motion to dismiss plaintiff's medical claims, stating that "we cannot say that these claims do not constitute serious medical needs from someone in plaintiff's situation." *Candelaria,* 787 F. Supp. at 378.

9    Plaintiff also claims that defendants were in violation of their own policy requiring that a guard be present in the feed room. Am. Compl. at 4. Plaintiff has not, however, submitted a copy of this policy for the Record.

### All Citations

Not Reported in F.Supp., 1996 WL 88555, 7 NDLR P 466

---

End of Document                 © 2019 Thomson Reuters. No claim to original U.S. Government Works.